**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Amie Croteau, Thuy Daojensen, and Diane Thomas, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>TN Marketing, LLC d/b/a Craftsy,<br><br>Defendant. | Case No. 25-cv-00940 (PJS/ECW) |

**TN MARKETING, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT OR, ALTERNATIVELY, TO STAY AND COMPEL ARBITRATION**

Defendant TN Marketing, LLC d/b/a Craftsy ("**Craftsy**") respectfully submits this memorandum of law in support of its motion, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), to dismiss the Class Action Complaint ("**Compl.**"), Doc. 1, filed by Plaintiffs Amie Croteau, Thuy Daojensen, and Diane Thomas ("**Plaintiffs**") or, alternatively, to stay the action and compel individual arbitration pursuant to Sections 3 and 4 of the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* ("**FAA**") and the parties' binding agreement to arbitrate Plaintiffs' claims and class action waivers ("**Motion**").

**INTRODUCTION**

Craftsy operates a website offering live tutorials, instructional written content, video lessons, and a community forum on crafts, hobbies, and lifestyle topics to its members. Plaintiffs, former Craftsy members, bring this putative class action against Craftsy for

alleged violations of the Video Privacy Protection Act, 18 U.S.C. § 2710 (“**VPPA**”). Plaintiffs allege that, when they requested or viewed videos on Craftsy.com, a piece of programming code, called a Meta Pixel, caused their video-viewing information to be transmitted to Meta. Plaintiffs further allege that Meta—but no one else—is able to combine information transmitted by the Pixel to see who watched what video, and therefore Craftsy knowingly disclosed their personally identifiable information (“**PII**”) in violation of VPPA.

As a preliminary matter, Plaintiffs lack Article III standing and cannot maintain this lawsuit. First, none of Plaintiffs’ information was at any time made public; at most, Plaintiffs allege the private, business-to-business disclosure of information for private, analytical use by Meta. Plaintiffs, therefore, have not incurred the type of “publicity” harm akin to a common law injury needed to invoke this Court’s jurisdiction. Second, Plaintiff Croteau did not request or view any videos on Craftsy.com; therefore, her PII was not and could have been made public, and she therefore has not suffered an injury in fact.

The Complaint must also be dismissed with prejudice because Plaintiffs cannot state a claim under VPPA. First, Meta Pixels do not share PII as defined under VPPA: as the Second Circuit recently held, Meta Pixel data is not legible to or usable by an ordinary person, and therefore does not “identif[y] a person as having requested or obtained specific video materials” as required to support a VPPA claim. Second, Plaintiffs do not allege that their browsers, accounts, or profiles were configured such that any PII could be transmitted or derived by the Pixel. In addition, the Complaint does not contain any non-conclusory

allegations suggesting that Craftsy, as opposed to Meta itself, possessed or disclosed Plaintiffs' PII, or that Craftsy knowingly disclosed any PII to Meta.

Alternatively, Plaintiffs should be compelled to arbitrate their claims before JAMS. Each Plaintiff agreed to Craftsy's Terms of Service when purchasing a membership through the Website, which contained an express and conspicuous arbitration provision mandating arbitration of all disputes, including this one.

## FACTUAL BACKGROUND

### A. The Parties

Plaintiffs allege that Craftsy "operates and maintains the website Craftsy.com," which offers video lessons to members "related to crafting, cooking, baking, knitting, sewing, painting, and drawing, among other topics." Compl. ¶ 32. Plaintiffs each purchased a membership with Craftsy through its website, Craftsy.com ("**Website**" or "**Craftsy.com**").

- Plaintiff Thomas purchased a membership on January 9, 2021, which she renewed repeatedly on both annual and monthly bases through March 17, 2025.
- Plaintiff DaoJensen purchased an annual membership on November 1, 2023, which she maintained through November 2, 2024.
- Plaintiff Croteau purchased an annual membership on December 12, 2023, which she maintained through December 14, 2024.

Exhibit 1, Jay McNaughton Decl. ("Decl.") at ¶ 6[1]; *see also* Compl. ¶¶ 9, 17, 25 (asserting similar membership dates). Plaintiffs contend they used their respective memberships to watch pre-recorded videos on the Website. Compl. ¶¶ 11, 19, 26. Craftsy's internal

[1] The Declaration of Jay McNaughton, Craftsy's Chief Marketing Officer, along with a version of Craftsy's Terms of Service, is attached as Ex. 1.

membership data, which is not generated by and does not involve the use of a Meta Pixel, and which is not used outside Craftsy, shows that Amy Croteau never viewed a video on the Website. Ex., 1, Decl. ¶ 3.

Conspicuously missing from the Complaint are any allegations related to the browser, account, profile, or device configurations through which they allegedly viewed videos on the Website. Nor do Plaintiffs allege that they were logged into their Meta accounts when viewing any alleged video, or even that they used the same browsers or device while watching videos on Craftsy.com.

## B. Plaintiffs' Conclusory Allegations

Plaintiffs allege that Craftsy installed a "programming code" called the Meta Pixel ("**Pixel**") on its Website. Compl. ¶¶ 2, 3. The Pixel is developed by Meta as a marketing tool to improve Meta's ad offerings. *Id.* ¶¶ 61, 64. According to Plaintiffs, the Pixel transmits data that Meta can use to identify a "Meta profile" and associate it with video-watching data. *Id.* ¶¶ 3, 67, 68, 70. Specifically, they contend the Pixel transmits to Meta the "specific title of the video[s]" they "requested and obtained" in the form of the Website "URL" accessed and the user's "FID." *Id.* ¶¶ 12, 13, 20, 21, 27, 28. Plaintiffs also assert that the Pixel "disclosed to Meta information concerning the device Plaintiff[s] used to request and obtain the video," but fail to explain how this data is relevant to identifying either the individual or their viewing behavior.

