**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA**

**CASE NO. 25-cv-00940 (PJS/ECW)**

AMIE CROTEAU, THUY DAOJENSEN, DIANE THOMAS, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

TN MARKETING, LLC d/b/a Craftsy

Defendant.

# PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR COMPEL ARBITRATION

Plaintiffs Amie Croteau, Thuy DaoJensen, and Diane Thomas, by and through their undersigned counsel, file their opposition to Defendant TN Marketing, LLC's ("Craftsy") Motion to Dismiss Plaintiffs' Class Action Complaint or, Alternatively, to Stay and Compel Arbitration (the "Motion") (ECF No. 17) and state as follows:

## INTRODUCTION

This case involves the violation of consumer privacy rights under the Video Privacy Protection Act ("VPPA") by Defendant TN Marketing, LLC, d/b/a Craftsy, a subscription-based provider of how-to crafting videos. Plaintiffs Amie Croteau, Thuy DaoJensen, and Diane Thomas bring this action individually and on behalf of a proposed class of Craftsy.com subscribers who accessed online video content without ever being informed that their personally identifiable viewing data would be secretly and unlawfully disclosed to Meta Platforms, Inc. via the Meta Pixel, an analytics tool Craftsy embedded on its website to improve ad targeting. These disclosures violate the VPPA.

In its Motion, Craftsy asserts that Plaintiffs do not have a claim under the VPPA, cannot bring the claim in federal court due to lack of standing, and, in fact, cannot bring the claim in any court because each Plaintiff is bound to arbitration. All of these arguments fail.

Craftsy leads with a Rule 12(b)(1) standing argument—that its disclosure of private viewing information to Meta does not constitute a sufficiently "concrete" injury. This is flatly inconsistent with every circuit court to address the issue. The recent decision in *Salazar v. Paramount Global*, 133 F.4th 642 (6th Cir. 2025), reaffirms that disclosure of personal viewing data via tracking pixels is a concrete injury sufficient to confer Article

III standing. Defendant nonetheless presses the argument because the Eighth Circuit has not yet rejected it. But courts nationwide have rejected the exact reasoning Craftsy advances, recognizing that non-consensual digital disclosures to third parties like Meta implicate core privacy harms long protected at common law and under statutes like the VPPA. Craftsy offers nothing new to warrant deviation from the settled rule that federal courts have jurisdiction over VPPA claims.

Next, Craftsy makes four Rule 12(b)(6) arguments aimed at limiting the VPPA's scope. Plaintiffs plausibly allege that Craftsy knowingly disclosed their personally identifiable information (PII)—specifically, Facebook ID numbers and the titles of accessed video content—to Meta via the Pixel, without consent. These are exactly the type of disclosures the VPPA was enacted to prevent. Numerous federal courts have found that Meta Pixel-based allegations state viable VPPA claims.

Defendant urges this Court to adopt the restrictive "ordinary person" standard for identifying PII—a judicially created test with no support in the statute. But even under that test, Plaintiffs allege an ordinary person could identify users by entering their FIDs into a browser, which reveals their Meta profiles. The Complaint further alleges Craftsy embedded and operated the Pixel with knowledge it would transmit user information to Meta. These facts are more than sufficient to state a claim at the pleading stage. The Motion should be denied.

Craftsy also seeks to compel arbitration, asserting Plaintiffs agreed to an arbitration clause in the Terms of Service by clicking a "Complete Order" button at checkout. But Craftsy fails to establish that any Plaintiff manifested intent to assent to the Terms or

arbitration clause. Plaintiffs submitted declarations detailing the devices they used and the actual interfaces they encountered—none of which clearly or conspicuously disclosed arbitration terms. Expert analysis confirms the Terms of Service hyperlinks were not reasonably visible or intelligible, especially on mobile, and often appeared only briefly or after users completed payment. Craftsy has not met its burden as proponent of arbitration, and the Motion to Compel must be denied.

# ARGUMENT

## I. PLAINTIFFS HAVE ARTICLE III STANDING TO BRING A VPPA CLAIM

### (a) Defendant's facial challenge to Plaintiffs' Article III standing fails. Every Court to have considered Defendant's argument has rejected it.

To satisfy Article III's standing requirements, a plaintiff must show, among other things, that it has suffered an "injury in fact." *Friends of the Earth, Inc. v. Laidlaw Env'l Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). Defendant's standing challenge is limited to its assertion that the alleged VPPA violation is not a concrete injury.

It is beyond debate that pixel-based disclosures of a website user's PII to Meta cause sufficiently concrete injury to consumers for Article III standing purposes. Every court that has considered whether pixel-based disclosures on consumer-facing websites establish an "injury-in-fact" under *TransUnion LLC v. Ramirez*[1] and *Spokeo, Inc. v. Robins*[2] found

[1] 594 U.S. 413, 441–42, 141 S. Ct. 2190, 210 L.Ed.2d 568 (2021).

[2] 578 U.S. 330, 333, 136 S. Ct. 1540, 1544, 194 L. Ed. 2d 635 (2016).

that they do. *See Salazar v. Paramount Glob.*, 133 F.4th 642, 648 (6th Cir. 2025) ("*Paramount*") (finding that allegations of a VPPA violation based on identical pixel-based disclosures conferred Article III standing and stating "[i]ndeed, every other circuit to consider the issue agrees that a similar alleged violation of the VPPA confers standing.").[3]

Notwithstanding this well-defined consensus, Defendant asserts that this Court lacks jurisdiction. Defendant rehashes a repeatedly rejected argument – that since Craftsy disclosed Plaintiffs' PII to Meta, a private party, the disclosure was merely a "business-to-business" disclosure. Defendant continues that Plaintiffs lack standing because only the *public* disclosure of private facts was historically redressable at common law. While the concreteness of an injury resulting from a statute violation is judged by the similarity of the complained-of harm to one historically recognized at common law, *Spokeo*, 578 U.S. at 340-41, Article III standing does not turn on element-by-element equivalence between a statutory cause of action and its common law analogue. Rather, the nature of the harm

[3] In addition to the Sixth Circuit, the Second, Third, Seventh, Ninth, and Eleventh Circuits have reached the standing question. *See, e.g., Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 540-41 (2d Cir. 2024); *In re Nickelodeon Consumer Privacy Litigation*, 827 F.3d 262, 290 (3d Cir. 2016); *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 623 (7th Cir. 2014); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017); *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1339–41 (11th Cir. 2017).

Although the Eighth Circuit has not yet addressed the precise question of whether Meta Pixel-based disclosures of consumer PII confer standing under the VPPA, the only district court within this circuit to consider the issue—*Feldman v. Star Tribune Media Co., LLC*, 659 F. Supp. 3d 1006, 1016 (D. Minn. 2023)—answered that question in the affirmative. In *Feldman*, Judge Tostrud applied *Braitberg v. Charter Commc'ns, Inc.*, 836 F.3d 925, 930–31 (8th Cir. 2016) to find that the plaintiff had established Article III standing over an identical Meta Pixel-based VPPA claim.

controls. *Paramount*, 133 F.4th at 648 (6th Cir. 2025) (internal citation omitted) ("the Supreme Court pointed out [in *Transunion*], there is 'an important difference' between the elements of the cause of action and the concrete harm. So 'disclosure of private information' remains one of 'those traditional harms' that 'is sufficiently concrete to qualify as an injury in fact,' even when it fails to meet all of the elements of the common law tort of public disclosure of private facts."); *see also In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 278 (3d Cir. 2016) (rejecting standing challenge of "business to business" PII transfer between Viacom and Google).[4]

Defendant's facial attack on Plaintiffs' standing fails for a second reason. The VPPA safeguards consumers from invasions of privacy generally, not only those traditionally covered by the tort of the public disclosure of private facts. As noted by *Paramount,* 133 F.4th 642, 647–48 (6th Cir. 2025): "*TransUnion* expressly states that at least a couple of invasions of privacy cause sufficiently concrete injuries—such as 'disclosure of private information' and 'intrusion upon seclusion…Salazar's asserted injury resembles the harms addressed by these torts." *See also Eichenberger*, 876 F.3d at 983, 986 (finding plaintiff "has Article III standing to bring his [VPPA] claim because 18

[4] This Court has concluded as much in a similar context. *See Potocnik v. Carlson*, No. 13-CV-2093 (PJS/HB), 2016 WL 3919950, at *3 (D. Minn. July 15, 2016) (Schlitz, C.J.) (finding plaintiff had Article III standing to bring a TCPA case involving junk faxes, stating "*Spokeo* does not require that the harm created by the violation of a statute be identical to the type of harm that will give rise to a recovery under the common law of any particular jurisdiction. Instead, *Spokeo* speaks broadly about the harm created by violation of a statute having a 'close relationship' to a harm that has traditionally 'provid[ed] a basis for a lawsuit' in 'English [and] American courts[.]'")

