**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | | |
|---|---|---|
| Amie Croteau, Thuy DaoJensen, and Diane Thomas, individually and on behalf of all others similarly situated, | ) | Case No. 25-cv-00940-PJS-ECW |
| Plaintiffs, | ) | |
| vs. | ) | |
| TN Marketing, LLC d/b/a Craftsy, | ) | |
| Defendant. | ) | |

**TN MARKETING, LLC'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS OR TO STAY AND COMPEL ARBITRATION**

Defendant TN Marketing, LLC d/b/a Craftsy ("Craftsy") respectfully submits its reply in support of its motion to dismiss or alternatively, stay this matter and compel arbitration, because: (1) Plaintiffs lack standing; (2) Plaintiffs fail to state viable VPPA claims; and (3) Craftsy's terms of service bind Plaintiffs and require them to arbitrate their claims. Plaintiffs' arguments do not alter these three conclusions.

## ARGUMENT

### I. Plaintiffs Lack Standing

This lawsuit cannot proceed if Plaintiffs lack standing to bring their pixel-based video privacy claims. It is Plaintiffs' burden to establish standing for their statute-based privacy lawsuit: they cannot simply assert a statutory injury, but rather, must "identif[y] a close historical or common-law analogue for their asserted injury." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). This is a "fact-intensive" and "case-specific inquiry"

to determine whether the injury "would be actionable under the contours of th[e] common law tort as set forth in the Restatement (Second) of Torts." *Denmon v. Kansas Counselors, Inc.*, No. 23-3612, 2025 WL 2329189, at *2, *5 (8th Cir. Aug. 13, 2025). Plaintiffs make no attempt to establish that their asserted injuries are analogous to the *required elements* of the common law torts they summarily claim apply. *See id.* (no standing where plaintiff failed to show injury satisfied "two of the main elements" of intrusion upon seclusion: an intentional intrusion and conduct that is "highly offensive" to a reasonable person). The Court should not consider these comparator torts in deciding whether Plaintiffs have standing. *See Shields v. Pro. Bureau of Collections of Md., Inc.*, 55 F.4th 823, 829 (10th Cir. 2022) (declining to consider underdeveloped arguments relating to tort comparators because appellant "fail[ed] to explain their relevance").

Plaintiffs analogize the alleged transmission of their viewing history and Facebook ID ["FID"] to Meta to invasion of privacy, intrusion upon seclusion, public disclosure of private facts, and the non-existent "non-consensual dissemination of facts about them to third parties." (Doc. 26 at pp. 6–7). None work. Invasion of privacy is a *category* of torts encompassing intrusion upon seclusion and public disclosure of private facts; it is not a tort itself. *See Nabonzy v. Optio Sols., LLC*, 84 F.4th 731, 735 (7th Cir. 2023) ("[A]n invasion of the right to privacy has traditionally encompassed four distinct torts: intrusion upon seclusion, appropriation of another person's name or likeness, publicity given to another person's private life, and publicity that places one in a false light."); *accord* Restatement (Second) of Torts § 652A, cmt. b. And the fourth analogue—non-consensual dissemination of facts—is entirely manufactured, appearing nowhere in the Restatement.

Plaintiffs' remaining comparator torts fare no better. Public disclosure of private facts prohibits "giv[ing] publicity to a matter concerning the private life of another . . . , if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." Restatement (Second) of Torts § 652D. The focus is on "highly offensive information being widely known." *Shields*, 55 F.4th at 829; *accord Nabonzy*, 84 F.4th at 737 ("Public disclosure is the gravamen of the tort of giving publicity to another's private life."); *Am. Fed'n of Teachers v. Bessent*, No. 25-1282, 2025 WL 2313244, at *5 (4th Cir. Aug. 12, 2025) (confirming the tort requires "disclosure to the public at large, since [it] take[s] aim at the reputational damage that can accompany publicity").

