UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Amie Croteau, Thuy Daojensen, and Diane Thomas, individually and on behalf of all others similarly situated,

Plaintiffs,

vs.

TN Marketing, LLC d/b/a Craftsy,

Defendant.

Case No. 25-cv-00940 (PJS/ECW)

**DECLARATION OF HEATHER MARX IN SUPPORT OF TN MARKETING, LLC'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS OR TO STAY AND COMPEL ARBITRATION**

I, Heather Marx, declare as follows:

1. I am counsel for Defendant TN Marketing, LLC d/b/a Craftsy in this action. I have personal knowledge of the facts set forth in this Declaration, and I could and would competently testify to each fact set forth in this Declaration if called and duly sworn by this Court. I make this Declaration in support of TN Marketing, LLC's Reply in Support of its Motion to Dismiss or to Stay and Compel Arbitration.

2. Attached as **Exhibit 1** is a true and correct copy of the Petition for a Writ of Certiorari filed with the United States Supreme Court in the matter of *Nat'l Basketball Ass'n v. Salazar*, as such Petition is publicly available on the case's docket on the United States Supreme Court's website (https://www.supremecourt.gov/DocketPDF/24/24-

994/352136/20250314113233410_National%20Basketball%20Assn%20v.%20Salazar%20-%20Cert%20Petition%20FILE.pdf).

I declare under penalty of perjury under the laws of the United States of America and the State of Minnesota that the foregoing is true and correct.

Executed this 29th day of August, 2025

_____________________________
Heather Marx

# EXHIBIT 1

**No. 24-____**

# In the Supreme Court of the United States

NATIONAL BASKETBALL ASSOCIATION, PETITIONER

*v.*

MICHAEL SALAZAR

*ON PETITION FOR A WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE SECOND CIRCUIT*

## PETITION FOR A WRIT OF CERTIORARI


Shay Dvoretzky
*Counsel of Record*
Parker Rider-Longmaid
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Ave. NW
Washington, DC 20005
202-371-7000
shay.dvoretzky@skadden.com

Raza Rasheed
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
2000 Ave. of the Stars,
Ste. 200N
Los Angeles, CA 90067

*Counsel for Petitioner*

## QUESTIONS PRESENTED

The Video Privacy Protection Act prohibits any "video tape service provider" from "knowingly disclos[ing] … personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The statute defines "video tape service provider" as "any person, engaged in the business … of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." *Id.* § 2710(a)(4). It defines "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." *Id.* § 2710(a)(1).

The NBA shows basketball highlights on its free public-facing website, and also allows fans to subscribe to a free online newsletter. Michael Salzar subscribes to the NBA's newsletter. Separately, he claims he watched videos on the NBA's website. He claims that the NBA's website discloses his video viewing history to Meta, the company that operates Facebook, so that Meta can send him targeted ads. He does not allege that Meta ever has, or will, disclose his viewing history to the general public.

The questions presented are:

**1.** Whether a consumer claiming that he was harmed by disclosure of his personal information must plead that his information was revealed to the public to establish Article III standing, as the Third, Seventh, Tenth, and Eleventh Circuits have held, or whether the consumer need only plead that his information was disclosed to any third party without his consent, as the Second Circuit held below.

**2.** Whether the VPPA bars a business from disclosing information about consumers who do not subscribe to its audiovisual goods or services.

## PARTIES TO THE PROCEEDING

Petitioner is the National Basketball Association, which was the defendant and appellee in the proceedings below. Respondent is Michael Salazar, who was the plaintiff and appellant below.

## CORPORATE DISCLOSURE STATEMENT

The NBA does not have any parent corporation and there is no publicly held corporation which holds a 10% or more ownership interest in the NBA.

## RELATED PROCEEDINGS

United States Court of Appeals (2d Cir.):

*Salazar v. National Basketball Ass'n*, No. 23-1147, 118 F.4th 533 (Oct. 15, 2024)

United States District Court (S.D.N.Y.):

*Salazar v. National Basketball Ass'n*, No. 1:22-cv-07935, 685 F. Supp. 3d 232 (Aug. 7, 2023)

## TABLE OF CONTENTS

**Page**

QUESTIONS PRESENTED ....................................... i
PARTIES TO THE PROCEEDING .......................... ii
CORPORATE DISCLOSURE STATEMENT ........... ii
RELATED PROCEEDINGS ..................................... ii
TABLE OF AUTHORITIES....................................... v
INTRODUCTION....................................................... 1
OPINIONS BELOW ................................................... 8
JURISDICTION ........................................................ 8
CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED .................................. 8
STATEMENT ............................................................ 8
A. Legal background ........................................... 8
B. Factual and procedural background............ 11
REASONS FOR GRANTING THE PETITION ....... 13
I. The Second Circuit created a circuit split and contravened *TransUnion* by holding that consumers are concretely injured when their information is privately disclosed between two businesses. .................................... 15
A. The courts of appeals disagree about whether private disclosures of consumer information are actionable. ......... 16
B. The Second Circuit's decision is wrong and contravenes *TransUnion*....................... 22
II. The Second Circuit misconstrued the VPPA and stretched it far beyond its intended scope by extending it to consumers of non-audiovisual goods and services. .......................... 24

**TABLE OF CONTENTS**
(continued)

**Page**

A. The VPPA does not apply to consumers who do not subscribe to audiovisual goods or services. ....... 24

B. The Second Circuit's contrary reasoning is unpersuasive. ....... 27

C. The courts of appeals are poised to split on this issue. ....... 30

III. These issues are critically important, and this case is an ideal vehicle for resolving them. ....... 31

CONCLUSION ....... 36

| | |
|---|---|
| Appendix A | Court of appeals opinion, October 15, 2024 ....... 1a |
| Appendix B | District court opinion, August 7, 2023 ....... 41a |
| Appendix C | Complaint, September 16, 2022 ....... 67a |
| Appendix D | First amended complaint, December 13, 2024 ....... 91a |
| Appendix E | 18 U.S.C. § 2710 ....... 138a |

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Barclift v. Keystone Credit Services, LLC*,
93 F.4th 136 (3d Cir. 2024) .................................3, 4,
.................................................................18, 19, 21

*Chan v. Korean Air Lines, Ltd.*,
490 U.S. 122 (1989) ................................................26

*Ellis v. Cartoon Network, Inc.*,
803 F.3d 1251 (11th Cir. 2015) ..............................25

*Fischer v. United States*,
603 U.S. 480 (2024) ................................................26

*Gardener v. MeTV*,
681 F. Supp. 3d 864 (N.D. Ill. 2023),
*appeal filed*, No. 24-1290
(7th Cir. argued Sept. 13, 2024) ..............................4

*Honig v. Doe*,
484 U.S. 305 (1988) ................................................31

*Hunstein v. Preferred Collection & Management Services, Inc.*,
48 F.4th 1236 (11th Cir. 2022)
(en banc) ..........................................................3, 4, 5,
...........................................................16, 17, 18, 19,
......................................................20, 21, 22, 24, 34

*King v. Burwell*,
576 U.S. 473 (2015) ..........................................27, 28

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803) .................................31

*Nabozny v. Optio Solutions LLC*,
84 F.4th 731 (7th Cir. 2023) ....................3, 4, 17, 18