According to the Complaint, Meta uses the Pixel to "amass a vast digital database of dossiers comprised of highly detailed personally identifying information about each of its billions of users worldwide, including information about all of its users' interactions

with any of the millions of websites across the Internet on which the Meta Pixel is installed." Compl. ¶ 64. Meta "monetizes" this data to advertisers to "serve highly targeted advertisements." Compl. ¶ 64.

Critically, however, Plaintiffs' allegations are limited to Meta. Plaintiffs never allege that any other entity—let alone an ordinary person—could understand the data captured by the Pixel. Nor do Plaintiffs allege that an ordinary person could somehow use or even access any data captured or transmitted by the Pixel. Instead, Plaintiffs plead that Pixel activity occurs at the "code" level. Compl. ¶¶ 61, 88. Further, Plaintiffs allege that PII is controlled, collected, and transmitted by Meta to Meta via the Pixel so that only Meta can send Plaintiffs targeted ads. *Id.* ¶¶ 61-64. In addition, the Complaint pleads that it is Meta that has amassed a "dossier" and Meta is the one that matches event data with profile identifiers. Compl. ¶¶ 63.

Plaintiffs nonetheless allege that Craftsy (not Meta) violated VPPA. On this basis, Plaintiffs seek to represent a nationwide class of all persons "who requested or obtained a subscription to Defendant's website or video content from Defendant's website while maintaining an account with Meta" and seek statutory penalties under 18 U.S.C. § 2710(c) on their behalf. Compl. ¶ 75 and Prayer For Relief.

### C. Plaintiffs Agreement to Arbitrate Any Disputes With Craftsy Through Binding Arbitration.

All Craftsy members must agree to Craftsy's Terms of Service ("**Terms**") in order to purchase a Craftsy membership. Decl. ¶ 8. The Craftsy.com membership sign-up process has been materially the same since 2021. *Id*. In order to purchase a membership, individuals

must complete their order by submitting payment information via Craftsy.com's checkout page. *Id*. The checkout page, a screenshot of which is below, advised that that by completing the order, individuals were agreeing to Craftsy's terms of service and privacy policy. *Id*.




Directly underneath the "COMPLETE ORDER" button, lettering approximately the same font as all others in the form, the purchasing member is informed that "By completing my order, I agree to Membership with automatic renewal, the terms of service and privacy policy." Decl. ¶ 8. "[T]erms of service" is presented in a conspicuously different, bright orange color and hyperlinks to Craftsy's Terms. *Id*.

The Terms of Service begin by informing members that they constitute an agreement between the member and Craftsy that "sets forth the legally binding terms for your use of our websites." Decl. ¶ 9; Ex. 1, p. 1. Members also agree to Craftsy's operative Terms of Service every time they "access or use" the Website. Decl. ¶ 9; Ex. 1, p. 2.

Members are further told to discontinue using the Website if they do not agree to the Terms of Service. *Id.*

By agreeing to Craftsy's Terms of Service, members also agree to individually arbitrate all disputes between the parties, including all claims arising out of their use of the Website. Decl. ¶ 10. At the very top of the Terms,[2] in bold and capitalized lettering, there is an "**Arbitration Notice and Class Action Waiver**" which states: "you agree that disputes between you and us will be resolved by binding individual arbitration and you waive your right to participate in a class action lawsuit." *Id.* ¶ 10 (capitalization removed).

A Quick Link within the Terms of Service sends members directly to the section **ARBITRATION / DISPUTE RESOLUTION FOR U.S. RESIDENTS** (*id.* ¶¶ 11-13), which provides:

> **Limitation of Legal Remedies; Arbitration.** If there is a Dispute that remains unresolved after mediation, INSTEAD OF SUING IN COURT, YOU AND TNM EACH AGREE TO THE FULLEST EXTENT PERMITTED BY LAW TO ARBITRATE DISPUTES THROUGH BINDING ARBITRATION PURSUANT TO THE JAMS ARBITRATION RULES AND PROCEDURES, ON AN INDIVIDUAL BASIS, WITHOUT CLASS RELIEF, EXCEPT FOR DISPUTES PERTAINING TO TNM's INTELLECTUAL PROPERTY RIGHTS AND STATUTORY CLAIMS THAT PURSUANT TO LAW ARE NOT ARBITRABLE. This agreement to arbitrate is intended to be broadly interpreted. It includes claims based in contract, tort, statute, fraud, misrepresentation or any other legal theory ("Claim(s)"). The arbitrator's decision and award are final and binding, with some exceptions under the Federal Arbitration Act, 9 U.S.C. 1, et seq., and judgment on the award may be entered in any court with jurisdiction.

---

[2] The cited language is from Craftsy's Terms of Service, effective November 17, 2023. Along with the Arbitration/Dispute Resolution provisions quoted on pp. 7-8, the language has remained relatively unchanged. Decl. ¶ 14.

The Terms further provide in capitalized letters, that the parties "each voluntarily waive the right to a trial by jury in resolving any dispute between us arising out of these terms or the sites or services," and that "each agree that claims against the other may only be brought in an individual capacity and not in a class action or representative proceeding." Decl. ¶ 13 (capitalization omitted). The Arbitration/Dispute Resolution provisions applicable from 2023 also contain an opt-out section, which allows members to exclude themselves from the agreement to arbitrate by sending Craftsy a letter. Decl. ¶ 15. Craftsy's records do not indicate that any of the Plaintiffs submitted an opt-out letter. *Id.*