U.S.C. § 2710(b)(1) is a substantive provision protecting consumers' concrete interest in their privacy"); *see also* Restatement (Second) of Torts § 652B, cmt. a ("[Intrusion upon seclusion] does not depend upon any publicity given to the person whose interest is invaded or to his affairs.").

The same result is warranted here. Each Plaintiff alleges that she "never consented, agreed, authorized, or otherwise permitted Defendant to disclose her Personal Viewing Information to Meta[;]" that such disclosures were done without "written notice of its practices of disclosing its customers Personal Viewing Information to third parties such as Meta;" and that such disclosures "violated [the plaintiffs'] statutorily conferred interest in keeping such information (which bears on [their] personal affairs and concerns) private." (Compl. at ¶¶ 13-14, 21-22, 29-30). Plaintiffs complain of harms akin to invasion of privacy, intrusion upon seclusion, and the non-consensual dissemination of facts about them to third parties. They easily clear Article III's concreteness threshold. Defendant offers nothing new here to justify a departure from the now well-settled rule: federal courts have jurisdiction to hear VPPA claims arising from disclosures of consumer PII to Meta via the Pixel. Defendant's motion should be denied.[5]

---

[5] Defendant cites *Barclift v. Keystone Credit Servs., LLC*, 93 F.4th 136, 145–46 (3d Cir. 2024); *Nabonzy v. Optio Sols., LLC*, 84 F.4th 731, 736–37 (7th Cir. 2023); *Shields v. Professional Bureau of Collections of Md., Inc.*, 55 F.4th 823, 829 (10th Cir. 2022); and *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1245 (11th Cir. 2022) (*en banc*). However, each of these cases involved alleged violations of the Fair Debt Collection Practices Act ("FDCPA") arising from debt collectors' disclosure of consumers' personally identifiable information (PII) to mailing vendors.

**(b) Defendant's factual challenge to Plaintiff Croteau's standing fails. The Complaint's allegations and Plaintiff Croteau's declaration establish she has standing.**

Defendant's factual attack on Plaintiff Amie Croteau's standing also fails. The attack is directed at the Complaint's allegation that "[o]n multiple occasions during the two years preceding the filing of this action, Plaintiff Croteau used her subscription to Defendant's website to request and obtain pre-recorded videos from Defendant." (Compl. ¶ 12). Defendant submits the Declaration of Jay McNaughton (ECF No. 20) (cited hereinafter as "McNaughton Decl.") in which it asserts that, because, according to its records, Plaintiff Croteau did not watch any video content on the craftsy.com website, her information could not have been disclosed to Meta, and hence she has not suffered an injury-in-fact and lacks standing. (Mot. at 13). However, Plaintiff Croteau has submitted a counter declaration in which she asserts:

> I subscribed to Craftsy.com on December 13, 2023, for approximately one year. I paid a membership fee to access videos on Craftsy.com.
>
> I requested and watched several videos on Craftsy.com after I subscribed. I recall these videos covered topics such as painting and crocheting. I was excited to purchase a subscription and specifically purchased a Craftsy.com subscription because of my interest in painting and crocheting and my desire to watch how-to videos on these topics.
>
> *Declaration of Amie Croteau,* (Ex. B) ¶¶ 2–3.

---

As the court in *Paramount* recognized, analogizing FDCPA mail vendor cases to Meta Pixel disclosures under the VPPA is inapt: "We acknowledge that [the Eleventh Circuit in *Hunstein*] has distinguished information disclosure to a single company from disclosure to the 'public.' Still, *Hunstein* dealt with disclosures to mail processors, rather than the world's largest social media conglomerate—a company that aggregates, uses, and monetizes personal data." *Paramount*, 133 F.4th at 648.

The Croteau declaration is record evidence beyond the Complaint's averments that Plaintiff Croteau requested and obtained video content, which the McNaughton Declaration does not undermine. The McNaughton Declaration concedes that the video viewing information available to Craftsy is "limited." *Id.* at ¶ 7. There is no basis to conclude that Craftsy maintains accurate records of every video title it disclosed to Meta, or that Craftsy has a record of every video viewed by a subscriber, and there is no indication of how long Craftsy maintains the "limited" viewing records. Nor does the declaration explain how the search for Ms. Croteau's viewing history was conducted; notably the Declaration misspells her first name. Further, the McNaughton Declaration does not explain how "viewing" videos on Craftsy.com is different from "otherwise request[ing]" video content. *See id.* at ¶ 7 ("The related membership data also does not indicate that Plaintiff Croteau otherwise requested any video content.")

In short, the McNaughton Declaration fails to undermine the conclusive jurisdictional facts the Croteau declaration puts forth. Plaintiffs have met their obligation as the proponent of federal jurisdiction to prove jurisdictional facts by a preponderance of the evidence, *see OnePoint Solutions LLC v. Borchert*, 486 F.3d 342, 347 (8th Cir. 2007), and Defendant's factual attack on Plaintiff Croteau's standing fails.[6]

---

[6] Should the Court conclude that the jurisdictional facts at issue—specifically, whether Croteau requested and obtained pre-recorded videos from Craftsy.com—are "bound up" with the merits of the case, the district court may "decide whether to evaluate the evidence under the summary judgment standard." *Moss v. United States*, 895 F.3d 1091, 1097 (8th Cir. 2018). In that event, Plaintiff proposes the Court defer ruling on the issue of Ms. Croteau's standing pending discovery into the issues raised above, to include, potentially,

## II. THE CLASS ACTION COMPLAINT PLAUSIBLY STATES A CLAIM FOR VIOLATION OF THE VPPA

Next, Defendant asserts Plaintiffs have failed to state a violation of the VPPA based on four grounds: (1) that the information Craftsy disclosed is not PII under the VPPA statute because an "ordinary person" could not use it to identify an individual; (2) that Plaintiffs have failed to allege they could be sufficiently identified based on the disclosures Craftsy made to Meta; (3) that the Complaint fails to allege that Craftsy, as opposed to Meta, possessed and disclosed Plaintiffs' PII; and (4) that the Complaint does not sufficiently allege that Craftsy knowingly disclosed PII to Meta. The 12(b)(6) motion must be denied. Crediting the Complaint's well-pled allegations, each of these arguments is factually unfounded, and courts have considered and rejected them all in recent VPPA decisions under identical facts.

### (a) The Complaint Plausibly Alleges Craftsy's Disclosure of PII to Meta

*i. Craftsy's disclosures determine liability under the VPPA. Plaintiffs have plausibly alleged the disclosure of PII.*

Under 18 U.S.C. § 2710(a)(3), PII "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." Defendant contends that the Complaint fails to state a VPPA violation because Facebook IDs ("FIDs"), numbers Meta assigns to individuals to serve as unique identifiers (Comp. ¶ 63) do not identify a person and thus are not PII covered by the statute.

---

third-party discovery. In any event, on this record, the Court cannot grant the Motion as to Ms. Croteau.

Defendant proposes the Court graft a requirement onto the VPPA's PII definition to limit PII to the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior. *See Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 49 (2d Cir. 2025) citing *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 284 (3d Cir. 2016) ("*Nickelodeon*"). If, as Defendant proposes, the Court rewrites the VPPA to include an "ordinary person" requirement, Defendant contends that the Complaint (1) fails to plausibly allege that an FID identifies a person; (2) does not involve covered PII, since an "ordinary person" receiving Craftsy's disclosures could not identify the user to whom the disclosure pertains; and (3) fails to state a claim under the VPPA.

Defendant is incorrect. In the first place, the VPPA contains no express limitation constraining PII to information that can be understood or used by an "ordinary person," nor defines or even references the term "ordinary person." *See Lee v. Springer Nature Am., Inc.*, 769 F. Supp. 3d 234, 260 (S.D.N.Y. 2025) ("The "ordinary person" standard is a judicial construct."). Simply stated, there is no ambiguity about the type of PII the statute covers and no textual basis to justify rewriting it as Defendant proposes. Moreover, as set forth below, even if Defendant is right about the "ordinary person" standard (and it is not) the Complaint still plausibly pleads a disclosure of PII in violation of the VPPA.

The Circuits are split between two views of what type of PII is protected under the VPPA statute. The First Circuit holds that the disclosure of PII is subject to the VPPA if the "information reasonable and foreseeably [is] likely to reveal" the customer and videos he acquired. *Yershov v. Gannet Satellite Information Network, Inc.*, 820 F.3d 482, 486 (1st

Cir. 2016).[7] Under the "reasonable and foreseeable" standard Meta Pixel-based disclosures of an FID and URL indicating the video content requested or obtained are PII under the VPPA.[8] The focus of the inquiry is the disclosing party's knowledge that the information can be used to identify a third person, not the recipient's technological savvy. *See* 18 U.S.C. § 2710(1)(b). The Second, Third, and Ninth Circuit hold that the restrictive "ordinary person" test applies. *Solomon*, 136 F.4th at 49 (2d Cir. 2025); *Nickelodeon*, 827 F.3d at 284 (3d Cir. 2016); *Eichenberger v. ESPN, Inc.,* 876 F.3d 979, 985 (9th Cir. 2017). Relying on *Solomon*, Defendant asserts that the "ordinary person" standard accords with the statutory text and the statute's scheme, and "better informs" a company that possesses customer information of its obligations under the statute. (Mot. at 14). Defendant also points to Congressional intent. It claims that Congress intended the VPPA to apply

[7] *See id*. ("Many types of information other than a name can easily identify a person. Revealing a person's social security number to the government, for example, plainly identifies the person. Similarly, when a football referee announces a violation by "No. 12 on the offense," everyone with a game program knows the name of the player who was flagged.").