Put simply, public disclosure "means that the matter is made public, by communicating it to the public at large." Restatement (Second) of Torts § 652D, cmt. a. Plaintiffs allege Craftsy disclosed their viewing history to only one entity: Meta. (Doc. 1 at ¶¶1, 3). The fact remains that the Restatement and case law provide that the tort elements are not met when an allegedly private fact is communicated "to a single person or group or even to a small group of persons," including, as here, business-to-business disclosures. *See* Restatement (Second) of Torts § 652D, cmt. a; *see also Nabonzy*, 84 F.4th at 736 (no standing because "[w]ithout a public-exposure component, [plaintiff]'s alleged injury is not analogous to the harm at the core of the public-disclosure tort."); *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1247 (11th Cir. 2022) (no standing where a consumer claimed a debt collector "placed his personal information 'within the possession of an unauthorized third-party'" but did not allege that the information

"reached, or was sure to reach, the public"); *Shields*, 55 F.4th at 829 (no standing where a plaintiff "alleged private—not public—disclosure"); *Barclift v. Keystone Credit Servs., LLC*, 93 F.4th 136, 148 (3d Cir. 2024) (no standing because "information transmission" could not "compare to a traditionally recognized harm that depends on the humiliating effects of public disclosure").[1] Earlier this month, the Third Circuit upheld dismissal of a plaintiff's Wiretapping and Electronic Surveillance Control Act ("WESCA") claims for lack of standing where defendant disclosed data to Microsoft, not to the "broader public." *Cook v. GameStop, Inc.,* No. 23-2574, 2025 WL 2250261, at *4 (3d Cir. Aug. 7, 2025). In that case, the court found that the "harm" associated with business-to-business disclosure was "not analogous to the harm associated with the tort of disclosure of private information." *Id.*

Plaintiffs' analogy to public disclosure also crumbles because Plaintiffs do not allege that anyone ever read and understood their data. Again, "[p]ublicity" means "*communicating* [the matter] to the public at large." Restatement (Second) of Torts § 652D cmt. a (emphasis added). And "[t]he word 'communication' is used to denote the fact that one person has brought an idea *to the perception of another*." Restatement (Second) of Torts § 559 cmt. a (emphasis added). Thus, "a plaintiff must allege that the document was actually read and not merely processed." *Hunstein*, 48 F.4th at 1253 (Pryor, C.J., concurring); *Sputi v. Alltran Fin.*, No. 21-cv-4663, 2021 WL 5772033, at *4 (S.D.N.Y.

[1] Plaintiffs try to distinguish these cases on the ground that they do not involve VPPA. (Doc. 26 at p.7 n.5). But the entire point of the "close relationship" analysis is to put aside the bare statutory violation and ask whether the plaintiff has been concretely harmed. *See TransUnion*, 594 U.S. at 427.

Dec. 5, 2021) (stating the common law did not "protect[] against the exposure of private information to an inanimate object like a computer"). Finally, the alleged disclosure does not involve "highly offensive" information. All the Pixel allegedly revealed are the "specific videos that a particular person viewed." (Doc. 1 at ¶3). No "reasonable person" would feel "seriously aggrieved" by the baking and sewing videos they watched becoming publicly known. *See* Restatement (Second) of Torts § 652D, cmt. c, illus. 8 ("Mrs. B did her washing yesterday" is not actionable.).

Intrusion upon seclusion is an inapt analogy as well. This tort prohibits "intentionally intrud[ing], physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, . . . if the intrusion would be highly offensive to a reasonable person." *Denmon*, 2025 WL 2329189, at *11–12. Plaintiffs have not alleged multiple "elements" of "intrusion upon seclusion," so they have "not suffer[ed] a harm [with] a sufficiently *close* relationship" to confer standing." *Denmon*, 2025 WL 2329189, at *5; *see also Cook*, 2025 WL 2250261, at *5 (no standing where plaintiff failed to allege that information entered on defendant's website was "personal or sensitive"). Plaintiffs do not allege any intrusion into their private affairs, nor do they allege the use of a Meta pixel to record content viewed is highly offensive to them, much less a reasonable person.[2] Nor could they. In *Jones v. Bloomingdales.com, LLC*, the Eighth Circuit upheld the dismissal of Electronic Communications Privacy Act claims for lack of standing where the plaintiff

---

[2] Plaintiffs cannot cure these pleading deficiencies through their Opposition. *Morgan Distrib. Co. v. Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989) ("[I]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss.").

failed to allege harm analogous to intrusion upon seclusion. 124 F.4th 535, 539 (8th Cir. 2024). There, the court found that defendant's alleged recording of the plaintiff's mouse movements, keystrokes, and webpages visited the equivalent of a security camera at a brick-and-mortar store: "no reasonable customer … could claim a privacy interest in her general movements and activities in the public part of the store." *Id.* Similarly, Plaintiffs cannot claim a privacy interest in the cooking and baking videos they watched, *see id.*, and the alleged collection and transmission of such data does not constitute an intrusion that a reasonable person would find highly offensive. *See Phillips v. U.S. Customs & Border Prot.*, 74 F.4th 986, 995–96 (9th Cir. 2023) (no standing via analogy to intrusion because "names, birthdays, [and] social security numbers" are not "so sensitive that another's access to that information 'would be highly offensive to a reasonable person'").