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Pileggi v. Washington Newspaper Publishing Co.*, No. 1:23-cv-00345 (BAH), 2024 WL 324121 (D.D.C. Jan. 29, 2024), *appeal filed*, No. 24-7022 (D.C. Cir. argued Feb. 27, 2025).....4, 5

*Raines v. Byrd*, 521 U.S. 811 (1997)..........................................9, 10

*Salazar v. Paramount Global*, 683 F. Supp. 3d 727 (M.D. Tenn. 2023), *appeal filed*, No. 23-5748 (6th Cir. argued June 18, 2024) ..............................5

*Shields v. Professional Bureau of Collections of Maryland, Inc.*, 55 F.4th 823 (10th Cir. 2022) ..................3, 4, 18, 21

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016)..........................................7, 9, ..................................................................16, 31, 32

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)..............................................31

*Tawam v. Feld Entertainment Inc.*, 684 F. Supp. 3d 1056 (S.D. Cal. 2023) ....................4

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)........................................3, 4, 5, ....................................................................7, 9, 10, ............................................................15, 16, 18, 22, ......................................................23, 24, 31, 33, 34

*Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000)..............................................31

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

CONSTITUTION AND STATUTES

U.S. Const. art. III........................................1, 3, 4, 7, ..........................................................9, 12, 14, 17, ...................................................18, 22, 23, 31, 32

U.S. Const. art. III, sec. 2 .......................................8

Fair Credit Reporting Act,
15 U.S.C. § 1681 *et seq*....................................22, 32

Fair Debt Collection Practices Act,
15 U.S.C. § 1692 *et seq*..................................16, 17, ...............................................................18, 20, 32

Computer Fraud and Abuse Act of 1986,
18 U.S.C. § 1030..................................................32

Electronic Communications Privacy Act of 1986,
18 U.S.C. § 2510 *et seq*..........................................32

Video Privacy Protection Act,
18 U.S.C. § 2710....................................1, 2, 3, 4, 5, ..........................................................6, 7, 8, 9, 10, ..................................................11, 12, 13, 14, 15, ............................................20, 22, 24, 25, 26, 27, .........................................28, 29, 30, 32, 33, 34, 35

18 U.S.C. § 2710(a) ..............................................11

18 U.S.C. § 2710(a)(1).................................2, 6, 11, ...............................................................25, 26, 28

18 U.S.C. § 2710(a)(3)..........................................11

18 U.S.C. § 2710(a)(4).................................2, 6, 10, .........................................................11, 25, 26, 28

18 U.S.C. § 2710(b)(1).......................2, 6, 10, 11, 25

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

18 U.S.C. § 2710(c)(2) ........................................2, 10

28 U.S.C. § 1254(1)......................................................8

Class Action Fairness Act of 2005,
28 U.S.C. §§ 1332(d), 1453, 1711-1715 .................32

28 U.S.C. § 1332(d) ...............................................32

28 U.S.C. § 2101(c) ......................................................8

**OTHER AUTHORITIES**

Antonin Scalia & Bryan Garner,
*Reading Law* (2012).........................................27, 28

Restatement (Second) of Torts
(Am. L. Inst. 1977).......................................3, 16, 17

S. Rep. 100-599 (1988)................................6, 9, 10, 27

## INTRODUCTION

This case presents two exceptionally important issues of federal law that have divided the lower courts. The Second Circuit's ruling threatens to blow open the federal courthouse doors to all manner of lawsuits over trivialities, all while jeopardizing the data-use practices that make so much of the Internet free, accessible, and useful to consumers.

The first issue concerns Article III standing: does a consumer suffer concrete harm when one business discloses his personal information to another, without ever disclosing that information to the public? The Third, Seventh, Tenth, and Eleventh Circuits have answered "no." Those courts hold that because common law courts did not recognize non-public, business-to-business disclosures as harmful, federal courts cannot do so either. But the Second Circuit here said "yes," holding that consumers are always concretely harmed whenever a business discloses any information about them to anyone without their prior authorization. App. 17a.

The second question concerns the scope of the Video Privacy Protection Act (VPPA), 18 U.S.C. § 2710, which prohibits certain companies that provide audiovisual content from disclosing information about their customers' video viewing habits without consent. Most federal courts have concluded that only persons who rent, buy, or subscribe to a business's audiovisual goods and services can sue to enforce the VPPA. But the Second Circuit here staked out yet another outlier position, holding that any person who has ever purchased some good or service from a business is protected by the VPPA, even if they watched the business's audiovisual content without renting,

buying, or subscribing to it. The Sixth, Seventh and D.C. Circuits, which have heard argument on the issue, are likely to reject the Second Circuit's position soon, creating a second circuit split requiring this Court's intervention.

These questions implicate fundamental constitutional limitations on the kinds of disputes the federal courts can hear and have potentially enormous implications for the modern Internet economy. Indeed, if accepted, Salazar's position could effectively destroy the widespread data-use practices that allow countless websites to offer audiovisual content that is both consumer-friendly and free. This case is an excellent vehicle for resolving these important issues. The Court should grant review and reverse.

**1.** In 1987, a Washington, D.C., newspaper leaked then–D.C. Circuit Judge Robert Bork's video rental history to embarrass him while his nomination was pending for a seat on this Court. App. 22a. Congress responded by passing the VPPA, which prohibits any "video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The statute defines "video tape service provider" as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." *Id.* § 2710(a)(4). It defines "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." *Id.* § 2710(a)(1). Violators are subject to statutory damages of $2,500, among other things. *Id.* § 2710(c)(2).

This case represents the latest in a series of recent efforts by consumer plaintiffs to stretch the VPPA beyond its modest scope. The NBA is the world's most popular professional basketball league. It offers a variety of free media content to fans through its public website, NBA.com, including video highlights and a free email newsletter. Michael Salazar claims he signed up for the NBA's email newsletter, and separately watched unspecified videos on NBA.com while logged into his Facebook account. He alleges that the NBA's website contained software that automatically disclosed his video viewing history to Meta (the company that operates Facebook), so that Meta could send him targeted Facebook ads. He claims that this purported disclosure violated the VPPA and seeks to represent a class of other consumers who watched videos on NBA.com while logged into their Facebook accounts.

**2. a.** The courts of appeals have divided over whether private, business-to-business disclosures of consumer information like those Salazar challenges here cause concrete harm sufficient for Article III standing. Traditionally, American tort law didn't allow plaintiffs to sue for disclosures of their personal information unless the disclosures were both outrageous and made to the public at large, rather than to a few individuals. *See* Restatement (Second) of Torts § 652D cmt. a (Am. L. Inst. 1977). Because Article III standing requires the plaintiff to allege an injury with "a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021), the Third, Seventh, Tenth, and Eleventh Circuits have all held that consumers cannot bring federal statutory claims challenging private,

business-to-business disclosures. *See Barclift v. Keystone Credit Services, LLC*, 93 F.4th 136, 145 (3d Cir. 2024); *Nabozny v. Optio Solutions LLC*, 84 F.4th 731, 733 (7th Cir. 2023); *Shields v. Professional Bureau of Collections of Maryland, Inc.*, 55 F.4th 823, 827 (10th Cir. 2022); *Hunstein v. Preferred Collection & Management Services, Inc.*, 48 F.4th 1236, 1240 (11th Cir. 2022) (en banc). Although these courts used different methodologies, they all agree that business-to-business disclosures are fundamentally unlike the public disclosures actionable at common law, and thus do not cause the kind of concrete harm Article III requires.