## LEGAL STANDARD

### A. Standard Applicable to a Rule 12(b)(1) Motion to Dismiss

Challenges to a plaintiff's Article III standing implicate the court's subject matter jurisdiction and are analyzed under Federal Rule of Civil Procedure 12(b)(1). *Mekhail v. N. Mem'l Health Care*, 726 F. Supp. 3d 916, 931 (D. Minn. 2024). A defendant may raise either a "facial" or a "factual" challenge to a court's jurisdiction under Rule 12(b)(1). *Scott v. UnitedHealth Grp., Inc.*, 540 F. Supp. 3d 857, 861 (D. Minn. 2021). On a facial challenge "the court restricts itself to the face of the pleadings." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (citation omitted). By contrast, "[i]n a factual attack, the court considers matters outside the pleadings." *Id.* (citation omitted). This includes "testimony and affidavits." *Ozark Society v. Melcher*, 229 F. Supp. 2d 896, 903 (E.D. Ark. 2002). Importantly, "no presumptive truthfulness attaches to the plaintiff's allegations," and "the plaintiff bears the burden of proving that jurisdiction exists." *Id.*

## B. Standard Applicable to a Rule 12(b)(6) Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), the complaint must "contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiffs must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. The Complaint's factual allegations "must be enough to raise a right to relief above the speculative level." *Id.* (citations omitted). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully" or "more than a mere possibility of misconduct." *Wilson v. Arkansas Dep't of Hum. Servs.*, 850 F.3d 368, 371 (8th Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678-79). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. *Iqbal*, 556 U.S. at 678. (citation omitted).

## C. Standard Applicable to a Motion to Compel Arbitration

Pursuant to the Federal Arbitration Act (the "FAA"), "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. There is "liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). "As a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *PRM Energy Sys., Inc. v. Primenergy, L.L.C.*, 592 F.3d 830, 836 (8th Cir. 2010) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)).

Courts apply a two-part test to motions to compel arbitration. *Ballou v. Asset Mktg. Servs., LLC*, 46 F.4th 844, 851 (8th Cir. 2022). First, the court assesses "whether a valid agreement to arbitrate exists." *Id.* Second, the Court "consider[s] the scope of the agreement." *Id.* (*citing United Steelworkers of Am., AFL-CIO-CLC v. Duluth Clinic, Ltd.*, 413 F.3d 786, 788 (8th Cir. 2005)). "A court must grant a motion to compel arbitration if a valid arbitration clause exists which encompasses the dispute between the parties." *3M Co. v. Amtex Sec., Inc.*, 542 F.3d 1193, 1198 (8th Cir. 2008).

## ARGUMENT

## I. PLAINTIFFS LACK ARTICLE III STANDING.

### A. Plaintiffs Cannot Demonstrate a Concrete Injury to Any Privacy Interest By the Alleged Private, Business-to-Business Disclosure of their PII to Meta.

The Complaint should be dismissed for lack of standing because there was no public disclosure of Plaintiffs' PII. To demonstrate standing, a plaintiff must establish three elements: (1) she has suffered an injury in fact; (2) the injury is "fairly traceable to the challenged conduct of the defendant"; and (3) the injury is "likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). This means that each named Plaintiff at a minimum "must allege and show that they personally have been injured." *Id.* at 338 n.6.

Article III requires the plaintiff to allege an injury with "close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms." *Bassett v. Credit Bureau Servs., Inc.*, 60 F.4th 1132, 1135 (8th Cir. 2023) (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021)). Hence, to assert a statutory claim, a plaintiff must establish that he

has experienced a concrete injury with "a close historical or common-law analogue," such as "reputational harms, disclosure of private information, and intrusion upon seclusion." *TransUnion*, 594 U.S. at 425.

In the context of VPPA, the "analogue" injury is the "public disclosure of private facts." *Salazar v. Nat'l Basketball Ass'n,* 118 F.4th 533, 540-541 (2d Cir. 2024). VPPA "codifies a context-specific extension of the *substantive* right to privacy," intended to address "a video clerk leaking an individual customer's video rental history." *See Eichenberger v. ESPN, Inc*., 876 F.3d 979, 983 (9th Cir. 2017); *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 290 (3d Cir. 2016). Put differently, Congress enacted VPPA to keep individuals' choice of films and television to watch private. *See* S. Rep. No. 100-599, at 5 ("[I]t is nobody's business what Robert Bork…watch[es] on television…."). "Every step away from that 1988 paradigm will make it harder for a plaintiff to make out a successful claim." *In re Nickelodeon*, 827 F.3d at 290.

Here, Plaintiffs allege that Craftsy, an online website, installed a Pixel on its Website and thereby caused Meta—a sophisticated technology company—to obtain Plaintiffs' PII. Plaintiffs do not, however, allege that their PII was or could have been exposed publicly as a result of this nominal, business-to-business disclosure. *See e.g., Braitberg v. Charter Commc'ns, Inc.*, 836 F.3d 925, 930–31 (8th Cir. 2016) (dismissing statutory privacy claim for lack of standing where plaintiff alleged that defendant unlawfully retained his PII but there was "no material risk of harm from the retention"). But such a "bare procedural violation" which is devoid of any "concrete harm" is insufficient for Article III purposes. *See Braitberg*, 836 F.3d at 930–31. Indeed, applying

*Spokeo* and its progeny, the Third, Seventh, Tenth, and Eleventh Circuits have all held that consumers cannot bring federal statutory claims challenging private, business-to-business disclosures, as no injury to a privacy interest results. *See Barclift v. Key-stone Credit Services, LLC*, 93 F.4th 136, 145-6 (3d Cir. 2024); *Nabozny v. Optio Solutions LLC*, 84 F.4th 731, 736-7 (7th Cir. 2023); *Shields v. Professional Bureau of Collections of Maryland, Inc.*, 55 F.4th 823, 829 (10th Cir. 2022); *Hunstein v. Preferred Collection & Management Services, Inc.*, 48 F.4th 1236, 1245 (11th Cir. 2022) (*en banc*).[3] These courts agree that business-to-business data disclosures are not public, and thus do not cause the kind of concrete harm Article III requires.