[8] *See, e.g. Feldman v. Star Trib. Media Co. LLC*, 659 F. Supp. 3d 1006, 1021 (D. Minn. 2023) (finding complaint plausibly alleged dissemination of PII where complaint alleged that "each time Mr. Feldman has watched video content on startribune.com, the Star Tribune "simultaneously disclosed [his Facebook ID] and the name of the video/content that he viewed to Facebook via Facebook Pixel."); *Harris v. Pub. Broad. Serv.*, 662 F.Supp.3d 1327, 1334 (N.D. Ga. 2023) (denying motion to dismiss finding similar allegations satisfied VPPA's disclosure requirement); *see also Belozerov v. Gannett Co.*, 646 F.Supp.3d 310, 314 (D. Mass. 2022) (collecting cases); *Lebakken v. WebMD, LLC*, 640 F. Supp. 3d 1335, 1342 (N.D. Ga. 2022); *Ellis v. Cartoon Network, Inc.*, No. 14 Civ. 484 (TWT), 2014 WL 5023535, at *3 (N.D. Ga. Oct. 8, 2014) (same).

narrowly, because when Congress amended the VPPA in 2012 it *did not* revise the statute's definition of PII to specifically add identifiers associated with internet use. Defendant's argument is that because the statute was drafted in the video store era, its scope is limited to the technology of that time and cannot cover the disclosure of FID's, an internet-era identifier. Mot. at 15 ("rather, in assessing whether the VPPA applies to a disclosure, courts must be guided by the classic example of a video clerk leaking an individual's video rental history.").

*Manza v. Pesi, Inc.*, -- F.Supp. 3d --, 2025 WL 1445762, at *3 (W.D. Wis. May 20, 2025), a post *Solomon* decision dismantled these arguments. Its analysis is cogent and instructive. In *Manza* the court denied a motion to dismiss a Meta pixel VPPA case where the defendant urged the court to adopt the "ordinary person" standard.

Starting with the statute's plain text, the *Manza* court explained that there is no textual basis for the "ordinary person" standard and that under the statute "information that uniquely identifies a customer to a third party can qualify as PII, regardless of whether the third party is an "ordinary person" or a social media company." *Id.* at *5. The court noted that "[t]he courts that have adopted the "ordinary person" standard have identified little textual basis for the limitation they impose." *Id.* The court also determined that the "ordinary person" standard unreasonably cabined the statute given that the definition of PII provided is broad. *Id.*; *see also* 18 U.S.C. §2710(a)(3)) (defining PII only as "includ[ing]" information that identifies an individual without further limitation or qualification).

*Manza* next considered and rejected Defendant's argument that the statute's "knowing" scienter requirement supports the application of the "ordinary person" standard.

(Mot. at 14). As *Manza* explained: "the VPPA's intent element does not inform the meaning of PII. The intent element places a limitation on when a video tape service provider can be held liable for disclosing PII; the element does not explain what PII *is.*" *Id*. (emphasis original). Finally, the *Manza* court concluded that courts' use and application of legislative history to justify the "ordinary person" standard was unsound. *Id*. at *6. Discussing *Nickelodeon*, the Third Circuit decision to adopt the ordinary person standard, the court concluded: "*Nickelodeon* does not explain how anything in the legislative history supports a narrow reading of the statute. If anything, the text, purpose, and history of the statute suggest that Congress intended the meaning of PII to be expansive so that it could adapt to changing technology. *Id.*

Similarly, the *Manza* court was skeptical about overreliance on the factual origins of the statute and the "state of technology in 1988" to determine what conduct the statute covers. *Id.* On this point, the court pointed to the salience of the statute's plain text, writing: "The question is not whether Congress had a plaintiff's specific problem in mind when it enacted the statute, but whether the statute uses language broad enough to cover the problem. This court has concluded that it does." *Id.*

Finally, the *Manza* court rejected both the arguments that Congress's non-amendment of "PII" in 2012 supports a narrowing of the definition of PII from its plain text, and the argument that the "ordinary person" standard enables videotape service providers to better comply with the law. (Mot. at 14-15). Here, the *Manza* court pointed to Supreme Court precedent counseling against using Congress's decision not to amend a statute as evidence of legislative intent, where the Supreme Court called the approach

"speculative" and "dangerous." 2025 WL 1445762, at *7 (W.D. Wis. May 20, 2025) (quoting *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 671, 140 S. Ct. 1731, 1747, 207 L. Ed. 2d 218 (2020)). As to the purported benefits of compliance with the ordinary person standard, *Manza* was rightly skeptical, finding that reliance on the "ordinary person's" capabilities is hardly a sound basis by which a commercial entity can determine whether its conduct is lawful. *See id*. at *7 ("How computer savvy is the "ordinary person?" What access to information does she have? How motivated is she to obtain that information? These are all questions that a video tape service provider must ask itself under the "ordinary person" standard, and they do not have obvious answers."). The *Manza* court concluded by noting that the statute already provides guardrails to keep videotape service providers from committing "innocent or negligent mistakes" by covering only knowing violations. *Id.*

*Manza's* thorough and well-reasoned consideration—and ultimate rejection—of the identical arguments raised by Defendant here is instructive. The Court should refuse to apply the "ordinary person" test, and because Plaintiffs have pled facts that establish that Defendant knowingly disclosed to Meta information that "identifies a person as having requested or obtained specific video materials or services from a video tape service provider[,]" *see* 18 U.S.C. § 2710(a)(3), Compl. ¶¶ 12, 20, 28, Plaintiffs have properly alleged that Defendant's disclosures involved covered PII. Accordingly, the Court should deny the Motion.

*ii. Even if the "ordinary person" standard applies, Plaintiffs have plausibly alleged that Defendant disclosed to Meta PII covered by the VPPA.*

Even if the "ordinary person" standard applies, Plaintiffs have plausibly alleged that Craftsy's disclosures to Meta of Plaintiffs' and the class's FIDs constitute the disclosure of covered PII. The *Nickelodeon* decision itself recognized that "even a numeric identifier might qualify as personally identifiable information, at least in certain circumstances." 827 F.3d at 289 fn.174. Moreover, the overwhelming majority of courts have concluded that Meta Pixel-based disclosures of FIDs plausibly alleged the disclosure of protectable PII under the "ordinary person standard." *See, e.g.*, *Martinez v. D2C, LLC*, No. 23-21394-CIV, 2023 WL 6587308, at *4 (S.D. Fla. Oct. 10, 2023) (citations omitted) ("Assuming the "ordinary person" standard applies, as Univision submits, the Court finds the proposed amended complaint's allegations sufficient: "The [Facebook ID] is a unique identifier that is enough, on its own, to identify a person."); *Feldman v. Star Trib. Media Co. LLC*, 659 F. Supp. 3d 1006, 1021 (D. Minn. 2023) ("As the Complaint describes things then, connecting a Facebook ID to a specific person, a URL to a particular video, and the specific person to the particular video is a reasonably straightforward exercise… as the Complaint describes it, the information is both reasonably comprehensible and plausibly as usable as the GPS data addressed in *Yershov*."); *see also Jackson v. Fandom, Inc.*, No. 22-CV-04423-JST, 2023 WL 4670285, at *4 (N.D. Cal. July 20, 2023); *MacAlpine v. Onnit Labs, Inc.*, 2025 U.S. Dist. LEXIS 92819 at *10) (W.D. Tex May 14, 2025); *Archer v. NBCUniversal Media, LLC, Inc.*, 2025 U.S. Dist. LEXIS 129598 at *10) (N.D. Cal July 2, 2025); *Edwards v. Mubi, Inc.* 2025 U.S. Dist. LEXIS 64819 (N.D. Cal. Mar. 31, 2025); *Braun v. Philadelphia Inquirer, LLC*, No. 22-cv-4185, 2023 WL 7544160, at *4 (E.D. Pa. Nov. 13, 2023); *Haines v. Cengage Learning, Inc.*, No. 1:24-cv-710, at *16 (S.D. Ohio

May 5, 2025) (report and recommendation) (attached hereto along with Order adopting R&R as Exhibit E) (all finding Plaintiffs stated a VPPA claim even if the ordinary person standard applied in Pixel-based disclosure cases with materially identical allegations). These authorities each involved Meta Pixel-based disclosures of FIDs and support that Plaintiffs have plausibly alleged the disclosure of protectable PII, regardless of the applicable standard.