Plaintiffs have cobbled together attempted authority using cases that either predate or contravene *TransUnion* and cannot be squared with the Eighth Circuit's approach. (Doc. 26 at p. 5 n.3). In the Eighth Circuit, whether a plaintiff has suffered concrete harm is a "fact-intensive" and "case-specific inquiry" that is dependent upon what the plaintiffs actually allege. *Denmon*, 2025 WL 2329189, at *2, *5; *accord Ojogwu v. Rodenburg Law Firm*, 26 F.4th 457, 463 n.4 (8th Cir. 2022). It is not enough to simply cite decisions where a court has found standing under other facts not pled here, yet that is exactly what Plaintiffs have done. (Doc. 26 at pp. 4–6).

Second, most of Plaintiffs' cited authority predates *TransUnion*. *See Dinerstein v. Google, LLC*, 73 F.4th 502, 516, 522 (7th Cir. 2023) (calling *TransUnion* a "watershed decision" that "marked a shift in the Court's standing jurisprudence"). One of the pre-

*TransUnion* cases relied upon by Plaintiff is *Eichenberger v. ESPN, Inc.*, a Ninth Circuit VPPA standing opinion. Earlier this week, that court noted, "[p]erhaps we might analyze that statute differently today [on standing], especially after the Supreme Court's decision in *TransUnion*…." *Popa v. Microsoft Corp.*, No. 24-14, 2025 WL 2448824, at *8 (9th Cir. Aug. 26, 2025).

Further, Plaintiffs' post-*Trans Union* cases are inconsistent with the Eighth Circuit's approach, which hews closely to the contours of the common law comparator tort. *Compare Denmon*, 2025 WL 2329189, at * 4-5, *with Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 540–544 (2d Cir. 2024); *Salazar v. Paramount Glob.*, 133 F.4th 642, 646–48 (6th Cir. 2025); *Pileggi v. Wash. Newspaper Publ'g Co*., No. 24-7022, 2025 WL 2319550, at *4–7 (D.C. Cir. Aug. 12, 2025).[3] *Feldman v. Star Tribune Media Co.* is similarly unpersuasive because that court mistakenly accepted as true the bare legal conclusion that "[t]he surreptitious disclosure of PII paired with the name of video content an individual views . . . would be offensive to a reasonable person."[4] 659 F. Supp. 3d 1006, 1015 (D. Minn. 2023). *Feldman* was also decided without the Eighth Circuit's guidance in *Denmon* and *Jones,* which require a more in-depth consideration of the elements of the comparator tort. For these reasons, Plaintiffs lack standing to bring their VPPA claims.

---

[3] All these decisions are still subject to further review, and one already has a fully briefed petition for certiorari. (*See* Dec. of Heather Marx at Ex. 1 (*Nat'l Basketball Ass'n v. Salazar* Cert. Petition)).

[4] Plaintiffs did not allege that Craftsy's alleged disclosure would be offensive to a reasonable person.

## II. <u>Craftsy Did Not Disclose "Personally Identifiable Information" ("PII").</u>

Plaintiffs' VPPA claims should also be dismissed because "*Solomon* [*v. Flipps Media, Inc.*] effectively shut the door for Pixel-based VPPA claims." *Hughes v. Nat'l Football League*, No. 24-2656, 2025 WL 1720295, at *2 (2d Cir. June 20, 2025) (holding that information collected by Meta Pixel did not constitute PII under VPPA). *Solomon* held, "'[PII]' encompasses information that would allow an ordinary person to identify a consumer's video-watching habits, but not information that only a sophisticated technology company could use to do so." 136 F.4th 41, 52 (2d Cir. 2025). It went on to hold that the complaint failed to "plausibly allege that an ordinary person could identify Solomon through her [Facebook ID ("FID")]." *Id.* at 54. *Solomon* squarely supports dismissal of Plaintiffs' VPPA claims, which also allege that a FID constitutes PII.