The Second Circuit alone, by contrast, holds that any "expos[ure]" of a consumer's information "to an unauthorized third party" causes concrete harm. App. 17a. In that court's view, it is immaterial that common law courts did not find non-public disclosures sufficiently harmful to support liability. Instead, the court reasoned that because there was a common law tort that addressed disclosures of personal information (albeit public ones), any claim based on an unauthorized disclosure of personal information satisfies Article III. *Id.* The court acknowledged that other circuits have reached different results but declined to follow those decisions. App. 18a-19a & n.6. And the Second Circuit seldom rehears appeals en banc, meaning only this Court can resolve the disagreement.

**b.** Lower courts are also divided about the scope of the VPPA's liability provision. Before the Second Circuit's decision here, most lower courts had held that the VPPA extends only to consumers who rent, purchase, or subscribe to a business's audiovisual products. *See, e.g.*, *Tawam v. Feld Entertainment Inc.*, 684 F. Supp. 3d 1056, 1061-62 (S.D. Cal. 2023); *Gardener v. MeTV*, 681 F. Supp. 3d 864, 869 (N.D. Ill.

2023), *appeal filed*, No. 24-1290 (7th Cir. argued Sept. 13, 2024); *Pileggi v. Washington Newspaper Publishing Co.*, No. 1:23-cv-00345 (BAH), 2024 WL 324121, at *11 (D.D.C. Jan. 29, 2024), *appeal filed*, No. 24-7022 (D.C. Cir. argued Feb. 27, 2025). Indeed, one district court has rejected nearly identical claims brought by Respondent here, *see Salazar v. Paramount Global*, 683 F. Supp. 3d 727, 745 (M.D. Tenn. 2023), in a case currently awaiting decision from the Sixth Circuit, No. 23-5748 (6th Cir. argued June 18, 2024). But the Second Circuit below broke from these decisions, holding that the VPPA extends to consumers, like Salazar, who subscribe to a non-audiovisual service (like the NBA's free email newsletter), and separately watch the business's free videos (like basketball highlights on NBA.com), without renting, buying or subscribing to them. App. 22a, 33a-34a.

**3.** The Second Circuit's rulings are wrong.

**a.** On standing, this Court's precedents make clear that intangible harms don't count as concrete if they lack an element "essential to liability" at common law. *TransUnion*, 594 U.S. at 434. At common law, non-public disclosures weren't actionable—indeed, the common law tort the Second Circuit relied on is *public* disclosure of private facts. *See Hunstein*, 48 F.4th at 1245. Because Salazar's NBA video viewing information was allegedly disclosed to only to Meta, and even then only for the purpose of sending Salazar ads tailored to his interests, Salazar's theory of harm is missing the "essential" publicity element. *TransUnion*, 594 U.S. at 434 & n.6. The Second Circuit should have dismissed this case for lack of standing.

**b.** On the merits, the VPPA's text, structure, and history all make clear that the statute applies only to

consumers who rent, purchase, or subscribe to a business's audiovisual goods and services—not consumers, like Salazar, who watch free videos on a website while separately subscribing to one of the site owner's other services. Start with text and structure. The VPPA's liability provision applies only to "consumers" of "video tape service providers." 18 U.S.C. § 2710(b)(1). Read together, the statute's definitions cover "renter[s], purchaser[s], or subscriber[s] of goods or services from" someone "engaged in the business … of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." *Id.* § 2710(a)(1), (4). The VPPA's focus on customers of businesses who sell audiovisual products, its use of terms like "renter" and "subscriber" that refer to consumers of audiovisual goods, and the parallel structure of the statute's "consumer" and "video tape service provider" definitions all suggest that the VPPA applies only to renters, purchasers, and subscribers of audiovisual goods and services.

Legislative history points to the same conclusion. Congress crafted the VPPA's definitions "to make clear that simply because a business is engaged in the sale or rental of video materials or services does not mean that all of its products or services are within the scope of the bill." S. Rep. 100-599, at 12 (1988). Congress intended to protect consumers like Judge Bork from having their video histories leaked to the public, not consumers, like Salazar, who watched a few free videos online but otherwise subscribed only to the NBA's non-audiovisual services.

Because the Second Circuit's analysis is so wrong, other courts will likely reject it soon. Indeed, the Sixth, Seventh, and D.C. Circuits heard arguments on the issue in June 2024, September 2024, and

February 2025, and a number of judges expressed skepticism about Salazar's interpretation of the VPPA. One or more of these courts likely will reject the Second Circuit's reasoning soon, exacerbating the need for this Court's review.

**4.** The questions presented are exceptionally important. Article III's "concrete-harm requirement is essential to the Constitution's separation of powers." *TransUnion*, 594 U.S. at 429. By diluting it to recognize alleged injuries that American courts traditionally rejected, the Second Circuit opened the federal courts to a flood of suits over "bare procedural violation[s]" that have no business clogging federal dockets. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). Unless this Court promptly intervenes, the Second Circuit's decision is likely to be far-reaching, because many federal and state statutes regulate disclosures of consumer information.

The Second Circuit's distortion of the VPPA is just as significant. Countless websites offer free video content to consumers, collect their personal information, and then transfer that information to third-parties for use in targeted ad campaigns or to help the website better refine its services. This business model is essential to the modern Internet economy. It helps consumers by broadening the amount of free and useful content available on the web, and it helps businesses by giving them a way to target likely customers at affordable ad rates and improve their websites. The Second Circuit's decision endangers the web economy, because it is impossible for businesses to tell whether someone viewing their videos purchased or subscribed to some other good or service in the past. Thus, any disclosure of consumer video viewing data could lead to VPPA litigation—which is not

the result Congress intended. The Court should intervene to prevent the Second Circuit's decision from turning a statute about videotape rentals into a potential death knell for Internet advertising.

The Court should grant review and reverse.

## OPINIONS BELOW

The court of appeals' opinion (App. 1a-40a) is reported at 118 F.4th 533. The district court's opinion (App. 41a-66a) is reported at 685 F. Supp. 3d 232.

## JURISDICTION

The court of appeals entered its judgment on October 15, 2024. App. 1a. Justice Sotomayor's order of January 8, 2025, extended the time to file a petition for a writ of certiorari to March 14, 2024. *See* 28 U.S.C. § 2101(c). This petition is timely filed on March 14, 2024. The Court has jurisdiction under 28 U.S.C. § 1254(1).

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

Article III, section 2 of the Constitution provides that "[t]he judicial Power shall extent to all Cases, in Law and Equity, arising under … the Laws of the United States."

The Video Privacy Protection Act, 18 U.S.C. § 2710, is reprinted in the appendix to this petition. *See* App. 138a-142a.

## STATEMENT

### A. Legal background

This case concerns whether a consumer can sue for damages based on the private disclosure of his video viewing history from one business to another.