Here, according to Plaintiffs' own allegations, the Pixel transmitted data only to Meta—a sophisticated technology company—where it remained private and used solely for the purposes of "targeted advertising and other informational and analytical services offered by Meta." Compl. ¶¶ 68. There are no allegations at all to suggest that the data was made public. Therefore, Plaintiff's allegations are missing the "essential" publicity element necessary to establish a concrete injury to pursue a claim under VPPA. *TransUnion*, 594 U.S. at 434 & n.6.

[3] The Second Circuit reached the opposite conclusion in *Salazar v. Nat'l Basketball Ass'n,* 118 F.4th 533, 545 (2d Cir. 2024). However, on March 14, 2025, defendant NBA filed a Petition for a Writ of Certiorari in the U.S. Supreme Court seeking review of this holding. *Nat'l Basketball Ass'n v. Salazar*, Case No. 24-994 (Pet. Writ Cert. Mar. 14, 2025). Salazar's response to the petition is currently due by July 1, 2025. Craftsy reserves the right to seek a stay of this action should cert be accepted in *Salazar*.

### B. Plaintiff Croteau Never Requested or Viewed a Video, and Therefore Could Not Have Suffered An Injury to Non-Extant Private Information.

Plaintiff Croteau cannot have suffered a privacy-related injury for a simple reason: she never viewed a video on the Website. Ex. 1, Decl. ¶ 7. Plaintiffs' claimed injury stems from their allegations that Craftsy actively collected and transmitted their video viewing history to Meta through the Pixel when they watched videos on Craftsy.com. Compl. ¶¶ 7-14. Put differently, Plaintiffs' alleged injury is the sharing of video-watching behavior. But setting aside the merits, *Plaintiff Croteau never requested videos from or viewed videos on Craftsy.com*. Decl. ¶ 7. As such, Plaintiff Croteau never triggered the Pixel as alleged and, more to the point, has no video watching behavior to share. She therefore has suffered no injury and lacks standing to bring a claim for any alleged disclosures of information that never existed. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 566-67 (1992); *Finneman v. Laidlaw*, 57 F.4th 605, 607 (8th Cir. 2023) ("[Plaintiffs] do not have standing because they have not suffered an injury in fact that would likely be redressed by judicial relief.").

## II. PLAINTIFFS FAIL TO STATE A CLAIM UNDER VPPA.

The Complaint should be dismissed with prejudice because Plaintiffs have not and cannot plausibly alleged a VPPA violation. To plead a claim under VPPA, a plaintiff must plausibly allege that: "(1) a defendant is a 'video tape service provider,' (2) the defendant disclosed 'personally identifiable information concerning any [consumer]' to 'any person,' (3) the disclosure was made knowingly, and (4) the disclosure was not authorized by Section 2710(b)(2)." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015) (citing 18 U.S.C. § 2710(b)). As discussed below: (1) Meta Pixels do not transmit PII; (2) the PII

allegedly disclosed lacked identifying information; (3) Craftsy did not possess or disclose Plaintiffs' PII; and (4) any disclosure by Craftsy was not done knowingly.

**A. Pixels Do Not Transmit "Personally Identifiable Information."**

Data transmitted through Meta Pixel technology does not qualify as PII under VPPA. *See Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 52 (2d Cir. 2025). To qualify as PII under VPPA, a disclosure must "identif[y] a person as having requested or obtained specific video materials" from a "video tape service provider." 18 U.S.C. § 2710(a)(3). Stated differently, the information must "readily permit an ordinary person to identify a specific individual's video-watching behavior." *Solomon*, 136 F.4th 41, 49 (2d Cir. 2025); *accord Eichenberger*, 876 F.3d at 986; *In re Nickelodeon*, 827 F.3d at 290. Accordingly, it is irrelevant that a sophisticated technology company, like Meta, could extract data; rather, the plaintiff must allege facts sufficient to plausibly infer that an ordinary person, "*with little or no extra effort*," can understand the data to "identify [plaintiff's] video-watching habits." *Solomon*, 136 F.4th at 54 (emphasis added) (explaining that courts must be guided by the "classic example" of "a video clerk leaking an individual customer's video rental history.").

This follows from "the words of the statute, the specific context in which the language is used, and the broader context of the statute as a whole." *Solomon*, 136 F.4th at 52. VPPA is a penal statute which targets "knowing" violations; it "does not make sense" that the recipient's "level of sophistication" would control. *Id.* at 53. An "ordinary person" standard "better informs [defendants] of their obligations." *Id.* at 50. VPPA is also a "limited" statute, and Congress has repeatedly chosen to keep its scope narrow. *Id.* at 53

(noting that, when updating VPPA in 2013, Congress chose not to broaden the definition of PII to capture Internet technologies, even "in the face of testimony asking" for one).[4] Given this context and history, it is irrelevant whether a sophisticated third party can "assemble otherwise anonymous pieces of data to unmask the identity of individual [users]"; rather, in assessing whether VPPA applies to a disclosure, courts must be guided by the "classic example" of "a video clerk leaking an individual customer's video rental history." *Id.* at 54 (quoting *In re Nickelodeon*, 827 F.3d at 290).