Plaintiffs have specifically alleged that an ordinary person could use an FID to identify a person by simply entering the FID into a web browser. *See, e.g.,* Compl. ¶ 3 ("Entering "facebook.com/[FID]" into a web browser returns the Meta profile of the person to whom the FID corresponds."); Compl. ¶ 63 ("Meta is able to this because it has assigned to each of its users an FID number: a unique and persistent identifier that allows anyone to look up the user's unique Meta profile and thus identify the user by name."); Compl. ¶ 69 ("With only a person's FID and the video content name or URL that the person requested on Defendant's website—all of which Defendant knowingly provides to Meta—any ordinary person could learn the identity of the person to whom the FID corresponds and the specific video products or services that this person requested. This can be accomplished simply by accessing the URL www.facebook.com/[unencrypted FID]."). Thus, the Complaint's present allegations fully address any requirement that disclosed information be capable of use by an ordinary person to identify an individual. Consistent with the Complaint's well-pled allegations and the raft of recent VPPA decisions, the Court should deny the motion.

**(b) The Complaint's Allegations Plausibly Suggest Plaintiffs and the Class Can Be Uniquely Identified by Operation of the Meta Pixel**

The Motion baselessly asserts that Plaintiffs have failed to allege they could be identified from the information Craftsy transmitted to Meta. The Complaint's well pled allegations squarely contradict Defendant's position. The Complaint specifies that a consumers FID is a uniquely associated with a Meta profile and that the profile identifies a consumer by name includes other personal information, that the Defendant disclosed the FID and the specific title of the video each Plaintiff requested or obtained to Meta as well as the device the user used every time she visited the site, that an ordinary person provided with only a person's FID can identify that person by inputting the FID into Facebook, and that Defendant chose to program its website to disclose this information and made such disclosures *en masse*. (Compl. ¶ 3, ¶ 63, ¶ 69, ¶ 72).

Defendant further argues that the Complaint fails to plausibly allege a VPPA violation because it does not describe each Plaintiff's browser configuration, cookie settings, or similar technical details. (Mot. at 17.) This argument fails as well. First, a plaintiff is not required to plead every fact at the motion to dismiss stage. *See BJC Health Sys. v. Columbia Cas. Co.*, 348 F.3d 685, 688 (8th Cir. 2003). In the VPPA context, courts have consistently held that alleging a disclosure of an FID is sufficient to plausibly allege a violation of the VPPA. *Lee v. Springer Nature Am., Inc.*, 796 F. Supp. 3d 234, 261 (S.D.N.Y. Mar. 4, 2025) (collecting cases) ("Courts have generally recognized that Facebook IDs constitute PII under the VPPA."); *See also Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 720 (N.D. Cal. 2023); *Braun v. Philadelphia Inquirer, LLC*, No. 22-

cv-4185, 2023 WL 7544160, at *4 (E.D. Pa. Nov. 13, 2023) (same); *Martinez*, 2023 WL 6587308, at *4 (S.D. Fla. Oct. 10, 2024) (internal citation and quotation omitted).

Moreover, Defendant improperly invites the Court to consider facts outside the Complaint— the operation of cookie blockers, privacy settings, or Meta's profile configurations—none of which is alleged or judicially noticeable. These are technical matters about the operation of the Meta Pixel that cannot be resolved at the pleading stage. *See, e.g., Manza v. Pepsi, Inc.*, --- F. Supp. 3d ---, 2025 WL 1445762, at *10 (W.D. Wis. May 20, 2025) (whether Plaintiff was signed into a social media account was a fact was outside the complaint and thus inappropriate to consider on a Rule 12(b)(6) motion).[9] Defendant's argument for dismissal based on Plaintiffs' failure to plead the existence or non-existence of certain technical conditions is not well taken and should be rejected.

[9] Defendant's main case in support of this sub-argument, *Martinez v. D2c, LLC,* No. 23-21394-Civ, 2024 WL 4367406 (S.D. Fla. Oct. 1, 2024) was decided on a motion for class certification not a motion to dismiss and is inapposite.

Also inapplicable is *Smith v. Trinity Broad. Of Tex., Inc.*, 2024 WL 4394557, at * 3 (C.D. Cal. Sept. 27, 2024) (Mot. at 17) where the court dismissed a VPPA claim because of the plaintiff's failure to allege that her FID could be sufficiently used to identify her. Here, the Complaint's allegations clearly indicate that Plaintiffs could be specifically identified by way of their FID. (*See, e.g.*, Compl. ¶ 3), ¶ 60) and that Plaintiffs by had accounts with Meta, profiles on Meta's internet properties, and Facebook IDs associated with those profiles. *Id*. at ¶ 10, ¶ 18, ¶ 26. *See also Feldman v. Star Trib. Media Co. LLC*, 659 F. Supp. 3d 1006, 1020–21 (D. Minn. 2023) (finding that a plaintiff plausibly alleged his personally identifiable information was disclosed via the Meta Pixel when he alleged that his Facebook profile contained his name, "making it feasible to identify [him] by reference to this information.").

**(c) Defendant Possessed Plaintiffs' PII and Knowingly Disclosed it to Meta**

Defendant's third 12(b)(6) argument is that Plaintiffs have failed to allege that Defendant as opposed to Meta possessed and knowingly disclosed Plaintiffs' PII. Its fourth basis, that Plaintiffs have failed to allege that Defendant's disclosures were "knowing" under 18 U.S.C. § 2710(b)(1), is related. Both arguments fail.

As to the first, Defendant contends that "there are no factual allegations suggesting that it was Craftsy that possessed or disclosed Plaintiffs' PII." (Mot. at 18). Again, the assertion is baseless and belied by the Complaint's allegations. The Complaint plainly alleges that Defendant transmitted Plaintiff's PII to Meta, that Defendant's transmissions included user's FIDs and the video content the user watched, specifies that the transmission were done by Defendant's knowing installation of the Meta Pixel, and explains how and why Defendant uses the Pixel. (Compl. ¶ 1, 59, 68, 69, 70, 72, 73, 74, 88).

Any one of these allegations, standing alone, would be sufficient to allege Defendant's knowing disclosure of personally identifiable information of Plaintiff and the Class, and by extension Defendant's possession of such information in the first place. *See Monday Restaurants v. Intrepid Ins. Co.*, 32 F.4th 656, 658 (8th Cir. 2022) (all reasonable inferences are drawn in favor of the non-moving party when considering a motion to dismiss). Taken together, they paint a comprehensive picture of how Defendant intentionally and knowingly utilized the Meta Pixel to disclose its consumers' personally identifiable information to Meta to improve its own marketing and advertising abilities. Defendant attempts to shift blame to Meta by asserting that Meta itself installs cookies on user's browsers that are inherent to the transmission of Plaintiffs' PII, and hence Defendant

is not liable for disclosure because any transmission of PII from the Craftsy.com website is "from Meta to itself." Mot. at 19. This argument also fails. First, it impermissibly relies upon Meta's cookie policy (Mot. at 19), which is neither referenced in, nor attached to, the complaint. Second, the consensus among courts is that website owners cannot duck liability under the VPPA at the pleading stage for disclosures caused by installation of the Meta Pixel simply because of some purported role Meta plays in the in the process. *See, e.g. Czarnionka v. Epoch Times Ass'n, Inc.*, No. 22 CIV. 6348 (AKH), 2022 WL 17069810, at *3 (S.D.N.Y. Nov. 17, 2022) ("By installing the Pixel, Defendant opened a digital door and invited Facebook to enter that door and extract information from within...This is sufficient to constitute "disclosure" under the VPPA."); *Mendoza v. Caesars Ent., Inc.*, No. 23-CV-03591, 2024 WL 2316544, at *4 (D.N.J. May 22, 2024); *Lee v. Springer Nature Am., Inc.*, 769 F. Supp. 3d 234, 263 (S.D.N.Y. 2025). Defendant offers no compelling basis to undermine these authorities or their shared view that a defendant's installation of the pixel sufficiently meets the VPPA's disclosure requirements.[10]

[10] Defendant does attempt a flawed argument pointing to unrelated statutes (Mot. at 20), 15 U.S.C. § 6821 (concerning use of false pretenses to obtain customer information from a financial institution) and 10 U.S.C. § 949p-5 (governing procedures applicable to the trial of enemy combatants before a Military Commission), for support that Congress could have specifically included the phrase "or causes to be disclosed." Plaintiffs plead that Defendant knowingly disclosed PII by installing and using the pixel on its website. The statute unambiguously covers Defendant's conduct, and there is no need for the Court to construe the term "disclose" by examining its use in other (and completely unrelated) statutory contexts. *See Adams v. Apfel*, 149 F.3d 844, 846 (8th Cir. 1998) ("If the statute is clear and unambiguous, judicial inquiry is complete."). For the same reason, Defendant's subsequent appeal to the rule of lenity is not well taken and because the rule of lenity is inapplicable because the VPPA is not a "penal statute." *See, e.g., Abbott v. Drs. Ridgik. Steinberg & Assocs., P.A.*, 609 F.Supp. 1216, 1218 (D.N.J. 1985) (internal citation and quotation omitted) ("A penal statute is one which imposes punishment for an offense