Plaintiffs' only responses to the Second Circuit's cogent reasoning are to: (1) dissuade the Court from applying the "ordinary person" standard adopted a the majority of circuit courts[5]; and (2) cite non-authoritative district court cases for the proposition that FIDs satisfy the ordinary person standard. (Doc. 26 at pp. 9-16). Both arguments fail. First, the ordinary person standard flows from the original purpose of VPPA and its unchanged definition of PII. As the Ninth Circuit observed, "we are not persuaded that the 1988 Congress intended for the VPPA to cover circumstances so different from the ones that motivated its passage." *Eichenberger*, 876 F.3d at 985. *Accord Solomon,* 136 F.4th at 54;

[5] While Plaintiffs claim that *Feldman* adopted the opposing "reasonable and foreseeable" standard (Doc. 26 at p.11, n.8), that is inaccurate. *See* 659 F.Supp.3d at 1020-21 (judging complaint against *both* the ordinary person standard and the reasonable and foreseeable standard).

*In re Nickelodeon Consumer Priv. Litig.,* 827 F.3d 262, 289-90 (2016). The circumstances that motivated VPPA's passage were preventing video store clerks from disclosing individuals' names and a list of the videos they viewed (*i.e.,* PII) to others. In this way, the ordinary person standard prevents litigants from applying VPPA to fact patterns outside its intended scope, as Plaintiffs seek to do.

Only one circuit court has adopted the "reasonable and foreseeable" standard that Plaintiffs suggest this Court follow. In addition to being on the wrong side of a circuit split, the "reasonable and foreseeable" standard risks broadening VPPA to scenarios not intended by Congress, to the unfair detriment of the "disclosing party." For example, in *Eichenberger,* the defendant, ESPN, allegedly disclosed plaintiff's Roku serial device number and the videos he watched. 876 F.3d at 986. Standing alone, this information could not identify plaintiff; it is only when combined with data solely in Adobe's possession (which ESPN does not possess) that transforms it into something that could identify him. *See id.* As the Ninth Circuit recognized, it is not fair that a defendant's liability should be determined by the capabilities of the party to whom data is disclosed, rather than their own conduct. *See id.* at 985 ("It looks to what information a video service provider discloses, not to what the recipient of that information decides to do with it."). Plaintiff's lengthy summary of *Manza v. Pesi, Inc.*, an unpublished district court case from outside the Eighth Circuit, does not alter that conclusion. (Doc. 26 at pp.12-14).

Second, Plaintiffs have not sufficiently alleged that FIDs constitute PII under the ordinary person standard. Plaintiffs argue that, because an ordinary person could plug a FID into a Facebook URL, an ordinary person could use the FID to identify an individual.

(Doc. 26 at p.15). *Solomon* specifically rejected this argument, reasoning, "[t]he Complaint merely states that entering 'facebook.com/[Solomon's FID]' into any web browser would result in Solomon's personal Facebook profile, and that '[t]his basic method of accessing a person's Facebook profile is generally and widely known among the public.' …[W]e are not persuaded that an FID is 'vastly different' from the unique device identifiers in *Nickelodeon*, or the Roku device serial numbers in *Eichenberger*." 136 F.4th at 54–55.

Here, Plaintiffs admit that a FID is a "sequence of numbers." (Doc. 1 at ¶ 3). But they have not alleged any facts suggesting how an ordinary person would know this "sequence of numbers" was a FID, particularly in the context of the other data transmitted by the Meta Pixel. *Hughes,* 2025 WL 1720295, at *3 ("While Hughes asserts that a viewer's FID can be identified based on the string of numerals following the 'c_user' field, it is not plausible that an ordinary person, without [ ] annotation ..., would see the 'c_user' phrase on [this communication] and conclude that the phrase was a person's FID."). *See also Eichenberger,* 876 F.3d at 986 (finding a Roku device serial number "cannot identify an individual unless it is combined with other data in Adobe's possession—data that ESPN never disclosed and apparently never even possessed").