That question implicates principles of Article III standing, as well as the VPPA—a federal statute enacted "[t]o preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials." S. Rep. No. 100-599, at 1.

**1. Article III's concrete injury requirement**

Article III of the Constitution permits federal courts to adjudicate only those cases where the plaintiff claims that the defendant caused a concrete injury that could be remedied by a favorable judgment. *See, e.g.*, *Spokeo*, 578 U.S. at 338. These requirements implement the Constitution's "separation of powers" by "keeping the Judiciary's power within its proper constitutional sphere." *Raines v. Byrd*, 521 U.S. 811, 820 (1997).

To establish a constitutionally cognizable injury, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339. "[T]angible harms" like "physical" injury and "monetary" loss typically satisfy these requirements. *See TransUnion*, 594 U.S. at 425. But "intangible harms" less readily qualify as concrete. *Id.* As *TransUnion* explained, intangible harms satisfy Article III's injury requirement when they bear "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *Id.*

"Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo*, 578 U.S. at 341. "It is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Raines*, 521 U.S. at 820

n.3. That means "Congress's creation of a statutory … cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm." *TransUnion*, 594 U.S. at 426.

**2. The VPPA**

**a.** In 1987, President Reagan nominated then–D.C. Circuit Judge Robert Bork to a seat on this Court. During Judge Bork's confirmation process, a local newspaper published his family's video rental history in an effort to embarrass him. App. 22a. That same year, a Philadelphia "wom[a]n in a child custody proceeding made an informal request for the records of every film rented by her husband in an effort to show that, based on his viewing habits, he was an unfit father." S. Rep. No. 100-599, at 6.

**b.** Concerned by these efforts to embarrass and shame consumers by publicizing their private video history, Congress enacted the VPPA. For certain disclosures of their video viewing history, the VPPA allows consumers to secure injunctive relief and to recover actual damages or $2,500 in liquidated damages, punitive damages, and attorneys' fees. 18 U.S.C. § 2710(b)(1), (c)(2).

**c.** The VPPA's text reflects Congress's desire to prevent the kind of weaponized viewing history disclosures that were used against Judge Bork. The VPPA's key provision prohibits any "video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider." *Id.* § 2710(b)(1). The statute defines "video tape service provider" as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery

of prerecorded video cassette tapes or similar audio visual materials." *Id.* § 2710(a)(4). It defines "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." *Id.* § 2710(a)(1). And it defines "personally identifiable information" as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *Id.* § 2710(a)(3). The VPPA thus prohibits businesses that sell "audio visual materials" like "video cassette tapes" from disclosing the video viewing histories of their "renter[s]," "purchaser[s]," and "subscriber[s]." *Id.* § 2710(a), (b)(1).

**B. Factual and procedural background**

**1.** The NBA is the world's most popular professional basketball league. The NBA offers a free email newsletter that allows its millions of fans to keep abreast of developments concerning the league's teams and players. App. 8a. Salazar alleges that he subscribed to that newsletter in 2022, and that he subsequently watched videos on the NBA's website. App. 9a-10a. He further alleges that at the time he watched the videos, the NBA's website contained automated tracking software that sends a fan's viewing history to Facebook if they use the website while logged into their Facebook account. App. 8a, 10a. He claims that this software sent his NBA viewing history to Facebook's parent company, Meta, which used that information to send him targeted Facebook advertisements. App. 8a, 20a. He does not claim that the NBA, Meta, or anyone else disclosed this information to the public.

**2.** In 2022, Salazar brought a putative class action against the NBA in the Southern District of New

York, alleging that the NBA violates the VPPA each time its website transfers a fan's viewing history to Meta. App. 10a-11a. The NBA moved to dismiss for lack of standing and failure to state a claim, arguing that (a) Salazar was not concretely injured by the private, business-to-business disclosure of his NBA video viewing history to Meta; and in any event, (b) Salazar isn't a "consumer" as the VPPA defines that term. App. 11a.

The district court granted the motion. The court concluded that Salazar's alleged injury—disclosure of his NBA video viewing history—was sufficiently analogous to the common law tort of intrusion upon seclusion to count as concrete. App. 12a-13a. But the court agreed with the NBA that Salazar does not count as a "subscriber" under the VPPA because he does not subscribe to any of the NBA's video services—only its free email newsletter. *Id.*

**3.** The Second Circuit reversed.

**a.** The court held that Salazar has Article III standing, but on different grounds than the district court. App. 21a. The court concluded that Salazar's "alleged harm—that his personal information was disclosed to a third party, without his consent, in violation of the VPPA—'has a close relationship'" to the common law tort of "public disclosure of private facts." App. 5a-6a.

The court recognized that the public disclosure tort permits suit only when the plaintiff's personal information is "publicized." App. 15a-16a. And it recognized that other courts of appeals have held that a plaintiff cannot claim a concrete disclosure-based injury if his personal information was never publicly disseminated. App. 18a n.6. But the Second Circuit

did not follow those decisions. Instead, it held that Salazar's asserted harm was enough like public disclosure to count as concrete because he alleged "that his personally identifiable information was exposed to an unauthorized third party." App. 17a. The court didn't decide whether Salazar's harm was sufficiently similar to intrusion upon seclusion. App. 16a n.5.

**b.** After dispensing with standing, the Second Circuit next held that Salazar counts as a "consumer" under the VPPA. App. 26a. The court held that all of a business's customers count as VPPA consumers if they subscribe to any of the business's goods or services, not just its audiovisual ones. App. 31a. Thus, in the Second Circuit's view, Salazar is a VPPA "consumer" because he subscribes to the NBA's free email newsletter, even though he doesn't subscribe to any of the NBA's audiovisual services. App. 39a-40a.

To be clear, the services in question—basketball highlights and analysis—are free for anyone to view on NBA.com. No one has to "subscribe" to the NBA to watch video clips of LeBron James or Kevin Durant.

## REASONS FOR GRANTING THE PETITION

The Second Circuit's decision creates a 4–1 circuit split over whether consumers have standing to sue over private, business-to-business disclosures of their personal data. The Third, Seventh, Tenth, and Eleventh circuits hold that such disclosures don't cause any concrete harm, because the common law made only outrageous public disclosures actionable. The Second Circuit, by contrast, holds that any unauthorized disclosure always causes concrete harm, because the common law had a tort addressing disclosures of personal information, even if Salazar's theory of harm does not resemble what that tort covers. The split is

clear. Indeed, the Second Circuit rejected the methodology other circuits use for evaluating claims of injury, and reached a result those circuits reject.

The Second Circuit also reached an outlier result on the merits. Tracking the statute's text, structure, and history, most courts have held that the VPPA covers only those consumers who rent, purchase, or subscribe to a business's audiovisual goods and services. By contrast, the Second Circuit held that the statute extends to anyone who purchases anything from any business that puts out any video content, even free content on a public website. Under the Second Circuit's theory, a grocery store chain can't disclose information about consumers who watch product ads on its website if any of those consumers buy milk and eggs at one of the chain's stores.