Applying this standard, the Second Circuit recently held it to be "implausible" that a Meta Pixel could transmit PII as contemplated by VPPA. In *Solomon v. Flipps Media, Inc.*, the plaintiff asserted a VPPA claim on a similar theory asserted here: that whenever she viewed a video on defendant's website, a Meta Pixel transmitted the URL and her Meta ID in the form of "PageView" and "c_user" cookie data. *Id.* at 45. The plaintiff claimed that since one's "viewing history" can be derived by Meta from a URL and Meta ID, the Pixel use violated VPPA. *Id.* at 46. The Second Circuit disagreed, finding it "implausible" that an "ordinary person" could derive video-watching information captured by the Pixel. *Id.* at 54. Specifically, the Second Circuit held "it is not plausible that an ordinary person" would: (i) identify the relevant information "interspersed with many characters, numbers, and letters"; (ii) understand that information to contain a "video title"; (iii) know that a

[4] By contrast, in enacting the Children's Online Privacy Protection Act, Congress chose to include in the definition of "personal information," *inter alia,* "any other identifier that the [Federal Trade Commission] determines permits the physical or online contacting of a specific individual" and/or "information concerning the child or the parents of that child that the website collects online from the child and combines with an identifier described in this paragraph." *Solomon*, 136 F.4th at 53.

"c_user" cookie reflects a person's Meta ID; or (iv) know how to use this information to identify the individual. *Id.* at 54 (rejecting as conclusory plaintiff's allegation that entering "facebook.com/[Solomon's FID]" to reach an individual's profile "is generally and widely known among the public"). The allegations were so thin, the court noted, plaintiff could not even allege "how an ordinary person might access the information on the Pixel's PageView." *Id.* It could not be, therefore, that the "video-watching" information buried in Pixel-transmitted data qualified as PII under VPPA. *Id.* at 54.

Here, as in *Solomon*, Plaintiffs fail to allege in any non-conclusory manner how an ordinary person could, "with little or no extra effort," identify them or their "video-watching habits" from Pixel-transmitted data. *Id.* at 54; *accord In re Nickelodeon*, 827 F.3d at 284. Nor can they. According to Plaintiffs' own allegations, Meta (not Craftsy) created the Pixel and is the only entity that collects, combines, controls, or maintains Pixel data. Compl. ¶¶ 61-64; *see also Solomon*, 136 F.4th at 45 ("only Facebook's servers can access" Pixel-embedded identifying data). Nor do Plaintiffs plead how anyone other than Meta could understand the depersonalized data captured, focusing instead on the "Orwellian database" and analytical tools necessary for Meta to make any sense of the Pixel data allegedly transmitted. Compl. ¶ 64. At most, Plaintiffs assert that an "ordinary person" can identify a user's Facebook profile by "[e]ntering "facebook.com/[FID]" into a web browser (*id.* ¶ 69), but any inference that an "ordinary person" knows of this URL-level tool is purely speculative. *Solomon*, 136 F.4th at 54 (rejecting as conclusory plaintiff's allegation that entering "facebook.com/[Solomon's FID]" to reach an individual's profile "is generally and widely known among the public"). As in *Solomon*, Plaintiffs' allegations fail

the simple requirement of pleading *plausible* facts sufficient to infer any person—other Meta itself—could make heads or tails of the data allegedly transmitted, let alone decipher any specific individual's video-watching behavior from its code. *See In re Nickelodeon,* 827 F.3d at 283 ("To an average person, an IP address or a digital code in a cookie file would likely be of little help in trying to identify an actual person.").

### B. Plaintiffs Allegations Are Insufficient to Infer They May Be Identified from Their Pixel Data.

Moreover, Plaintiffs fail to allege information sufficient to infer that even Meta, let alone anyone else, could identify them from the allegedly transmitted data. Plaintiffs do not, for example, allege that their browsers, accounts, cookie settings, or profiles were configured such that PII could be sent in the manner otherwise alleged. This is not small oversight, as Pixels only transmit identifying information if certain user-level requirements are met. *See, e.g.*, *Martinez v. D2C, LLC*, 2024 WL 4367406, at *7 (S.D. Fla. Oct. 1, 2024) (identifying factors to be met for Meta Pixel to cause transmission to Meta); *Feldman v. Star Trib. Media Co. LLC*, 659 F.Supp.3d 1006, 1021 (D. Minn. Mar. 7, 2023) (explaining that plaintiffs plausibly alleged disclosure where plaintiff alleged that he watched videos on defendant's website "using the same device and/or browser in which he is logged into his Facebook account.").

Further, there are no allegations at all as to whether Plaintiffs' profiles were public or that the public profiles contained any personal identifying information. *See Smith v. Trinity Broad. of Tex., Inc.*, No. 8:24-cv-01046, 2024 WL 4394557, at *3 (C.D. Cal. Sept. 27, 2024) (dismissing VPPA claim where plaintiff failed to allege "that her profile [was]

public and contain[ed] any identifying information."). In the absence of such allegations, "the complaint does not adequately allege that [disclosure of Plaintiffs' Facebook IDs] result[s] in the sharing of any personal information." *Ghanaat v. Numerade Labs, Inc.,* 689 F. Supp. 3d 714, 720 (N.D. Cal. 2023). Plaintiffs otherwise bald allegations that the Pixel must nonetheless have transmitted their PII are simply insufficient to "nudge[] [the] claims across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570.

**C. Craftsy Did Not Possess or Disclose Plaintiffs' PII.**

To state a claim under VPPA, Plaintiffs must allege that Craftsy possessed and disclosed their PII. *See Eichenberger*, 876 F.3d at 986 (rejecting VPPA claim where defendant never possessed the information necessary to identify plaintiff); *see M.K. v. Google LLC,* No. 21-cv-08465-VKD, 2023 U.S. Dist. LEXIS 51895, *8 (C.D. Cal. Mar. 27, 2023) (dismissing VPPA claim where there were "no facts linking [] allegations to [the plaintiff], much less identifying what 'personally identifiable information' Google allegedly disclosed, or *to whom* such information was disclosed."); *Chutich v. Green Tree Acceptance, Inc.*, 1993 WL 173813, at *9 (D. Minn. Apr. 19, 1993) ("[A] corporation cannot disclose what it does not know…."). Here, there are no factual allegations suggesting that it was Craftsy that possessed or disclosed Plaintiffs' PII. Instead, the Complaint alleges that the Pixel, and any PII allegedly transmitted, were owned and controlled by Meta, not Craftsy. *See* Compl. ¶ 61 ("The Meta Pixel… is a unique string of code that companies can embed on their websites to allow them to track consumers' actions and report the actions back to Meta."); *id.* ¶ 63 (stating that the Pixel allows Meta to "match . . . website visitors to their respective [Meta] User accounts"); *id.* ¶ 64 ("Meta has used