The authorities Defendant does cite are inapposite and not reach Defendant's claim that Meta disclosed PII to itself. In *Eichenberger v. ESPN, Inc.*, the court affirmed dismissal agreeing that the disclosed information was not PII because it could not be used to identify the plaintiff without being combined with other information the defendant did not possess. 876 F.3d 979, 986 (9th Cir. 2017). In *M.K. v. Google, LLC*, 2023 U.S. Dist. LEXIS 51895, * 8 (C.D. Cal. Mar. 27, 2023) the Plaintiff failed to allege any facts plausibly establishing the type of PII disclosed, or even to whom the information was disclosed. Most closely on point, but still readily distinguishable, is *Buchler v. Gannet Co. Inc.*, 2023 WL 6389447, at * 4 (D. Del. Oct. 2, 2023). *Buchler* is inapplicable here because the Complaint established that subscriber-users themselves and/or Facebook—not the defendant—implemented the technology that disclosed the plaintiffs' PII to Facebook. *Id.* Here, the Complaint contains no similar allegations. The sole paragraph of the Complaint to which Defendant cites to justify the argument, Paragraph 61, specifically states that "companies can embed" the Meta Pixel on their websites "to allow them to track customers actions and report the actions back to Meta[,]" not that Meta automatically embeds any tracking software on a company's website. Defendant fails to present any cogent ground for dismissal based on the Complaint's failure to plausibly allege the VPPA's "disclosure" element.

---

against the [S]tate as compared to a wrong against an individual."); *cf. Melrose Hotel Co. v. St. Paul Fire & Marine Ins. Co.*, 432 F. Supp. 2d 488, 509 (E.D. Pa. 2006) (finding the TCPA is not a penal statute and collecting cases).

Defendant's final argument is related – that the complaint fails to allege that Craftsy "created, controlled, or could access the information collection by the Pixel" and thus "it could not have known what information the Pixel was collecting to transmit[]." (Mot. at 22). Once again, the Complaint's averments completely undermine Defendant's contention. Plaintiffs specifically alleged that Defendant installed the pixel "knowing that such code would transmit to Meta the subscription purchases and video titles requested by its customers and its customers' unique identifiers (including FIDs) when they subscribed to or requested or obtained videos from its website." (Compl. ¶ 81); *see also*, *id.* at ¶ 1, ¶ 69, ¶ 72, ¶ 74 (each set forth above). In support of its argument, Defendant again cites *Martinez v. D2C, LLC*, 2024 WL 4367406, at *7 (S.D. Fla. Oct. 1, 2024), this time as grounds to assert that "several conditions must be met for a Pixel to transmit identifying information to Meta" such as the user having a Meta account, having been logged in to the account, be using a browser that does not block pixel transmissions, and so forth. (Mot. at 22). But these "conditions" are of no moment at the pleading stage; *Martinez* only considered these issues at class certification. *See Martinez*, 2024 WL 4367406, at * 6 (discussing such conditions considering numerosity). Tellingly, at the pleading stage, the *Martinez* court rejected the argument stating: "[T]he Court is satisfied that the Plaintiffs' allegations are enough: they set forth that Univision intentionally embedded Meta Pixel on its website to disclose its subscribers' identities and video viewing histories to Meta and purposedly programmed the Facebook Pixel into its website code, knowing that Facebook would receive specific video titles and the subscribers' [associated identities] when they

requested or obtained videos." 2023 WL 6587308, at *3 (S.D. Fla. Oct. 10, 2023) (internal quotation marks and citations to the record omitted).[11]

Each of Defendant's arguments for dismissal is meritless – belied by the Complaint's allegations, contrary to Rule 8's pleading standards, and out of step with the raft of VPPA decisions on point. The Court should deny Defendant's Rule 12(b)(6) motion. Should the Court grant any part of the Motion, Plaintiffs respectfully request leave to amend. *See* Fed. R. Civ. P. 15(a).

## III. PLAINTIFFS DID NOT AGREE TO ARBITRATE

Defendant contends that each Plaintiff agreed to arbitrate her claims by pressing a button to complete registration on the Craftsy.com site. Defendant fails to carry its burden to prove, as to each Plaintiff, the existence of an enforceable agreement to arbitrate. As the record evidence shows, based on the contents, structure, and display of Crafsty's non-mobile and mobile sites Plaintiffs actually visited, none of the Plaintiffs was put on inquiry notice that purchasing a Craftsy subscription bound her to arbitration. The Motion should be denied.

---

[11] Unsurprisingly, *Martinez* is one of several courts to have reached the same conclusion concerning Defendant's argument on the sufficiency of the Complaint's pleading of Defendant's knowledge. *See, e.g.*, *Frawley v. Nexstar Media Grp. Inc.*, No. 3:23-cv-2197-L, 2024 WL 3798073, at *9 (N.D. Tex. July 22, 2024); *Adams v. Am.'s Test Kitchen, LP*, 680 F. Supp. 3d 31, 43 (D. Mass. 2023)); *Li v. Georges Media Grp. LLC*, No. 23-cv-1117, 2023 WL 7280519, at *4 (E.D. La. Nov. 3, 2023) (collecting cases); *Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 720 (N.D. Cal. 2023); *Lebakken v. WebMD, LLC*, 640 F. Supp. 3d 1335, 1342–43 (N.D. Ga. 2022) (denying motion to dismiss); *Feldman v. Star Tribune Media Co. LLC*, 659 F. Supp. 3d 1006, 1021–22 (D. Minn. 2023); *Belozerov v. Gannett Co., Inc.*, 646 F. Supp. 3d 310, 315 (D. Mass. 2022).

**(a) Applicable Standard**

A party may not be compelled to arbitrate unless it has contractually agreed to do so. As the Eighth Circuit has explained, “the primary inquiry is whether the parties formed a valid contract that binds them to arbitrate their dispute.” *Duncan v. Int'l Markets Live, Inc.*, 20 F.4th 400, 402–03 (8th Cir. 2021) (internal quotation marks and citation omitted). Because Defendant seeks to compel arbitration, it bears the burden of proving the existence of a valid and enforceable arbitration agreement. *Id.*

Here, Plaintiffs dispute that they assented to Craftsy.com’s Terms of Service (the “Terms”). Both parties have submitted declarations addressing this issue. When parties introduce matters outside the pleadings in the context of a motion to compel arbitration, courts apply the summary judgment standard. *See NCMIC Ins. Co. v. Allied Pros. Ins. Co.*, 694 F. Supp. 3d 1164, 1167–68 (D. Minn. 2023) (Schlitz, C.J.), *aff’d*, 110 F.4th 1072 (8th Cir. 2024). Under that standard, “the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.” *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Based on the record evidence, Defendant has failed to establish the existence of an agreement to arbitrate, and the Court should deny the motion. However, if the Court finds that a genuine dispute of material fact exists as to whether a valid arbitration agreement was formed, the Federal Arbitration Act requires the Court to hold a trial on that issue. *See* 9 U.S.C. § 4.

**(b) Summary of the Record Evidence**

*i. Defendant’s Proffered Evidence – the McNaughton Declaration*

To carry its burden to establish the existence of an agreement to arbitrate, Defendant relies on the Declaration of its Chief Marketing Officer Jay McNaughton. (ECF No. 20). In a single paragraph the McNaughton Declaration discusses Plaintiffs' purported assent to arbitrate by completing Craftsy.com's registration flow. *Id.* at. ¶ 7. The declaration asserts that "the Craftsy.com process has been materially the same since 2021. In order to purchase a membership, individuals must complete their order by submitting payment information via Craftsy.com's checkout page." *Id.* It also states that a purchaser "must complete their order by submitting payment information via Craftsy.com's checkout page. The checkout page, a screenshot of which is below, advised that by completing the order, individuals were agreeing to Craftys's terms of service and privacy policy." *Id.* The Declaration then displays the following image (hereinafter referred to as the "McNaughton Screenshot"):



Finally, the declaration states that "[t]he above hyperlinks to Craftsy's terms of service and privacy policy, which appear in in bright orange print, link to the terms of service and privacy policy at the time of the order." *Id.*

Subsequent paragraphs discuss the terms of service, which contains an arbitration provision. *Id.* at ¶ 13; *see also Id.* at Ex. 1.