Nor have Plaintiffs alleged that their individual Facebook accounts, which are allegedly connected to their FIDs, contained information that an ordinary person could use to identify their video watching habits, like names or addresses. (Doc. 1 at ¶¶ 7-30). One of the primary cases upon which Plaintiffs rely, *Feldman* (Doc. 26 at pp.11, 15), found that the plaintiff had successfully claimed a FID constituted PII where he alleged his "Facebook profile and his email address contain his name." 659 F.Supp.3d at 1021. *See also Ghanaat*

*v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 720 (N.D. Cal. 2023) ("Here, plaintiffs' allegations are inadequate because they do not allege their Facebook pages contain any personal information, such as their names or email addresses."); *Heerde v. Learfield Commc'ns, LLC*, 741 F. Supp. 3d 849, 857 (C.D. Cal. 2024) (similar). Additionally, Plaintiffs argue that *Smith v. Trinity Broad. of Tex., Inc.* is distinguishable because "Plaintiffs by [sic] had accounts with Meta, profiles on Meta's internet properties, and Facebook IDs associated with those profiles." (Doc. 26 at p.18 n.9 (citing Doc. 1 at ¶¶ 3, 60)). But neither of the paragraphs cited by Plaintiffs show their Facebook profiles were "public and contain[ed] any identifying information." No. 8:24-cv-01046, 2024 WL 4394557, at *3 (C.D. Cal. Sept. 27, 2024). As set forth in Craftsy's opening brief, Plaintiffs have not alleged Craftsy possessed or knowingly disclosed their PII. (Doc. 19 at pp.18-23). Therefore, Plaintiffs' VPPA claims should be dismissed.

## II. The Arbitration Agreement Is Binding and Enforceable as to Plaintiffs.

Plaintiffs' opposition to Craftsy's Motion to Compel Arbitration is an exercise in misdirection. Specifically, Plaintiffs contend the Court should decline to compel arbitration because Craftsy's Terms of Service, which include an arbitration agreement, may be "hybrid-wrap" and not "clickwrap." (Doc. 26 at pp. 27-28). This is a distinction without a difference. As the Ninth Circuit held this week, "[u]nder an inquiry theory of notice, contracts are formed between website users and operators only where (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, ***such as clicking a button or checking a box***, that unambiguously manifests his or her assent to those terms." *Massel v. SuccessfulMatch.com*,

No. 24-1870, 2025 WL 2452371, at *1 (9th Cir. Aug. 26, 2025) (emphasis added). *Massel* emphasized: "there are no per se rules about what's necessarily inadequate"; instead, courts must consider "the visual design of the webpages and the context of the transaction." *Id.* *Massel* found arbitration was proper because (1) the account creation screen was not "too crowded with extraneous visuals"; (2) "the requirements to review and agree to the Service Agreement were in the natural flow of [the user's actions]"; and (3) the plaintiff should have been "more vigilant in looking for contractual terms when the context of the transaction reasonably implies a contractual relationship." *Id.* at *1-2.

*Massel*'s reasoning is directly applicable here. Plaintiffs did not engage in an one-off purchase on Craftsy's website; instead, they purchased year-long memberships to Craftsy.com. (Doc. Nos. 27-1, ¶2; 27-2, ¶2; 27-3, ¶2). Plaintiffs' transactions contemplated a continuing relationship and put Plaintiffs on notice that they should be looking for Craftsy's terms of service. *See Massel,* 2025 WL 2452371, at *1; *Morisson v. Yippee Ent., Inc.*, No. 24-7235, 2025 WL 2389424, at *2 (9th Cir. Aug. 18, 2025) ("A reasonable user … would have contemplate[d] some sort of continuing relationship that prompted scrutiny of the website for any contractual obligations or terms."). To purchase a membership, Plaintiffs had to submit their payment information on the website's checkout page. (Doc. 20 at ¶ 8). A statement directly below the "Complete Order" button appears within "the natural flow of the user's actions" (*Massel,* 2025 WL 2452371, at *1), and states: "**By completing my order, I agree to Membership with automatic renewal, the terms of service, and privacy policy.**" (Doc. 20 at ¶ 8). (*See also* Doc. 27-4 at Exs. B, J, M). The words "terms of service" and "privacy policy" are in bright orange font, and link to

Craftsy's terms of service and privacy policy, respectively. (Doc. 20 at ¶ 8). A screenshot of this portion of Craftsy's website is below:




The checkout page is orderly and uncluttered. On the left side are a series of labeled boxes for the user to enter basic name/address information, and the right side displays the items purchased with pricing, and the above credit-card interface. (Doc. 27-4 at Ex. B). Any user would be able to navigate this page with ease. *Massel,* 2025 WL 2452371, at *1. Most importantly, ***Plaintiffs do not deny seeing the language relating to the terms of service, nor do they deny that they clicked the hyperlink to the terms of service.***[6] (Doc. 27-1, 27-2, and 27-3).