The Second Circuit's holdings are wrong. The Court's precedents make clear that plaintiffs lack Article III standing when their theory of injury lacks elements essential to liability for similar claims at common law. The common law did not recognize private, business-to-business disclosures as harmful, and so Article III does not either. Moreover, the VPPA's text, structure, and legislative history all show that the statute covers only people who, like Judge Bork, rent, purchase, or subscribe to a business's audiovisual goods and services. The statute was not meant to cover people who watch free basketball highlights on a public-facing website.

The questions presented are critically important. Cabining standing to harms traditionally recognized by American courts is essential to preserve the separation of powers. The Second Circuit's standing analysis opens the federal courthouse doors to a

multitude of unharmed plaintiffs, turning the federal courts into regulators of bare procedural violations. And the Second Circuit's construction of the VPPA threatens common, web-based information-sharing and advertising practices that are critical to the modern Internet economy. Both of the questions presented were litigated and squarely decided below, making this case an ideal vehicle to resolve them.

The Court should grant review.

**I. The Second Circuit created a circuit split and contravened *TransUnion* by holding that consumers are concretely injured when their information is privately disclosed between two businesses.**

The courts of appeals have split 4–1 on whether private, business-to-business disclosures cause concrete harm. The Eleventh and Seventh Circuits have answered "no," holding that because publicity was an essential element of the common law public disclosure tort, consumers aren't concretely harmed by non-public disclosures. The Third and Tenth Circuits reject the Eleventh and Seventh Circuits' focus on the public disclosure torts' formal elements, but nevertheless hold that disclosure to one business and its employees is fundamentally unlike the public disclosures that were actionable at common law. The Second Circuit alone, by contrast, holds that any unauthorized disclosure of information causes concrete harm. Salazar's claim would have been dismissed for lack of standing under any of the other courts' approaches. Only this Court can resolve the circuit split.

### A. The courts of appeals disagree about whether private disclosures of consumer information are actionable.

**1. a.** Start with the Eleventh and Seventh Circuits. Those courts hold that consumers don't suffer concrete harm from disclosures of their information between businesses because such claims cannot satisfy the public disclosure tort's publicity element.

***i.*** In *Hunstein*, a consumer sued a debt collection agency alleging that the agency violated the Fair Debt Collection Practices Act (FDCPA) by disclosing the consumer's debts to its mail processing vendor. 48 F.4th at 1240. The plaintiff argued that the debt collector's disclosure "caused him a concrete injury because it was analogous to the common-law tort of public disclosure." *Id.*

The en banc Eleventh Circuit disagreed. Analyzing this Court's decisions in *TransUnion* and *Spokeo*, the court held that consumers lack standing to bring statutory claims "when an element 'essential to liability' at common law is missing from [their] alleged harm." *Id.* at 1244; *see also id.* at 1252 (Pryor, C.J., concurring) (reasoning that "there is no concrete injury" under *TransUnion* "if an element whose presence is necessary for the plaintiff's traditionally recognized injury is absent"). That holding, the court recognized, made the standing analysis an "exercise in simplicity." *Id.* at 1245 (majority opinion). The public disclosure tort does not reach "communications that are private rather than public." *Id.* at 1245-46. "Instead, it requires that a matter be 'made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.'" *Id.*

at 1246 (quoting Restatement (Second) of Torts § 652D cmt. a). Although the consumer alleged that the debt collector "placed his personal information 'within the possession of an unauthorized third-party,'" he did not allege that information "reached, or was sure to reach, the public." *Id.* at 1247-48. Since the consumer's theory of injury thus "lack[ed] a necessary element of the [public disclosure] tort—the requirement that the disclosure be *public*," it was not concrete enough to confer Article III standing. *Id.* at 1240.

***ii.*** The Seventh Circuit followed the Eleventh Circuit's approach in *Nabozny*, a "materially identical" case. 84 F.4th at 735. There, as in *Hunstein*, a consumer alleged that a debt collector violated the FDCPA by disclosing her information to a mail vendor. *Id.* And, as in *Hunstein*, the consumer argued that the disclosure caused concrete harm because it was analogous to the tort of public disclosure. But the Seventh Circuit held that the consumer's "attempt to analogize her case to this privacy tort [fell] apart on the threshold element of publicity." *Id.* Because the consumer's "complaint [was] devoid of any allegations that [the debt collector] made her private information public," the court held that her asserted harm was too dissimilar from a recognized common law harm to count as concrete. *Id.* at 735-36.

**b.** The Tenth and Third Circuits likewise hold that consumers suffer no concrete injury from private disclosure of their personal information from one business to another, because private disclosures do not cause the same kind of harm as the public disclosures that are actionable at common law. Although the Tenth and Third Circuits, unlike the Eleventh and Seventh Circuits, do not require the plaintiff's theory

of harm to satisfy the essential elements of an analogous common law tort claim to have Article III standing, they reach the same result.

***i.*** As in *Hunstein* and *Nabozny*, the plaintiff in *Shields* alleged that a debt collector violated the FDCPA by disclosing her information to a mail vendor. The Tenth Circuit held that she lacked standing. Unlike the Eleventh and Seventh Circuits, the Tenth Circuit held that the plaintiff "did not have to plead and prove" the public disclosure tort's essential "elements to prevail." *Shields*, 55 F.4th at 829. Instead, the court held, "to proceed," the plaintiff must "allege a similar harm." *Id.* But even under that analysis, the court explained, the plaintiff's "alleged harm"—"that one private entity (and, presumably, some of its employees)" learned her private information—was not sufficiently similar to any harm recognized at common law. *Id.* The plaintiff's claim "alleged private—not public—disclosure," and thus did not assert "the same kind of harm as *public* disclosure of private facts, which is concerned with highly offensive information being widely known." *Id.*

***ii.*** The Third Circuit reached the same result in *Barclift*, another FDCPA case asserting that a debt collector disclosed consumer information to a mail vendor. There, the court surveyed the courts of appeals' post-*TransUnion* standing jurisprudence and identified "two different" approaches for determining whether plaintiffs asserting statutory claims have suffered concrete harm. *Barclift*, 93 F.4th at 144-45. The Eleventh and Seventh Circuits, the court explained, "espouse an element-based approach, wherein a plaintiff's alleged harm must not lack any element of the comparator tort that was essential to liability at common law." *Id.* at 144. The Tenth

Circuit, by contrast, "compare[s] the kind of harm a plaintiff alleges with the kind of harm caused by the comparator tort." *Id.* at 144-45. The Third Circuit adopted the Tenth Circuit's approach. *Id.* at 145.

Applying the Tenth Circuit's harm comparison approach, the Third Circuit held that the consumer failed to allege a concrete injury and thus lacked standing. The court reasoned that "the harm" recognized by the public disclosure "tort is 'the humiliation that accompanies the disclosure of sensitive or scandalizing private information to public scrutiny.'" *Id.* at 145-46. Business-to-business "disclosures that remain functionally internal are not closely related to those stemming from public ones," the court explained, because communications between businesses are "unlikely to result in the type of humiliation associated with the traditional injury." *Id.* at 146 & n.4. It did not matter that the mail vendor could someday disclose the consumer's information to the public, because that possibility was "far too speculative to support standing." *Id.* at 148.

**2.** The Second Circuit below departed from the Third, Seventh, Tenth, and Eleventh Circuits in both method and result.