the Meta Pixel to amass a vast digital database of dossiers comprised of highly detailed personally identifying information about each of its billions of users worldwide, … Meta then monetizes this Orwellian database by selling advertisers the ability to serve highly targeted advertisements to the persons whose personal information is contained within it."). It is thus Meta who places cookies on an individual's browsers and receives the information from them. *See e.g.*, *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 948 (N.D. Cal. 2017) ("Facebook puts cookies on visitors' computers."); *aff'd*, 745 F. App'x 8 (9th Cir. 2018); *In re Hulu Priv. Litig.*, No. C 11-03764, 2014 WL 2758598, at *5 (N.D. Cal. June 17, 2014) ("Facebook sets the c_user cookie."). Any transmission here, was one from Meta to itself. *See e.g.*, *Austin-Spearman v. AMC Network Ent. LLC*, 98 F. Supp. 3d 662, 664 (S.D.N.Y. 2015) ("In particular, through its 'c_user' cookie, Facebook's code allegedly forces a user's web browser to look for the user's Facebook ID.").

Indeed, Meta's "Cookie Policy"[5] confirms that cookies are small pieces of text used to store information on web browsers. *Id.* The cookie "just sits on the browser and gets sent along with information that would otherwise be sent." *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 142 (3d Cir. 2015); *see also In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1093–94 n.3 (N.D. Cal. 2015) ("A 'cookie' is a file on a user's computer."). When a Pixel is triggered, Meta *pulls* information from the user's browser, and not from Craftsy. *See, e.g., Austin-Spearman*, 98 F. Supp. 3d at 664 ("[T]hrough its 'c_user' cookie, Facebook's code allegedly forces a user's web browser to look for the

[5] *See* Meta Cookies Policy, https://www.facebook.com/policies/cookies/.

user's Facebook ID."); *accord Buechler v. Gannett Co., Inc.*, No. 22-1464, 2023 WL 6389447, at *4 (D. Del. Oct. 2, 2023) (dismissing VPPA claim as "the subscriber-users themselves and/or Facebook—not [defendant]—implement the 'Tracking Methods'…that result in the disclosure of Plaintiffs' PII and Video Watching Data to Facebook"); *see also Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066–67 (9th Cir. 2015) (rejecting VPPA claim where the alleged disclosure of PII to third parties resulted from the plaintiffs' own decision to give those parties access to their Netflix accounts). Thus, to the extent any PII was disclosed, it was captured from and transmitted by Plaintiffs' browsers, not Craftsy.

Plaintiffs nonetheless claim that Craftsy is liable because the Website contains "a string of code" that caused a third-party to access their PII. Compl. ¶ 61. Such a contention is belied by the Complaint, which alleges that Meta owns and controls the Pixel and uses its "Orwellian database" to "amass" and connect the PII collected by the Pixel. Compl. ¶ 61. Nor is the argument supported by the plain language of VPPA. VPPA imposes liability only on a party that actually "discloses" PII, not a party that contributed or caused a risk of disclosure. Indeed, when Congress wants to prohibit "causing" a disclosure, it indicates so expressly. *See, e.g.*, 15 U.S.C. § 6821 (prohibiting any person to obtain or "cause to be disclosed or attempt to cause. . . customer information of a financial institution"); *see* 10 U.S.C. § 949p-5 ("accused reasonably expects to disclose, or to cause the disclosure of, classified information…".) It did not use such language here, as it was not concerned with such disclosures when it passed VPPA[6]. When interpreting statutory language, courts must

[6] VPPA is a penal statute codified under Title 18 of the U.S. Code ("Crimes and Criminal Procedure"). 18 U.S.C. § 2710(b). It was enacted when "a video clerk leak[ed] an

give effect to the textual language used in the statute. *Griffith v. Steiner Williamsburg, LLC*, 760 F. Supp. 2d 345, 355 (S.D.N.Y. 2010). This is particularly true for penal statutes, such as VPPA, where "it is appropriate to apply the rule of lenity in resolving any ambiguity in the ambit of the statute's coverage." *Crandon v. United States*, 494 U.S. 152, 158 (1990); *see also Cenveo, Inc. v. Rao*, 659 F. Supp. 2d 312, 316 n.3 (D. Conn. 2009) (noting rule of lenity applies to civil action brought under Title 18). Absent allegations that Craftsy disclosed their PII, Plaintiffs' VPPA claim fails.

**D. Craftsy Did Not "Knowingly" Disclose PII to Meta.**

Plaintiffs also fail to allege any disclosure by Craftsy was made "knowingly." "Knowingly" means "actual knowledge" and "consciousness of transmitting the private information." *In re Hulu Priv. Litig.*, 86 F. Supp. 3d at 1095. "It does not merely mean transmitting the code," and "[i]t is not enough…that a disclosure be merely voluntary in the minimal sense of the defendant's being aware of what he or she is doing[.]" *Id.* (citation omitted).