*ii. Plaintiffs' Declarations and the Young Declaration*

In support of their opposition, each Plaintiff has submitted a declaration wherein she explains, among other things, the specific device she used to access the registration flow and purchase a crafsty.com account. *See generally* Ex. A, B, C. Plaintiff DaoJensen used an HP Envy laptop. (Ex. C at ¶ 3). Plaintiffs Croteau and Thomas both used their mobile phones. (Ex. A at ¶ 4); (Ex. B at ¶ 3). Plaintiff Croteau used an iPhone 13, and Plaintiff Thomas states that she used either a Samsung S10 or S20 but does know exactly which. *Id.*

Plaintiffs also submit the declaration of Alex Young, the Chief Strategist of ePageCity, a web design firm with more than 20 years' experience in web design, web technology, and website user interaction. (Declaration of Alex Young, hereinafter "Young Decl." (Ex. D); *see also* Ex. A thereto).

Young obtained from the Internet Archive versions of Crafty's site captured contemporaneously with Plaintiffs' registration dates.[12] (Young Decl. ¶ 4). He analyzed

---

[12] *Safeway Transit Ltd. Liab. Co. v. Disc. Party Bus, Inc.*, 334 F. Supp. 3d 995, 1000 n.4 (D. Minn. 2018) (collecting cases) ("The Court may take judicial notice of Internet Archive documents.").

the exact registration flows Plaintiffs used with methods that allowed him to recreate the exact user interface using the same mobile devices and laptop Plaintiffs used to register. (*Id.* at ¶¶ 4-5). Each interface is discussed below.

**(c) Defendant has Failed to Establish the Existence of an Arbitration Agreement**

*i. Craftsy's website did not use a clickwrap*

The Eighth Circuit has explained that "internet contracts just like other agreements, require mutual assent between the parties—a so-called 'meeting of the minds.'" *Foster v. Walmart, Inc.*, 15 F.4th 860, 862 (8th Cir. 2021) (internal citation omitted).[13] Presentations of such contracts on consumer-facing websites vary. *See id.* Defendant self-servingly characterizes its proffered McNaughton Screenshot as a "clickwrap," understanding that Courts generally deem clickwrap agreements to be binding. (Mot. at 24). The McNaughton Screenshot is decidedly *not* a clickwrap. *See Foster*, 15 F. 4th at 863. "A …"clickwrap" arrangement, requires the user to explicitly assent [to Terms of Service] by clicking "I agree" (or something similar) **before using the website or purchasing a product**." *Id.* A clickwrap involves a separate affirmative act of clicking a button to manifest assent to terms, usually in the form of a checkbox. *See Sgouros v. TransUnion Corp.*, No. 14 C 1850, 2015 WL 507584, at *4 (N.D. Ill. Feb. 5, 2015), (a clickwrap ….

[13] Courts apply state law to determine whether an arbitration agreement meets the essential elements of contract formation. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S. Ct. 1920, 1924, 131 L. Ed. 2d 985 (1995). Plaintiffs do not dispute that Minnesota law applies, but not because Plaintiffs assented to the Terms' choice of law provision as Defendant contends, but because it is the law of the forum.

requires users to take affirmative action to manifest assent by clicking a button or a checkbox which accompanies a statement instructing users that their click would constitute their assent to the terms at issue.”). A true clickwrap is demonstrated by what Craftsy uses today. (Young Decl. Ex. N).[14]

Rather, the McNaughton Screenshot presents at best a “hybrid” or “sign-in-wrap.” *See TopstepTrader, LLC v. OneUp Trader, LLC*, 2018 WL 1859040, at *3 (N.D. Ill. Apr. 18, 2018). In such a presentation “the webpage states something to the effect of: ‘By signing up for an account [or placing an order] with [website provider], you are accepting the [website]’s terms of service.’” *Id.* “While a hyperlink to the Terms is provided, the user is not required to scroll through the terms, read the terms, or otherwise explicitly indicate that he agrees to those terms before pressing the ‘Sign Up’ [or ‘Place Order’] button.” *Id.* “In this scenario, the user ‘agrees’ to the terms by signing up or creating an account,” or by placing an order. *Id*; *see also Selden v. Airbnb, Inc.,* 4 F.4th 148, 156 (D.C. Cir. 2021) (“a sign-in wrap bundles signing up for a service with agreement to the website’s contractual terms.”). This precisely describes Craftsy.com’s COMPLETE ORDER button mechanism – the user presses the button to finalize her subscription to site access. Craftsy asserts this manifests her assent to the Terms. The inquiry is complex. Craftsy avoids it altogether.

---

[14] *See also* Young Decl. Ex. R. On information and belief Craftsy revised its website to add clickwrap features sometime after this action was filed. The Young Declaration provides several other examples of Clickwraps at Ex. N.

"To determine whether sign-in-wrap and browsewrap agreements are enforceable, courts engage in fact-intensive inquiries of the layout and language of a website or application." *Route App, Inc. v. Heuberger*, No. 2022 WL 2316377, at *3 (D. Utah June 28, 2022). The key question for Courts evaluating such presentations is whether the website puts the site user on "inquiry notice," meaning that website clearly and conspicuously apprises the user that the consequence of pressing the COMPLETE ORDER button and consummating the transaction is assent to the site's terms. *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 79 (2d Cir. 2017). The standard by which mutual assent is gauged under such circumstances is "objective reasonableness." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 513 (9th Cir. 2023).

The Motion foregoes a "fact-intensive" analysis of the "layout and language of the website" prescribed in *Route App., Inc.*, even though each of the cases Defendant cites in support arrived at the result after doing just that, undertaking a close examination of the features of the subject webpages.[15] Craftsy places all of its chips on the patently incorrect

[15] Mot. at 24 citing: *Sarhadi v. Pear Health Labs, Inc.,* 2025 WL 1350033, at *2 (N.D. Cal. Apr 18, 2025) (describing an "uncluttered page" that "does not include any other graphics, hyperlinks, [or] notices."); *Ghazizadeh v. Coursera, Inc.,* 737 F. Supp. 3d 911, 930 (N.D. Cal. 2024) (examining whole reproductions and embedded design elements of multiple sign up flows); *Falcon v. TelevisaUnivision Digital, Inc*., 2024 WL 1492831, at *4 (M.D. Fla. Mar. 29, 2024) (examining all preceding account creation steps culminating with pressing of the Subscribe button to determine whether site provided inquiry notice); *Bernardino v. Barnes & Noble Booksellers, Inc.,* 2017 WL 7309893, at *6 (S.D.N.Y. Nov. 20, 2017), report and recommendation adopted, 2018 WL 671258 (S.D.N.Y. Jan. 31, 2018) (describing an "uncluttered page" where "no scrolling was need to access the TOU" and examining font choice and placement among other design elements) ; *Miracle Pond v. Shutterfly, Inc.,* 2020 WL 2513099, at *4 (N.D. Ill. 2020) (reproducing forth the entire page layout and stating "given the fact-intensive nature of the inquiry, the precise wording and formatting is relevant here").

idea that the proffered screenshot is a clickwrap. Not only does Defendant not discuss the layout and language of its website, *critically*, it fails to submit to the Court the entire webpage on which the CONTINUE button appeared, providing instead a closely cropped snippet of a credit card payment field devoid of any context. Defendant's failure do so is dispositive to the Motion. In *Ballou v. Asset Mktg. Servs., LLC*, 46 F.4th 844, 861–62 (8th Cir. 2022), reviewing a motion to compel arbitration, the Eighth Circuit noted that because the defendant "AMS provide[ed] only a cropped, close-up screenshot of the purchase webpage" and Plaintiff claimed he never visited the website, there was a factual dispute about whether the defendant formed a contract that included the terms and conditions. The dispute could not be sent to arbitration as Defendant proposed and instead was remanded to the district court for an FAA Section 4 trial. *See id.* The outcome in *Foster v. Walmart, Inc.*, 15 F.4th 860, 864 (8th Cir. 2021) was the same. The Defendant failed to provide the Court sufficient evidence of "the structure and design of the website itself" and relied on a copy of the website's online terms and conditions." *Id.* The court determined that "without more it is difficult to determine whether a reasonably prudent user would have known to inquire further. Among the yet-unanswerable questions are the exact location and prominence of the terms-of-use hyperlink, how many clicks it would have taken for the user to discover the arbitration provision, and whether the website changed during the relevant period." *Id.* Here, Defendant has not provided the Court with sufficient information for the Court to find assent through inquiry notice, consciously limiting its

presentation to a zoomed in payment interface, and not the webpages Plaintiffs actually encountered. The Court cannot conclude that the layout and language of the website put Plaintiffs on inquiry notice. The Motion must be denied on that basis alone. *See Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 41 (9th Cir. 1991) ("If there is doubt as to whether such an agreement exists" the non-moving party cannot be compelled to arbitrate).