[6] Any argument or evidence to the contrary has been waived. *Cf. Dale & Selby Superette & Deli v. U.S. Dep't of Agric.*, 838 F. Supp. 1346, 1348 (D. Minn. 1993).

Faced with similar facts, this Court has granted motions to compel arbitration. In *Jordan v. Best Buy Co., Inc.,* this Court granted a motion to compel arbitration where "Best Buy's Terms appear[ed] directly above the Place Your Order button, in plainly readable text, with a hyperlink in blue to stand out." No. CV 24-1066 (DWF/TNL), 2025 WL 580894, at *4 (D. Minn. Feb. 21, 2025). The Court held: "if the website contains an explicit textual notice of the terms, courts will generally find that a user was on inquiry notice," despite that the plaintiff claimed she was unaware of the terms. *Id.*

Further, in *Barclay v. ICON Health & Fitness, Inc.,* the Court compelled arbitration where, "[d]irectly beneath the 'Purchase for $xx' button was a statement that read, 'By clicking submit, you agree to the Terms Of Service. View our Privacy Policy.' Both the phrases 'Terms Of Service' and 'Privacy Policy' were in blue font, and the Terms of Service phrase hyperlinked directly to the iFit Terms of Use in effect at that time." No. 19-CV-2970 (ECT/DTS), 2020 WL 6083704, at *9 (D. Minn. Oct. 15, 2020). The Court held that "the 'clicking-means-assent' statement and the hyperlink to the Terms of Use were clear and conspicuous, and either of these procedures gave [plaintiff] enough information to discover and review the then-effective Terms of Use by proper diligence." *Id. See also Jones v. Experian Info. Sols., Inc.*, No. CV 23-3887 (JWB/DTS), 2025 WL 227198, at *2 (D. Minn. Jan. 7, 2025) (similar).

Circuit courts, as well as courts in other districts, have also upheld "clickwrap" or "hybrid-wrap" agreements like Craftsy's. In *Dhruva v. CuriosityStream, Inc.,* the Fourth Circuit vacated the denial of a motion to compel arbitration of the plaintiffs' VPPA claims where the plaintiffs "manifested assent to the terms of use (and thus the arbitration clause)

by registering with a covered website." 131 F.4th 146, 154 (4th Cir. 2025). The court found that "[b]ecause [the defendant] expressly advised [plaintiffs] that 'registering with the sites signifies that [they] agree to the[ ] terms of use,' their clicks of the 'Sign up now' button objectively and unambiguously manifested assent to those terms." *Id.* at 155. *See also Oberstein v. Live Nation Entm't, Inc.,* 60 F.4th 505, 516-17 (9th Cir. 2023) (affirming order compelling arbitration where terms of use were "distinguished from the rest of the text" and transaction required "full registration process" that contemplated a "continuing relationship"); *Myer v. Uber Tech., Inc.,* 868 F.3d 66, 78 (2d Cir. 2017) (affirming order compelling arbitration where language that creating account constituted agreement to terms of service was directly below buttons for registration and hyperlink to terms of service were blue and underlined); *Nicosia v. Amazon.com, Inc.,* 384 F. Supp. 3d 254, 266 (E.D.N.Y. 2019), *aff'd,* 815 F. App'x 612 (2d Cir. 2020) (similar); *Gennaro v. Avvo, Inc.,* Case No. 18-cv-2213-WQH-BLM, 2019 WL 13488559, at *4 (S.D. Cal. May 6, 2019) (similar); *Gorney v. Wayfair, Inc.,* Case No. 18 C 8259, 2023 WL 2409595, at *6 (N.D. Ill. Jun. 7, 2019) (similar).