The court first held that a plaintiff does need to "adequately plead *every* element of a common-law analog to satisfy the concreteness requirement." App. 18a n.6 (emphasis added). The court acknowledged the Eleventh Circuit's contrary holding in *Hunstein*, but declined to follow it. *Id.*

The court next held that "Salazar's alleged harm is sufficiently concrete," because he claims "that his personally identifiable information was exposed to an unauthorized third party," even though that

information was never made public. App. 17a. The court acknowledged that four other circuits had reached the opposite result in FDCPA cases involving disclosures to mail vendors, but declined to follow those cases. App. 17a-19a & n.6. Instead, the court reasoned that Salazar did not need to show that his personal information was disseminating to the public because Meta has a large number of employees and substantial revenues. The court reasoned that Meta could theoretically "sell, disclose, or otherwise use Salazar's data," App. 20a, even though Salazar has never claimed that Meta plans to disclose or use his data for any purpose other than sending him targeted Facebook ads. *See id.*

**3.** The split is outcome-determinative, and only this Court can resolve it.

**a.** Salazar's VPPA claim would have been dismissed for lack of standing if the Second Circuit had followed the Eleventh and Seventh Circuits' rule and required him to allege a theory of harm with all the "essential element[s]" of the public disclosure tort. *Hunstein*, 48 F.4th at 1248. Salazar doesn't claim that the NBA (or Meta) communicated his video viewing history "'to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.'" *Id.* at 1253 (Pryor, C.J., concurring) (emphasis omitted). He thus fails to satisfy the public disclosure tort's publicity element and cannot show concrete injury under the Eleventh and Seventh Circuits' approach. Indeed, the Eleventh Circuit expressly rejected the Second Circuit's theory that a consumer suffers concrete injury any time his personal information is disclosed without his consent. *Compare id.* at 1247 (allegation that defendant "placed [consumer's] personal information

'within the possession of an unauthorized third-party'" insufficient), *with* App. 17a ("allegation … that [Salazar's] personally identifiable information was exposed to an unauthorized third party" sufficient).

**b.** Salazar's claim also would have been dismissed if the Second Circuit had followed the Tenth and Third Circuits' harm comparison approach. Salzar's "alleged harm"—"that one private entity (and, presumably, some of its employees)" learned his personal information—does not assert "the same kind of harm as *public* disclosure of private facts, which is concerned with highly offensive information being widely known." *Shields*, 55 F.4th at 829. Salazar's usage of NBA.com was not publicly disseminated. Nor did it involve the sort of embarrassing information a consumer would have a concrete interest in keeping private, since watching basketball highlights is ubiquitous. The Tenth and Third Circuits therefore would not recognized Salazar's harm as concrete.

Moreover, the Third Circuit has expressly rejected the Second Circuit's theory that Salazar suffered injury because Meta could, theoretically, disclose his information to the public. Because Salazar "has not alleged facts supporting an inference of 'a sufficient likelihood that [Meta] would … intentionally or accidentally release [his] information to third parties,'" the Third Circuit would have held that "the mere assertion that [Meta's] employees could access and broadcast [Salazar's] personal information to the public is far too speculative to support standing." *Barclift*, 93 F.4th at 148 (second alteration in original) (emphasis omitted).

**c.** Only this Court can resolve the split and return uniformity to this important area of

constitutional law. The Second Circuit acknowledged the Eleventh and Seventh Circuits' rule "that an alleged harm isn't closely related to a common-law analog if the plaintiff doesn't plead a required *element* of that analog." App. 18a n.6. And it acknowledged that multiple circuits have held that consumers aren't injured by private, business-to-business disclosures, because consumers only suffer harm analogous to the public disclosure tort when their information is disclosed to the *public*. App. 18a-19a & n.6. But it declined to follow those decisions, instead holding that Salazar suffered a concrete injury because Meta learned his viewing history and could theoretically disclose it to others—premises those other circuits squarely rejected. App. 20a. This Court should grant review to resolve the conflict and repudiate the Second Circuit's outlier approach to Article III standing.

### B. The Second Circuit's decision is wrong and contravenes *TransUnion*.

*TransUnion* held that "if an element whose presence is necessary for the plaintiff's traditionally recognized injury is absent, there is no concrete injury." *Hunstein*, 48 F.4th at 1252 (Pryor, C.J., concurring); *see also TransUnion*, 594 U.S. at 434. The Second Circuit contravened *TransUnion* by allowing Salazar's VPPA claim to proceed without requiring him to show that his personal information was made public—an essential element for disclosure liability at common law.

**1.** In *TransUnion*, consumers in a Fair Credit Reporting Act class action argued that they had suffered a concrete harm because their credit files contained misleading notations suggesting that they were on a terrorist watchlist. 594 U.S. at 432-33. They

claimed that their harm was similar to "the reputational harm associated with the tort of defamation"—an injury long recognized as concrete. *Id.* at 432.

In analyzing whether the consumers had standing, the Court first explained that plaintiffs claiming to have suffered intangible injury from a statutory violation must show that their claimed harm bears "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *Id.* at 425. "Those include, for example, reputational harms, disclosure of private information, and intrusion upon seclusion," as well as "harms specified by the Constitution itself." *Id.*

The Court then held that some of the consumers had suffered a concrete injury, while others had not. Consumers whose credit files had been disclosed to third parties had standing, the Court explained, because they alleged all of the core elements of defamation: "a defamatory statement 'that would subject [them] to hatred, contempt, or ridicule' [was] published to a third party." *Id.* at 432. By contrast, consumers whose files were never disclosed lacked standing. "Publication is 'essential to liability' in a suit for defamation … [a]nd there is 'no historical or common-law analog where the mere existence of inaccurate information, absent dissemination, amounts to concrete injury.'" *Id.* at 434. Because these consumers' information was never published to third parties and thus lacked "a fundamental requirement of an ordinary defamation claim—publication," their intangible harm did not "bear a sufficiently 'close relationship' to the traditional defamation tort to qualify for Article III standing." *Id.* at 434 n.6.

**2.** The Second Circuit's decision below contravenes *TransUnion*. Like defamation's publication element, public disclosure's publicity element is essential to liability at common law. Indeed, the Second Circuit recognized that public disclosure is only "triggered when one 'gives publicity'" to a "highly offensive" "matter concerning the private of life of another." App 15a-16a. And the court did not dispute that the publicity element "requires that [the] matter be 'made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.'" *Hunstein*, 48 F.4th at 1246. But it allowed Salazar's VPPA claim to proceed because "his personally identifiable information was [allegedly] exposed to an unauthorized third party"—even though it wasn't disclosed to the public. App. 17a. By excusing Salazar's failure to satisfy public disclosure's publicity element, the Second Circuit squarely violated *TransUnion*'s holding that intangible harms are not concrete when they lack an element "essential to liability" for comparable common law claims. *TransUnion*, 594 U.S. at 434.

## II. The Second Circuit misconstrued the VPPA and stretched it far beyond its intended scope by extending it to consumers of non-audiovisual goods and services.