Here, Plaintiffs fail to allege that Craftsy knowingly transmitted any PII or that it was conscious of transmitting the PII. First, as discussed above, Craftsy does not receive, collect, transmit or have access to any data captured by the Pixel. And the mere fact that Craftsy "installed" the Pixel which allegedly caused Plaintiffs' web browser to transfer Plaintiffs' PII is insufficient. Compl. ¶ 3. Contributing to a disclosure, without more, does

---

individual customer's video rental history," and "was not intended to create liability where a third party is able to "assemble otherwise anonymous pieces of data to unmask the identity of individual [users]." *Solomon*, 136 F.4th at 54.

not equate to knowledge. Indeed, VPPA "views disclosure from the perspective of the disclosing party" and not from "what the recipient of that information decides to do with it." *Solomon*, 136 F.4th at 51. "If [the defendant] did not think it was conveying PII, then there could be no knowledge of the conveyance, regardless of whether it knew what Facebook might do with the information." *See e.g.*, *Bernardino v. Barnes & Noble Booksellers, Inc*., 2017 WL 3727230, at *8 (S.D.N.Y. Aug. 11, 2017). Here, there are no allegations at all that Craftsy created, controlled, or could access the information collected by the Pixel and thus it could not have known what information the Pixel was collecting to transmitting.

Further, given the technology at issue, Craftsy *could not* know whether Plaintiffs' PII was even disclosed. As the court explained in *Martinez v. D2C, LLC*, several conditions must be met for a Pixel to transmit identifying information to Meta. 2024 WL 4367406, at *7 (S.D. Fla. Oct. 1, 2024). Specifically, and among other things, a user must concurrently:

1. have a Meta account;
2. be logged into his Meta account;
3. be logged into Meta on the same device;
4. be logged into Meta using the same browser;
5. use a browser that does not block Pixels by default;
6. not have deployed any number of browser settings that block Pixels or cookies; and
7. not have deployed any number of add-on software that block Pixels or cookies.

*Id.* at *7–8. Here, Plaintiffs do not make any allegations that there were logged into Meta while on Craftsy.com, that they use a browser that permits Pixels, and whether or not they

use software that blocks Pixels or cookies. Craftsy cannot know these conditions for any given user, and, thus, it would be impossible for Craftsy to have knowledge of any resulting disclosure.

## III. PLAINTIFFS MUST ARBITRATE THEIR CLAIMS

The Court should compel Plaintiffs to arbitrate their VPPA claims before JAMS because they are each bound by the Terms, which expressly provide for mandatory arbitration and contain a class action waiver.

### A. Plaintiffs Entered Into A Binding And Enforceable Agreement To Arbitrate.

In addressing a motion to compel arbitration, a court must first determine whether the parties formed a valid agreement to arbitrate. *See Acuity Ins. v. Vivint Inc.*, 2023 WL 4186303, at *2 (D. Minn. June 26, 2023) (citing *Pro Tech Indus., Inc. v. URS Corp.*, 377 F.3d 868, 871 (8th Cir. 2004)).

State contract law governs whether a valid agreement to arbitrate exists. *See Triplet v. Menard, Inc.*, 42 F.4th 868, 871 (8th Cir. 2022). Here, pursuant to the Terms, Minnesota law applies. *See* Decl., Ex. 1 ("These Terms shall be governed by and construed in accordance with the laws of the State of Minnesota without application of conflict of laws rules"). Under Minnesota law, where the language of a contract is plain and unambiguous, the agreement is enforced as written. *See Placzek v. Mayo Clinic*, 18 F.4th 1010, 1018 (8th Cir. 2021); *see also Commer. Assocs. v. Work Connection*, 712 N.W.2d 772, 782 (Minn. Ct. App. 2006) ("Whether a contract is formed is judged by the objective conduct of the parties and not their subjective intent."). Parties are deemed to form a contract where there

is "offer, acceptance, and consideration." *Commer. Assocs. v. Work Connection*, 712 N.W.2d at 782.

Minnesota law recognizes a "clickwrap" agreement as a legitimate and enforceable form of contract. *See e.g.*, *Siebert v. Amateur Athletic Union of U.S., Inc*., 422 F. Supp. 2d 1033, 1039-40 (D. Minn. 2006); *Rasschaert v. Frontier Commc'ns Corp*., No. CIV. 12-3108 DWF/JSM, 2013 WL 1149549, at *6 (D. Minn. Mar. 19, 2013) (stating that most courts have upheld arbitration clauses in clickwrap contracts). This is because, unlike other forms of web-based agreements, a "clickwrap" agreement "requires the user to explicitly assent by clicking 'I agree' (or something similar) before using the website or purchasing a product." *Foster v. Walmart, Inc*., 15 F.4th 860, 863 (8th Cir. 2021) (citation omitted). The action of clicking "represents assent to the contract, including the arbitration clause." *Siebert*, 422 F. Supp. 2d at 1039-40.

Courts routinely enforce website arbitration terms presented in an identical manner in the privacy class action context. *See e.g.*, *Sarhadi v. Pear Health Labs, Inc.*, No. 24-cv-07921-TLT, 2025 WL 1350033, at *2 (N.D. Cal. Apr 18, 2025) (compelling arbitration in a VPPA action where plaintiff had received a notice above a "Join" button that read: "By joining Aaptiv, you agree to our Terms of Service."); *Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 930 (N.D. Cal. 2024) (same, where plaintiffs were presented the hyperlinked operative terms below a "Sign Up" button); *Falcon v. TelevisaUnivision Digital, Inc.*, No. 8:23-cv-2340-TPB

UAM, 2024 WL 1492831, at *4 (M.D. Fla. Mar. 29, 2024) (same); *Bernardino v. Barnes & Noble Booksellers, Inc.*, No. 17-CV-04570(LAK)(KHP), 2017 WL 7309893, at *6

(S.D.N.Y. Nov. 20, 2017), *report and recommendation adopted*, 2018 WL 671258 (S.D.N.Y. Jan. 31, 2018) (same): *Miracle Pond v. Shutterfly, Inc.*, 2020 WL 2513099, at *4 (N.D. Ill. 2020) (compelling arbitration in a BIPA class action).