*ii.* None of the Plaintiffs was put on inquiry notice of her purported assent to the Terms

Compounding its errors, Defendant asserts that each Plaintiff was "provided with clear notice" and cites the McNaughton Screenshot, plainly suggesting each Plaintiff encountered the identical presentation when she subscribed. As set forth in the Young Declaration (*Id.* Ex. B, Ex. I, Ex. M) this is demonstrably false. Defendant's failure to establish each Plaintiffs' assent is fatal to Defendant's argument. *cf. Nabry v. MV Transp., Inc* No. 07-CV-0124 PJS/JJG, 2007 WL 4373107, at *5 (D. Minn. Dec. 13, 2007) (Schlitz, C.J.) (denying motion to compel arbitration as to four of eight plaintiffs for whom Defendant could not establish assent to arbitrate because there was no record evidence that these individuals had received an employee handbook containing subject arbitration clause). As the Young Declaration demonstrates, each Plaintiff clicked the COMPLETE ORDER button to join Craftsy, but did so through a markedly different interface, as each used a different type of device. The McNaughon Declaration does not provide exemplars of the different non-mobile and mobile interfaces Plaintiffs used, does not address the devices Plaintiffs actually used to visit the site or indicate whether Craftsy has records

indicating the device each Plaintiff actually used, does not address whether any of the Plaintiffs elected to pay by PayPal - which ostensibly sets off a different payment field, and does not provide any examples of changes to the registration flow over time.

While each Plaintiff subscribed to Craftsy using a different device and therefore saw a different interface, uniting their experience is that none of these three disparate interfaces put the Plaintiff on inquiry notice such that she whould be required to arbitrate. Each Plaintiff's Craftsy sign-up experience is discussed in turn.

*1. Plaintiff DaoJensen*

Plaintiff DaoJensen signed up for Craftsy in November 1, 2023, using her HP Envy laptop computer. (Ex. C at ¶ 3). At this time, Craftsy's non-mobile registration page, *unscaled*, and viewed as a whole was structured as follows:




*fig. 1* (Young Decl., ¶ 4(c), *Id.,* Ex. B.)

Immediately apparent from the above is that the McNaughten Screenshot, which Defendant claims is "a screenshot of" the "checkout page" (Mot. at 6) is merely a snip of

the bottom right corner of the registration page, a page which is obviously complex and contains several visual elements.

The top of the registration page features a bright orange banner with a prominent stylized Craftsy logo, the largest item on the page. Immediately below are two grey boxes each containing other hyperlinks – one directing returning customers to follow, the other for those with coupons. The right side contains 12 data fields for customer input. The left presents an order summary box set off by a black banner with the terms "**PRODUCT**" and "**SUBTOTAL**" in bolded. Immediately under the summary box is another bolded notice, presented in black against a white background stating "**Yes, I want to become a Gold Member with Craftsy with unlimited access to hundreds of how-to videos, tips, and techniques**." Immediately following is yet another bolded notice, this one pertaining to "**Hands Free Automatic Renewal**". This notice is followed by 12 single lines of single-spaced text describing the terms of automatic renewal. Below them is the credit card input interface presented in the McNaughton Screenshot.[16] The credit card interface is set off with a light grey background and itself contains four brightly colored credit card logos. Towards the bottom of the interface is the bright, orange COMPLETE ORDER button, which is the largest interactive feature on the page. *Below* the COMPLETE ORDER button, outside of the grey box, is the language that Defendant contends binds Plaintiffs to arbitrate which references first the automatic renewal terms which are fully described above and then provides an orange link to the terms of service and privacy policy.

[16] The Young Declaration explains that the CVV field is absent in *fig.* 1 only because that field loads from the live Crafsty.com site. *Id.* at ¶ 4(c).

Overall, plainly, the website's terms and conditions were not clearly and conspicuously presented. The page is cluttered - 16 data input fields, 4 brightly colored logos, a prominent colored banner, an order summary table advising the customer what exactly she is purchasing, and two bolded notices *above* the COMPLETE ORDER button, one of which sets off twelve rows of fine print containing the actual autorenewal terms. The volume of information presented to and sought from the user, and manner of presentation makes it highly unlikely that a consumer would notice the terms and conditions which are spatially decoupled from the COMPLETE ORDER button by the gray framing box. *See Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 63–64 (1st Cir. 2018) ("the presence of other terms on the same screen with a similar or larger size, typeface, and with more noticeable attributes diminished the hyperlink's capability to grab the user's attention. If everything on the screen is written with conspicuous features, then nothing is conspicuous."); *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022) (internal quotation omitted) ("the textual notice is further deemphasized by the overall design of the webpage, in which other visual elements draw the user's attention away from the barely readable critical text. Far from meeting the requirement that a webpage must take steps to capture the user's attention and secure her assent, the design and content of these webpages draw the user's attention away from the most important part of the page[.]"); *Morrison v. Yippee Ent., Inc.*, 756 F. Supp. 3d 842, 850 (S.D. Cal. 2024) (no assent where page "contains promotional material displaying emoticon illustrations and self-promotional statements, which draw a viewer's attention away from the hyperlink" and was not "uncluttered").

The Terms hyperlink itself appears to be in smaller print than much of the text of the page and it is neither underlined, capitalized, nor bolded, and instead is presented as unobtrusively as possible. *See Morrison*, 756 at 850 (*"*While the "Terms of Service" hyperlink appears in blue font against a white background—a characteristic to which many courts look—the font is not underlined nor completely capitalized and is small in proportion to most of the text on the page."); *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 404 (E.D.N.Y. 2015) (declining to bind Plaintiff to a "sign-in contract of adhesion" where hyperlink to the 'terms of use' was not in large font, all caps, or in bold and was not accessible on multiple locations on the webpage).[17] Additionally, the hyperlinks were written in orange script, the same color as the prominent banner on the top of the page and the same color as the large COMPLETE ORDER. This design choice is consistent with the site's motif, but at the expense of visibility; certainly, they are less noticeable as hyperlinks than the bright blue color typically featured on websites. *See Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 467 (S.D.N.Y. 2017) ("Coloring can be for aesthetic purposes. Courts have required more than mere coloring to indicate the existence of a hyperlink to a contract."); *Cullinane*, 893 F. 3d at 63 ("While not all hyperlinks need to have the same characteristics, they are commonly blue and underlined.") (internal quotation marks omitted)).

[17] Notably, as stated in the Young Declaration (¶6, Ex. Q), since Plaintiffs signed up, Craftsy has changed its website to incorporate a pop-up overlay that notifies users of the Terms when they first visit either the non-mobile or mobile version of the site.

Moreover, Craftsy placed the Terms hyperlink below the COMPLETE ORDER button, making it even less noticeable to users. To register an account a user must first input their personal information and then their credit card information and would naturally focus on the order summary and bolded notices directly above the COMPLETE ORDER button. Having done all that, and given the prominence of those other features, it is less likely a hyperlink below the button would have been noticed. *See, e.g. MacDonald v. Rocket Mortg. LLC*, No. CV-23-02558-PHX-KML, 2024 WL 5200480, at *4 (D. Ariz. Dec. 23, 2024) ("It is more likely a user will notice they are entering a hybrid clickwrap agreement if the relevant notice is above or adjacent to the button instead of below it."); *Adams v. Am.'s Test Kitchen, LP*, 680 F. Supp. 3d 31, 39 (D. Mass. 2023) (internal citation and quotation omitted) ("The top of the screen [is] where the user [is] required to focus and fill in information, and the purpose of the screen, as indicated by the title at the top, [is] for the user to enter payment information."); *see also* Young Decl. at ¶ 7 (explaining typical site user behavior upon completing a commitment to pay form is to look upward to observe the summary of the transaction).

Importantly, Plaintiff DaoJensen (and indeed all the Plaintiffs) faced an additional obstacle which gave her even less opportunity to notice the Terms. Based on her the display of the page on her laptop screen, the checkout page did not display the complete page on loading. (Young Decl. at ¶ 4(c)). Upon loading the page exceeded the viewing area and as such Plaintiff DaoJensen would have only seen up to the upper portion of the credit card entry field:




*Fig. 2* (Young Decl., Ex. E). As described in the Young Declaration

> Testing revealed that the content below that shown in Exhibit E remained off screen until the very last field was entered ahead of the "complete order" button when the page automatically scrolls or "jumps." Hence, the site visitor would not have necessarily seen the complete order button and the hyperlinks below until he or she had input all the information above. The site visitor's only next action would have been to immediately click the "complete order" button. *Id.* at ¶ 4(c).

As such, rather than a full opportunity to notice the Terms hyperlink, a user such as Plaintiff DaoJensen would only have had reasonably as much time as it would take to click COMPLETE ORDER to notice the linked terms. *See id.* at ¶ 7 ("The sentence regarding

the terms was briefly in the user's field of vision as it was displayed on the page, but it was not where the Plaintiff's eyes would have fallen and certainly not to spend the 2-3 seconds needed to read. It would have been unlikely that a user would have spent that amount of time consuming this additional information before clicking the button.")

Considering the checkout screen as a whole – the display, design choices, and features – and Plaintiff DaoJensen's experience with it under an objective standard the then-operative Craftsy registration page did not put site users on inquiry notice that clicking the button to purchase a Craftsy subscription would bind the customer to arbitration. Accordingly, as to Plaintiff DaoJensen the Motion should be denied.