Plaintiffs rely solely on the Young Declaration to establish that Plaintiffs were not on constructive notice of Craftsy's terms and conditions. However, Young lacks personal knowledge of what Plaintiffs saw or did not see when they purchased their Craftsy memberships. Therefore, Young's explanation of how Plaintiffs may not have seen the terms of use disclosure does no evidentiary work, particularly given that **there is *no testimony* from Plaintiffs that they did not see the disclosure in the first place**. Plaintiffs also make no effort to qualify Young as an expert witness, such that his testimony should

be admitted under Fed. R. Evid. 702. Regardless, courts routinely disregard "expert" opinions pertaining to hybrid-wrap agreements, as expert testimony is not necessary for courts to decide the notice issue. For example, in *Oberstein*, the court found plaintiff's expert testimony "immaterial" as it was able to conclude on its own that the defendants' websites provided adequate constructive notice. No. CV 20-3888-GW-GJSX, 2021 WL 4772885, at *6 (C.D. Cal. Sept. 20, 2021), *aff'd,* 60 F.4th 505 (9th Cir. 2023). In reaching this conclusion, the court relied on the fact that "the text linking to the TOU is placed conspicuously close to the buttons that the users are required to press to sign up, sign in, or complete a purchase" and "[t]he actual hyperlink that navigates to the TOU is conspicuously blue, while the surrounding text is black." *Id.* Additionally, in *Harbers v. Eddie Bauer, LLC,* the court disregarded a plaintiff's expert declaration deeming a terms of use disclosure "inconspicuous," noting: "Courts in this circuit and others have concluded that disclosures similar to those on Eddie Bauer's Review Page provide customers notice sufficient to manifest mutual assent." Case No. C19-1012JLR, 2019 WL 6130822, at *7 (W.D. Wash. Nov. 19, 2019) (citing cases). So, too, here. The Court does not need to rely on expert testimony when it is clear from the face of Craftsy's website that the disclosure pertaining to the terms of service is directly under the "Complete Order" button, the words "terms of use" are in bright orange text,[7] and the terms of use themselves are hyperlinked.

---

[7] Plaintiff makes much of the fact that the hyperlink to Craftsy's terms of service was light blue for Plaintiff Thomas, rather than orange. (Doc. 26 at p.51). However, hyperlink text color is not determinative. *See Massel,* 2025 WL 2452371, at *1 ("That the links [to the Service Agreement and Privacy Policy were] not blue ... or capitalized does not undercut a conclusion that Millionaire Match provided reasonably conspicuous notice" of them.).

Finally, the cases cited by Plaintiffs are either outdated or inapposite. For example, *Morisson v. Yippee Ent., Inc.,* 756 F. Supp. 3d 842 (S.D. Cal. 2024) was recently reversed: the Ninth Circuit found that the hyperlink to the defendant's terms of service was conspicuous and the webpage was "reasonably uncluttered." 2025 WL 2389424, at *1. In *Cullinane v. Uber Techs., Inc.,* the court relied on the fact that the terms of use hyperlink did not stand out on the webpage. 893 F.3d 53, 63-64 (1st Cir. 2018). Here, by comparison, the terms of use hyperlink was bright orange, and was the only orange text on the otherwise white page besides the Craftsy banner and the "Order Now" button. And, in *Berman v. Freedom Fin. Network, LLC*, the disclosures stated, "'I understand and agree to the <u>Terms & Conditions</u>,' but they did not indicate to the user what action would constitute assent to those terms and conditions." 30 F.4th 849, 858 (9th Cir. 2022). This is not the case with Craftsy's disclosure, which explicitly stated that by clicking "Order Now," the user agreed to the terms and conditions. Plaintiffs do not contest that their VPPA claim falls within the scope of the arbitration clause, and have therefore waived that argument.

"There is "liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Plaintiffs have presented no compelling basis to diverge from that precedent here. The Court therefore should grant Craftsy's motion to compel arbitration.

## CONCLUSION

For the foregoing reasons, Craftsy requests dismissal of Plaintiffs' Complaint with prejudice. Alternatively, Craftsy requests the Court stay this matter and issue an order directing Plaintiffs to individually arbitrate their claims, consistent with the arbitration agreement.

Dated: August 29, 2025

Respectfully submitted,

**COZEN O'CONNOR**

By: */s/Heather L. Marx*
Heather L. Marx (#321163)
hmarx@cozen.com
33 South Sixth Street, Suite 3800
Minneapolis, MN 55402
Telephone: 612.260.9000

Melissa Siebert (*pro hac vice*)
msiebert@cozen.com
123 North Wacker Drive, Suite 1800
Chicago, IL 60606
Telephone: 312.474.4491

Gianna Puccinelli (*pro hac vice*)
gpuccinelli@cozen.com
2001 M Street NW, Suite 500
Washington, DC 20036
Telephone: 202.912.4800

***Attorneys for Defendant***