### A. The VPPA does not apply to consumers who do not subscribe to audiovisual goods or services.

The Second Circuit's ruling that Salazar counts as the sort of "consumer" the VPPA protects was also wrong. The VPPA's text, structure, and history make clear that it was intended to apply only to renters,

purchasers, and subscribers of audiovisual goods and services. Salazar doesn't count because he subscribed only to the NBA's free email newsletter, not its audiovisual goods and services.

**1.** Start with the text.

**a.** The VPPA's liability clause prohibits any "video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The statute defines "video tape service provider" as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." *Id.* § 2710(a)(4). It defines "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." *Id.* § 2710(a)(1). And while it does not define the term subscriber, that word ordinarily means "a person who is 'registered to pay for and receive a periodical, service, theater tickets, etc. for a specified period of time.'" *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1255-56 (11th Cir. 2015) (collecting definitions of "subscriber").

Putting these definitions together, the VPPA prohibits disclosure of personal identifying information about someone who is an ongoing customer of a business that is "engaged in the … rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). In other words, the statute extends protection to consumers of audiovisual goods and services. It does not apply to consumers who, like Salazar, subscribe to non-video services but separately view free videos elsewhere on a public website.

**b.** Other textual clues reinforce the point. Congress defined "consumers" as people who "rent[], purchase[], or subscribe[]" to "goods and services." 18 U.S.C. § 2710(a)(1). "Renting" and "subscribing" are how consumers obtain access to audiovisual goods and services, like videotapes in the 1980s or modern streaming services today. Congress's placement of "purchaser" between "renter" and "subscriber" suggests that Congress intended for the word to have a similar scope. Indeed, the Court has often found that statutory words are given "more precise content by the neighboring words" surrounding them and "'avoid[ed] ascribing to one word a meaning so broad that it is inconsistent with' 'the company it keeps.'" *Fischer v. United States*, 603 U.S. 480, 487 (2024). Congress's choice of verbs associated with video rentals strongly suggests that the "goods and services" it had in mind were audiovisual ones that a consumer might rent or subscribe to, rather than any products or services a business might offer.

**2.** The statute's structure points to the same conclusion. Congress chose similar wording when defining "video tape service providers" and "consumers." A "video tape service provider" is a person "engaged in the business … of *rental*, *sale*, or *delivery* of prerecorded video cassette tapes or similar audio visual materials," while a "consumer" is "any *renter*, *purchaser*, or *subscriber* of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1), (4) (emphases added). The "parallel structure" and wording of these definitions, along with their consecutive placement in the VPPA's liability clause, suggest that Congress intended for them to be read together. *See Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 131-33 (1989). That context, in turn, suggests that Congress

intended for the statute only to reach consumers who rent, purchase, or subscribe to audiovisual goods and services—the kinds of goods and service that distinguish "video tape service providers" from other businesses not subject to the VPPA.

**3.** The VPPA's legislative history confirms what its text suggests. The Senate Judiciary Committee's 1988 report on the VPPA notes that the definition of personally identifiable information was drafted "to make clear that simply because a business is engaged in the sale or rental of video materials or services does not mean that all of its products or services are within the scope of the bill." S. Rep. 100-599, at 12. "For example, a department store that sells video tapes would be required to extend privacy protection to only those transactions involving the purchase of video tapes and not other products." *Id.* Put differently, Congress carefully drafted the VPPA so that a consumer's non-video transactions would not trigger liability. That's yet another sign that a person isn't a "consumer" under the VPPA just because he rents, purchases, or subscribes to a business's non-video services.

**B. The Second Circuit's contrary reasoning is unpersuasive.**

Disregarding these textual, structural, and legislative history clues, the Second Circuit read the VPPA's definition of "consumer" in isolation as encompassing anyone who buys anything from any business that shows any video content. But courts should "consider the entire text, in view of its structure and of the physical and logical relation of its many parts," A. Scalia & B. Garner, *Reading Law* 167 (2012), rather than zeroing in on "isolated provisions." *King v.*

*Burwell*, 576 U.S. 473, 486 (2015). The Second Circuit contravened these principles.

**1.** The Second Circuit asserted that its reading best respects the VPPA's plain language, but none of its textual arguments withstand scrutiny.

**a.** The court first argued that "by using expansive words like 'any' and 'or,' Congress codified a 'consumer' definition that 'bespeaks breadth.'" App. 27a. But Congress did not define "consumer" as "any renter, purchaser, or subscriber of goods or services"; it defined "consumer" as "any renter, purchaser, or subscriber of goods or services *from a video tape service provider*." 18 U.S.C. § 2710(a)(1) (emphasis added). What makes a business a "video tape service provider" is the fact that it rents, sells, or delivers "prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). Congress wrote the VPPA to encompass consumers of those audiovisual materials, not consumers of anything under the sun. The Second Circuit nullified the back half of Congress's "consumer" definition limiting liability to consumers of audiovisual goods and services just because the front half used a couple of broad words.

**b.** The court also reasoned that Congress must not have intended to restrict the definition of "consumer" to renters, purchasers, and subscribers of audiovisual goods and services, because it included references to "audiovisual materials" in the definition of "video tape service provider," but not the definition of "consumer." App. 27a. But that's not true. As explained, Congress incorporated the definition of "video tape service provider"—including its reference to "audio visual materials"—into the definition of consumer, making clear the statute applies only to consumers of

such audiovisual materials. *Supra* pp. 25-26. Congress didn't need to repeat the definition of "video tape service provider" verbatim in its definition of "consumer" to reiterate that the reader can't ignore one definition when reading the other.

**2.** The Second Circuit also asserted that its reading best respects the VPPA's purpose. But as the Second Circuit acknowledged, the VPPA's purpose was "to preserve personal privacy with respect to the rental, purchase, or delivery of video tapes or similar audio visual materials" and thereby prevent the kind of weaponization of a person's private viewing history the Washington press employed against Judge Bork. App. 23a. Reading the statute so broadly that it encompasses someone who watches a basketball highlight sometime after subscribing to a free email newsletter does not advance that purpose. To the contrary, it stretches the VPPA far beyond the problem Congress was trying to address.

**3.** Likely recognizing that its reading of "consumer" substantially broadens the statute, the Second Circuit stated that "the VPPA's reach" is still not "boundless," because businesses are prohibited from disclosing only "personally identifiable information," which is limited to "information which identifies a person as having requested or obtained specific *video materials or services*." App. 31a-32a. But the VPPA's definition of personally identifiable information does little to solve the problem the Second Circuit created. In the Internet age, "countless" commercial websites "post[] videos, allow[] viewers to view them for free, and shar[e] information about the viewer with a third party" for targeted advertising. Chamber of Commerce Amicus Br. 9, 11, *Salazar v. National Basketball Ass'n*, (No. 23-1147), Doc. 56 [hereinafter

CA2 Chamber Br.]. That basic model is why so much of the Internet is free for consumers to use. *Id.* at 15-19. Under the Second Circuit's reasoning, every one of those websites' business models could potentially be illegal—exposing the business to damages of $2,500 per consumer—if any consumer has rented, bought, or subscribed to any good or services those businesses offer, and none of the VPPA's safe harbors apply. It's little comfort that the VPPA prohibits only disclosure of audiovisual viewing history, because an enormous number of businesses include some video content somewhere on their platform.