As discussed above, prior to opening an account on Craftsy.com, Plaintiffs were provided with a clear notice that "By completing my order, I agree to Membership with automatic renewal, the terms of service and privacy policy." Ex. 1, Decl. ¶ 8. Through the hyperlinked (via bright orange print) Terms of Service, Plaintiffs and Craftsy formed a binding agreement to individually arbitrate their claims. Ex. 1, Decl. ¶¶ 8-10. And they renewed that agreement each time they accessed the Website. *Id.* ¶ 9. The Terms expressly provide that all disputes, including those based on statute, are to be resolved "through binding arbitration pursuant to the JAMS arbitration rules" on an individual basis. Decl. ¶ 13 (capitalization removed). Furthermore, Plaintiffs waived any right to "commenc[e] any legal proceedings as a representative of others," including in a class action. Decl. ¶ 13. Craftsy's Arbitration/Dispute Resolution provisions have remained relatively unchanged since 2021. Decl. ¶ 14. None of the Plaintiffs ever took advantage of the 2023 provision allowing them to opt-out of arbitration. Decl. ¶ 14, 15. Terms govern even if Plaintiffs failed to read them. *Siebert*, 422 F. Supp. 2d at 1039.

This clear and unambiguous language creates a valid and binding agreement to arbitrate. *See Acuity*, 2023 WL 4186303, at *3 (finding an arbitration clause valid where its language was clear, unambiguous and mandatory); *McMurray v. AT&T Mobility Servs., LLC*, 2021 WL 3293540, at *6 (D. Minn. Aug. 2, 2021) (finding an unsigned arbitration agreement enforceable where there was valid offer, acceptance, and consideration). As

such, Plaintiffs entered into a valid and enforceable agreement to individually arbitrate any and all claims arising out of their use of the Website.

**B. Plaintiffs' VPPA Claim Is Within The Scope Of The Arbitration Clause**

After determining that an arbitration agreement exists, the Court considers whether Plaintiffs' claims fall within the scope of that agreement. *Siebert*, 422 F. Supp. at 1039. Here, it is clear that Plaintiffs' claims are encompassed by the arbitration agreement. Courts broadly enforce arbitration provisions unless it may be said "that the arbitration clause is not susceptible of an interpretation that covers [] dispute." *3M Co.*, 542 F.3d at 1199 (citation omitted); *Mainville v. College Town Pizza, Inc.*, 629 F. Supp. 3d 913, 923 (D. Minn. 2022) ("Arbitration is mandatory when the underlying factual allegations simply touch matters covered by the arbitration provision.") (citation omitted). The "scope of an arbitration agreement is given a liberal interpretation, with any doubts resolved in favor of arbitration." *MedCam, Inc. v. MCNC*, 414 F.3d 972, 975 (8th Cir. 2005). The party seeking to avoid arbitration "bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000) (citation omitted).

Here, the scope of the Terms' dispute resolution clause is broad and plainly encompasses Plaintiffs' VPPA claim. The parties' arbitration agreement "is intended to be broadly interpreted" and expressly includes "claims based in . . . statute." (Decl., Ex. 1). The Terms further specified that the arbitration provision applied to Plaintiffs' "use" of the website. Decl. ¶¶ 9-10. The only claims excluded from the provision are (a) "disputes pertaining to Craftsy's intellectual property rights" and (b) statutory claims that pursuant

to law are not arbitrable." Decl. ¶ 13. Courts have found similar arbitration language to be enforceable and to broadly encompass claims. *See Jones v. Experian Info. Sols., Inc.*, No. 23-cv-3887, 2025 WL 227198, at *1 (D. Minn. Jan. 7, 2025) (compelling arbitration where terms provided that "any claims against [defendant] … that relate to or arise out of [plaintiff's] membership [on defendant's website] to be litigated in arbitration."); *see Fleet Tire Serv. of N. Little Rock v. Oliver Rubber Co*., 118 F.3d 619, 621 (8th Cir. 1997) (stating that an agreement to arbitrate any dispute "relating to" the parties' agreement "constitutes the broadest language the parties could reasonably use to subject their disputes to that form of settlement").

In sum, Plaintiffs claims arising out of their use of the Website are subject to Craftsy's Terms which they affirmatively accepted and agreed to when purchasing memberships on Craftsy.com. The Terms provided that claims arising from Plaintiffs' use of Craftsy.com is subject to arbitration and made clear Plaintiffs were binding themselves to arbitrate such claims in an individual capacity. *See, supra* at p. 6-7. The Court should stay this action and order Plaintiffs to individual arbitration, consistent with the Terms of Service. *See Jones*, 2025 WL 227198, at *3 (compelling arbitration); *Mainville*, 629 F. Supp. at 923 (same); *Stinson v. Best Buy Co.*, No. 018CV00295JNEKMM, 2018 WL 3850739, at *11 (D. Minn. June 26, 2018) (same); *Owen v. Bristol Care, Inc*., 702 F.3d 1050, 1054-55 (8th Cir. 2013) (finding arbitration agreements that contain "class waivers" valid).

## CONCLUSION

For the foregoing reasons, the court should dismiss Plaintiffs' Complaint with prejudice. Alternatively, the court should stay this matter and issue an order directing Plaintiffs to individually arbitrate their claims, consistent with the arbitration agreement.

Dated: June 12, 2025

Respectfully submitted,

**COZEN O'CONNOR**

By: /s/Heather L. Marx
Heather L. Marx (#321163)
hmarx@cozen.com
33 South Sixth Street, Suite 3800
Minneapolis, MN 55402
Telephone: 612.260.9000

Melissa Siebert (*pro hac vice*)
msiebert@cozen.com
123 North Wacker Drive, Suite 1800
Chicago, IL 60606
Telephone: 312.474.4491

***Attorneys for Defendant***