*2. Plaintiff Croteau*

Plaintiff Croteau signed up for Craftsy in December 2023 using her Apple iPhone 13. (Ex. A at ¶ 2, ¶ 4). The Young Declaration explains that Plaintiff Croteau, using her iPhone 13, would have encountered the following screen to register her Craftsy account:


20:46
Craftsy
Returning customer? Click here to login
Have a coupon? Click here to enter your code
Account details
* required
First name *
Last name *
Company name (optional)
Country / Region *
United States (US)
Street address *
House number and street name
Apartment, suite, unit, etc. (optional)
Apartment, suite, unit, etc. (optional)
Town / City *
AA
web.archive.org

***Fig.* 3** (Young Decl. Ex. F)[18]

The Young Declaration explains that to input the required information a user would need to tap on the first field (First name), and then use the blue arrows to navigate to the next field or finger tap the field:

[18] Exhibit G of the Young Declaration is similar but focuses on the content displayed.




***Fig.* 4** (Young Decl. Ex. H).

Ultimately, the user reaches the credit input field and COMPLETE ORDER button:




***Fig.* 5** (Young Decl. Ex. I).

Though the COMPLETE ORDER button is partially displayed, nothing else is visible. It only after the user has input her credit card CVV (and on the archived version, the expiration date) (*see Id.* at ¶ 5(c)(i)) does the page autoscroll to reveal the full COMPLETE ORDER button and contents below it:




***Fig. 6*** (Young Decl. Ex. J)

This final screen presents the same issues discussed with relation to Plaintiff DaoJensen's sing up. The same attention-getting brightly colored logos and the prominent orange COMPLETE ORDER button are present, but on the mobile platform they dominate the users view even more. *Se,e e.g., Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 466-67 (S.D.N.Y. 2017) (describing mobile interface and concluding that plaintiff was not put "on inquiry notice of the terms of service," because the page featuring the clickable box featured a much larger "'Next' bar at the bottom of the screen," which "dwarfed" the "I agree to Lyft's Terms of Service" language that is featured in "smallest font on the screen."). The same timing issues presented in the non-mobile flow are present here, as the page autoscrolls to reveal the operative language only *after* the user has completed all other fields. At this point, having provided all the information necessary to subscribe an iPhone user like Plaintiff Croteau need only press the button to complete the purchase, which as with the non-mobile presentation, is situated *above* the COMPLETE ORDER button. All this supports that such a user would not have seen the agreement containing the Terms.

But the iPhone mobile display suffers from a more salient problem – the sentence proposing the deal –that assent to the Terms is exchanged for the sale of the subscription – is cut off and unintelligible.[19] The visible language does not reasonably communicate that in addition to agreement to "Membership" the user is agreeing to be bound to the "terms of service" and as such is ineffective to bind a consumer to arbitration. *See Minneapolis*

[19] The Young Declaration explains this is because of the website's style protocols as applied to the iPhone 13. (*Id.* at ¶ 7). This is not an artifact of the archived site but is present on the current craftsy.com registration site when viewed with the same device. (*Id.* at Ex. R)

*Cablesystems v. City of Minneapolis*, 299 N.W.2d 121, 122 (Minn. 1980) ("A contract requires a meeting of the minds concerning its essential elements."); *see also TRWL Fin. Establishment v. Select Int'l*, 527 N.W.2d 573, 580 (Minn. Ct. App. 1995) ("Boilerplate contract terms that are unreadable or illegible are invalid."). From any objectively reasonable view Plaintiff Croteau cannot be deemed have to been put on inquiry notice.

*3. Plaintiff Thomas*

Plaintiff Thomas signed up for Craftsy in January 2021 using either her Samsung Galaxy S10 or S20. (Ex. B at ¶¶ 2-3). The Young Declaration explains that Plaintiff Thomas, using her Samsung phone, would have encountered the same initial screen as Plaintiff Croteau did using her iPhone. (*Id.* at ¶ 5(c)(ii)). Notably, however, the Young Declaration finds that when Ms. Thomas registered her Craftsy account, as she proceeded through the registration flow, she was presented with an option regarding email communication:




***Fig. 7*** (Young Decl. Ex. L).

The McNaughton Declaration asserts that the Craftsy registration flow was materially unchanged since 2021. This is not true. As shown above, in 2021 part of the flow had users decide whether they would consent to receive communications from Craftsy and required them to affirmatively opt-in by checking a box. While the presence of this additional feature may not have great significance in most contract settings, it undoubtedly does when assessing an adhesion contract formed over the internet, where a Court must "engage in fact-intensive inquiries of the layout and language of a website[.]". *Route App, Inc. v. Heuberger*, No. 2:22-CV-291-TS-JCB, 2022 WL 2316377, at *3 (D. Utah June 28, 2022). Here, Plaintiffs like Ms. Thomas were presented with an additional option—requiring interaction with extra lines of text, a prominently sized message that drew more attention, and a decision to actively check a box—all of which created further distraction and made the hyperlinked Terms even less noticeable.

Moreover, the Young Declaration shows that again, once a potential subscriber enters her credit card information, the site again automatically "jumps" to reveal the full COMPLETE ORDER button, thus posing the same timing issues for Samsung users. (Young Decl. ¶ 5(c)(ii)).




*Fig. 8* (Young Decl. Ex. M).

Further, the Samsung flow like the the non-mobile and iPhone flows, features colorful logos and a dominating COMPLETE ORDER button. But there are additional features that render this interface uniquely incapable of manifesting inquiry notice. First, the large orange banner with large, stylized Craftsy logo header is present in the field of view where the Terms link is presented for the first time and is set on the opposite end of the page, naturally drawing attention. Additionally, the user is further distracted from noticing the Terms by 9 lines of text pertaining to the autorenewal terms. But worse still, here, the Terms hyperlink is presented in an almost imperceptibly light blue color, which the Young Declaration explains fails to meet contrast standards for minimum perceivability. *Id.* at 7. But even disregarding industry standards, Courts routinely find that linked terms presented in an imperceivable manner are ineffective to bind users to arbitration. *See e.g.*, *Eakins v. Whaleco Inc.*, 721 F. Supp. 3d 1252, 1259 (W.D. Okla. 2024) (internal citations, quotations, and marks omitted) ("Most glaring, however, is the App's failure to distinguish the "Terms of Use" hyperlink from its surrounding text. While it is permissible to disclose terms and conditions through a hyperlink, the fact that a hyperlink is present must be readily apparent. The notice here appears in grey font against a white backdrop.); *Smith v. Whaleco Inc.*, 741 F. Supp. 3d 1104, 1109 (W.D. Okla. 2024) (same); *Johnson v. Whaleco, Inc.*, No. 5:23-cv-403-GAP-PRL, 2023 U.S. Dist. LEXIS 184104, at *7-8 (M.D. Fla. Oct. 13, 2023) (same); *Goldstein v. Fandango Media, LLC*, No. 9:21-CV-80466-RAR, 2021 WL 6617447, at *3 (S.D. Fla. July 27, 2021) (Report and Recommendation) ("Moreover, the comparatively miniscule size of the typeface used to

notify the purchaser that he is agreeing to certain "Terms and Policies" and its light grey color render it practically unreadable.")

The overall look and presentation of the checkout process Ms. Thomas experienced in 2021 fails to bind her to arbitrate the instant dispute. It clear that the McNaughton Declaration's assertion that Craftsy's checkout flow has remained materially the same since 2021 is not credible. Defendant's bid to compel arbitration on these facts is offensive to any consumer's reasonable expectations of fair play. Because Defendant has failed to satisfy its burden to show "a valid and enforceable agreement," *Duncan v. Int'l Markets Live, Inc.*, 20 F.4th 400, 402 (8th Cir. 2021), by each Plaintiff to be bound to the Terms (and its incorporated arbitration provision) by clicking the COMPLETE ORDER button, the Court should find that this proceeding is not "referable to arbitration" and deny the Motion. *See* 9 U.S.C. § 3.

**CONCLUSION**

For the foregoing reasons, the Motion should be denied.

Dated: August 1, 2025

Respectfully submitted,

/s/ *Arun G Ravindran (Pro Hac Vice)*

**RAVINDRAN LAW FIRM PLLC**
Arun G. Ravindran*
2525 Ponce deLeon Blvd., Suite 300
Coral Gables, Florida 33134
arun@ravindranlaw.com

**Pro Hac Vice Application Forthcoming*

***Counsel for Plaintiffs and the Putative Class***

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC**
ARDC No. 6295219
Carl V. Malmstrom
111 W. Jackson Blvd., Suite 1700
Chicago, IL 60604
Tel: (312) 391-5059
Fax: (212) 686-0114
malmstrom@whafh.com

***Local Counsel for Plaintiff and the Putative Class***