### C. The courts of appeals are poised to split on this issue.

Although the courts of appeals are not currently divided on whether consumers of non-audiovisual services have statutory standing to assert VPPA claims, that likely will change in the near future. The Sixth, Seventh, and D.C. Circuits heard argument on this issue in June 2024, September 2024 and February 2025, with one of those appeals filed by Salazar himself. *Salazar*, No. 23-5748 (6th Cir. argued June 18, 2024); *Gardener*, No. 24-1290 (7th Cir. argued Sept. 13, 2024); *Pileggi*, No. 24-7022 (D.C. Cir. argued Feb. 27, 2025). Because the Second Circuit's analysis is egregiously wrong, one or more of those courts is likely to reject it. Indeed, multiple members of the panels in these cases expressed skepticism about Salazar's interpretation of the VPPA. If a split emerges, it will provide an additional reason why this important issue merits the Court's review.

### III. These issues are critically important, and this case is an ideal vehicle for resolving them.

**A.** The questions presented have critical implications for the separation of powers and the modern Internet economy.

**1.** Start with the separation of powers. "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014). It accomplishes that goal by limiting courts to adjudicating "cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process." *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 774 (2000). That constraint incorporates "the traditional, fundamental limitations" on judicial "powers" recognized by "common-law courts." *Honig v. Doe*, 484 U.S. 305, 340 (1988) (Scalia, J., dissenting). Among those limitations is the bedrock requirement that the plaintiff have suffered a concrete injury with a "a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 43. That requirement keeps the courts to their proper sphere—"decid[ing] on the rights of individuals," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803)—and prevents them from being enlisted by unharmed parties as freestanding regulatory bodies, *see Spokeo*, 578 U.S. at 348 (Thomas, J., concurring).

The Second Circuit's decision dilutes Article III's injury-in-fact requirement, distorting the separation of powers. The court allowed Salazar's lawsuit to

proceed because the NBA allegedly disclosed innocuous personal information to Meta without Salazar's consent, even though Meta used that information only to send Salazar himself personalized ads. But because Salazar's information was never made public (and wasn't highly personal or embarrassing), he did not suffer any "harm" American courts traditionally have recognized. *Supra* pp. 22-24. Thus, the district court on remand won't be adjudicating Salazar's rights, but whether the NBA committed "a bare procedural violation" of the VPPA. *Spokeo*, 578 U.S. at 341. Article III tasked the Judiciary with resolving "Cases and Controversies," not policing manufactured and meaningless technicalities. The federal courts are busy enough without being dragged into trivial disputes that enrich only the attorneys.

The impact of the Second Circuit's decision won't stop at the VPPA. A number of federal statutes let consumers sue based on disclosures of their personal information, including the VPPA, the Fair Debt Collection Practices Act, the Fair Credit Reporting Act, the Computer Fraud and Abuse Act, and the Electronic Communications Privacy Act. Many states provide similar causes of action, and those cases are often litigated as putative class actions in federal court under the Class Action Fairness Act and other jurisdictional bases. *See* 28 U.S.C. § 1332(d). If allowed to stand, the Second Circuit's decision will allow a broad array of consumers to sue over minor or innocuous disclosures of their information, meaning that the federal courts will regularly be asked to police technical statutory violations without regard for the traditional limitations on the courts' power.

**2.** The Second Circuit's decision also will have tremendous implications for the modern Internet

economy. As explained, the "business model of sharing information for purposes of targeted advertising underlies many of the Internet's most widely used services." CA2 Chamber Br. 15. That model is critical for both businesses and consumers. Businesses rely on targeted advertising to reach potential customers at affordable rates, while consumers benefit from data sharing and targeted advertising because they can access a substantial amount of information content—including audiovisual services—for free. *Id.* at 15-19. Businesses also rely on being able to share consumer data with vendors to improve the consumer experience on their websites.

The Second Circuit's radical expansion of VPPA liability strikes at the core of the targeted advertising model. In practice, "there is no possible way for a business to know whether a given viewer of a video had previously bought some separate product from the business." *Id.* at 11. For example, the NBA cannot know whether someone watching a highlight video on NBA.com previously bought a jersey at the NBA store. "Thus, sharing information with respect to any viewer could transform that viewer into a class-action plaintiff," leaving businesses with few good options to avoid VPPA liability beyond "turn[ing] off targeted advertising for *all* viewers." *Id.* at 11-12. That result would inflict tremendous harm on the modern Internet economy. The Court's intervention is needed to prevent the Second Circuit's decision from turning a statute about videotape rentals into the end of Internet advertising.

**B.** This case is an ideal vehicle for resolving the questions presented.

**1.** The Second Circuit squarely rejected the Seventh and Eleventh Circuits' post-*TransUnion*

standing jurisprudence, and reached results at odds with what the Third and Tenth Circuits have required in consumer privacy cases. *Supra* pp. 16-22. Moreover, the Second Circuit squarely decided the VPPA question, holding that the VPPA bars disclosures of personally identifying information about all of a business's customers, regardless of whether they rent, purchase, or subscribe to audiovisual materials. App. 31a. There are no alternative holdings or other complications that would impede this Court's review.

Meta has not publicly disclosed Salazar's NBA video viewing history, and Salazar doesn't argue that it ever will. According to the Second Circuit, Salazar still suffered a concrete injury because he did not consent to Meta's receiving this information. But the Third, Seventh, Tenth, and Eleventh Circuits would have dismissed for lack of standing, because the common law did not recognize as harmful private disclosures to one third party and some of its employees. Indeed, the Eleventh Circuit rejected the precise theory of standing that Salazar asserts here. *Compare Hunstein*, 48 F.4th at 1247 (allegation that defendant "placed [consumer's] personal information 'within the possession of an unauthorized third-party'" insufficient), *with* App. 17a ("allegation … that [Salazar's] personally identifiable information was exposed to an unauthorized third party" sufficient). This case is a perfect vehicle to resolve the purely legal question of whether a consumer suffers concrete harm when his personal information is privately disclosed to a single third party, rather than the public at large.

**2.** The Second Circuit also squarely rejected the conclusion of many other federal courts and held that the VPPA extends to consumers who do not subscribe to a provider's audiovisual services. App. 31a. This

case is at the motion to dismiss stage, meaning there aren't any factual disputes that might complicate the Court's review. This petition thus presents an ideal opportunity for the Court to address whether the VPPA reaches customers that have not rented, purchased, or subscribed to a provider's audiovisual services.

* * *

The Second Circuit's outlier decision creates a circuit split, undermines the separation of powers, and threatens the modern Internet economy. Its opinion turns solely on two purely legal questions squarely decided below, teeing up this case as the perfect vehicle. The Court should intervene to correct the Second Circuit's departure from this Court's standing precedents and the VPPA's text.

## CONCLUSION

The Court should grant the petition.

Respectfully submitted.

Shay Dvoretzky
*Counsel of Record*
Parker Rider-Longmaid
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Ave. NW
Washington, DC 20005
202-371-7000
shay.dvoretzky@skadden.com

Raza Rasheed
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
2000 Ave. of the Stars,
Ste. 200N
Los Angeles, CA 90067

*Counsel for Petitioner*

March 14, 2025