UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| AMIE CROTEAU, THUY DAOJENSEN, and DIANE THOMAS, individually and on behalf of all others similarly situated, | Case No. 25-CV-0940 (PJS/ECW) |
| Plaintiffs, | |
| v. | ORDER |
| TN MARKETING, LLC, d/b/a Craftsy, | |
| Defendant. | |

Arun Ravindran, RAVINDRAN LAW FIRM PLLC, and Carl Malmstrom, WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC, for plaintiffs.

Gianna Maria Puccinelli, Heather L. Marx, and Melissa Siebert, COZEN O'CONNOR, for defendant.

Plaintiffs Amie Croteau, Thuy DaoJensen, and Diane Thomas bring this putative class action alleging that defendant TN Marketing, LLC (d/b/a Craftsy) ("Craftsy") disclosed their video-watching histories to Meta in violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710. Craftsy moves to dismiss under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). Alternatively, Craftsy moves to compel arbitration and stay the litigation. For the reasons explained below, the Court denies Craftsy's motion to dismiss this lawsuit for lack of standing and defers ruling on Craftsy's other motions until the parties have engaged in limited discovery regarding whether plaintiffs are bound by a valid arbitration agreement.

## I.  BACKGROUND

Craftsy is a paid, subscription-based website that offers video tutorials on crafts and hobbies such as sewing, cooking, and drawing.  Compl. ¶ 32.  Each plaintiff maintained a Craftsy subscription at some point between September 2020 and December 2024.  *Id.* ¶¶ 9, 17, 25.  All plaintiffs allege that they are "consumer[s]" of Craftsy videos and that they "request[ed] and obtain[ed]" videos from Craftsy while they were subscribed.  *Id.* ¶¶ 9, 11, 17, 19, 25, 27.

Unbeknownst to plaintiffs, Craftsy had installed the "Meta Pixel" ("Pixel") on its website.  *Id.* ¶ 68.  The Pixel is a string of code that transmits user information from the host website to Meta.  *Id.* ¶¶ 62–63, 67–68.  Meta can then use that information itself and sell it to other companies; the information is used by Meta and other companies to display targeted advertisements to users.  *Id.* ¶¶ 62–65.

Each transmission of information from the Pixel back to Meta contains at least two pieces of information: (1) the user's activities on the host website (e.g., which pages the user viewed or which products the user purchased); and (2) the user's "FID" number (essentially, an account number corresponding to the user's Facebook profile).  *Id.* ¶¶ 61–63.  Someone who is provided with a user's FID number can search "www.facebook.com/[FID #]" and learn the user's identity.  *Id.* ¶ 69.  Thus, when a Craftsy subscriber visits its website, the Pixel tracks and transmits to Meta the specific

video history of the subscriber, as well as information that allows Meta to identify the subscriber.  *Id.* ¶ 67.

Plaintiffs allege that Craftsy's use of the Pixel violates the VPPA.  *Id.* ¶ 74.  The VPPA prohibits "video tape service provider[s]" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1).  Congress passed the VPPA in 1988 after a newspaper disclosed the video-rental history of Judge Robert Bork, who had been nominated to the U.S. Supreme Court.  *See Pileggi v. Wash. Newspaper Pub. Co.*, 146 F.4th 1219, 1224–25 (D.C. Cir. 2025) (detailing the history of the VPPA), *petition for cert. filed*, No. 25-1040 (U.S. Mar. 6, 2026).  The VPPA provides a private right of action, as well as remedies of $2,500 per violation, punitive damages, attorneys' fees, and equitable relief.  18 U.S.C. § 2710(c)(2).

In this lawsuit, plaintiffs contend that Craftsy "systemically" violated the VPPA by knowingly disclosing their video-watching history and FIDs to Meta without their consent.  Compl. ¶ 74.  Craftsy moves to dismiss the lawsuit under Rule 12(b)(1), contending that plaintiffs lack standing to pursue their VPPA claims, and under Rule 12(b)(6), contending that plaintiffs fail to state a claim upon which relief can be granted. Def.'s Mem. at 10–13; 13–23.  Alternatively, Craftsy moves to compel arbitration,

arguing that plaintiffs entered a valid and enforceable arbitration agreement at the time that they subscribed. *Id.* at 23–27.

## II. ANALYSIS

### A. Rule 12(b)(1) Motion

#### 1. Standard of Review

"A court deciding a motion under Rule 12(b)(1) must distinguish between a facial attack and a factual attack on jurisdiction." *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016) (quotation omitted). In ruling on a facial attack, the court may consider only what is alleged in the complaint; in ruling on a factual attack, the court may consider matters outside of the pleadings. *See id.*

Craftsy argues that plaintiffs failed to plead facts sufficient to establish that they suffered a concrete injury and thus that they have standing.[1] Def.'s Mem. at 10–12. This is a facial challenge, so the Court will "restrict[] itself to the face of the pleadings" and afford plaintiffs "the same protections as [they] would [have in] defending against a motion brought under Rule 12(b)(6)." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th

---

[1]Craftsy raises a separate factual challenge to the standing of Croteau. Def.'s Mem. at 13; McNaughton Decl. ¶ 7. Specifically, Craftsy asserts that its "membership data" indicates that Croteau never watched a video. McNaughton Decl. ¶ 7. In response, Croteau submits a declaration in which she swears that she did, in fact, watch a video. Croteau Decl. ¶¶ 2–3. In light of Croteau's declaration, and in light of the early stage of the litigation, the Court rejects Craftsy's factual attack on Croteau's standing. Craftsy may renew that attack after discovery is completed.

Cir. 1990) (citations omitted).  In other words, the Court will accept as true all of the factual allegations in the complaint and draw all reasonable inferences in plaintiffs' favor.  *Perez v. Does 1-10*, 931 F.3d 641, 646 (8th Cir. 2019).

### 2.  Standing

"The party invoking federal jurisdiction bears the burden of establishing [Article III standing]."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citations omitted).  "At the pleadings stage, general factual allegations suffice to support standing."  *Rydholm v. Equifax Info. Servs. LLC*, 44 F.4th 1105, 1108 (8th Cir. 2022) (citing *Jones v. Jegley*, 947 F.3d 1100, 1104 (8th Cir. 2020)).  A plaintiff establishes Article III standing by demonstrating that she has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted).

An injury in fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Id.* at 339 (quoting *Lujan*, 504 U.S. at 560).  An intangible injury can be concrete.  *Id.* at 340.  "Chief among" intangible injuries that qualify as concrete "are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American

courts[,]" such as "reputational harms, disclosure of private information, and intrusion upon seclusion." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) (citations omitted).

Craftsy argues that plaintiffs have not suffered an injury in fact because Craftsy disclosed their video-watching histories only to Meta, and not to the general public. Def.'s Mem. at 10–12; Def.'s Reply at 2–6. According to Craftsy, this type of business-to-business disclosure did not cause plaintiffs a concrete injury because plaintiffs cannot prove each of the "required elements" of an analogous tort. Def.'s Reply at 2.[2]

---

[2]Craftsy primarily relies on the Eighth Circuit's decision in *Denmon v. Kansas Counselors, Inc.*, 149 F.4th 1010, 1016–17 (8th Cir. 2025). The plaintiff in *Denmon* faxed a letter to a debt collector that both disputed a debt under the Fair Debt Collection Practices Act ("FDCPA") and demanded that she not be contacted about the debt. *See id.* at 1012–14. The plaintiff thereby created directly conflicting statutory obligations for the debt collector: The debt collector was, on the one hand, required to investigate the debt and report the results of its investigation to the plaintiff, but, on the other hand, required to honor plaintiff's request that she not be contacted. *Id.* at 1016–17. After the debt collector picked its poison and sent a letter to the plaintiff, the plaintiff sued for a violation of the FDCPA. *Id.* at 1012.

In the course of finding that the plaintiff did not have standing, the Eighth Circuit did indeed discuss whether she could recover for intrusion upon seclusion under the common law, and the Eighth Circuit did indeed review the elements of that tort. *See id.* at 1014, 1016–17. Ultimately, however, the Eighth Circuit found that the plaintiff did not have standing because the letter she received from the debt collector would not be highly offensive to a reasonable person. *See id.* at 1016–17. This finding had implications both for whether the plaintiff could *win* an intrusion-upon-seclusion claim (as an element of the claim is that the intrusion be highly offensive to a reasonable person) and for the type of *injury* the plaintiff suffered (as an intrusion that is not highly offensive is unlikely to cause an injury). *Id.* The dissent seemed to understand the majority's holding to be focused on the latter point. *See id.* at 1017 (Kelly, J., dissenting) ("The Court determines that the harm Denmon alleges is not significant enough to

(continued...)

The Court disagrees. In deciding whether a plaintiff has standing to recover for an intangible harm, a court does not compare the *elements* of the plaintiff's statutory cause of action with the *elements* of the analogous common-law cause of action. Rather, the court compares the nature of the *harm* suffered by the plaintiff with the nature of the *harm* for which the common law provided a remedy. In the words of the Supreme Court, a court compares "a plaintiff's asserted *harm*" with "a *harm* traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 433 (emphasis added).

Moreover, even the two *harms* do not have to be identical for the plaintiff to have standing. *See id.* ("[W]e do not require an exact duplicate."). "So long as Congress alters the degree of harm and not the kind of harm, congressional action can make an injury concrete." *Pileggi*, 146 F.4th at 1227; *see also Golan v. FreeEats.com, Inc.*, 930 F.3d 950, 959 (8th Cir. 2019) (noting that in analyzing concreteness "we consider the nature or type of the harm, not its extent"); *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.) ("[W]e are meant to look for a 'close relationship' in kind, not degree." (quoting *Spokeo*, 578 U.S. at 341)).

---

[2](...continued)
confer standing in federal court. The conclusion has intuitive force; after all, receiving an unwanted letter, without more, does not seem particularly harmful."). In any event, *Denmon* was an unusual case, and the Eighth Circuit explicitly confined its holding to its facts. *Id.* ("Our holding is limited to the facts of this case."). The facts of *Denmon* differ significantly from the facts of this case.

In addition, the Supreme Court has explained that "Congress may 'elevate to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law.'" *Spokeo*, 587 U.S. at 341 (quoting *Lujan*, 504 U.S. at 578) (cleaned up). In other words, "an injury that would *not* give rise to recovery in a tort action could nevertheless be sufficiently concrete to give a plaintiff standing to seek recovery in a statutory action." *Potocnik v. Carlson*, No. 13-CV-2093 (PJS/HB), 2016 WL 3919950, at *3 (D. Minn. July 15, 2016); *see also Golan*, 930 F.3d at 958–59 (explaining that "[a]n alleged harm need not actually have been actionable at common law" to be "concrete" for purposes of Article III).

Applying this framework, the Court finds that the injuries alleged by plaintiffs bear a close relationship to injuries that have traditionally provided a basis for tort claims in American courts. Specifically, plaintiffs' asserted harms are very similar to the harms that give rise to the torts of intrusion upon seclusion and public disclosure of private information. *See* Restatement (Second) of Torts § 652A(2) (Am. Law Inst. 1977) (outlining the recognized privacy torts); *Pileggi*, 146 F.4th at 1228–31 (finding sufficient similarity for concreteness between injuries alleged in a VPPA case and those addressed by the torts of intrusion upon seclusion and public disclosure of private information).

To state a claim for intrusion upon seclusion, a plaintiff must plead that someone "intentionally intrude[d], physically or otherwise, upon the solitude or seclusion of [the

plaintiff] or his private affairs or concerns."  Restatement (Second) of Torts § 652B.

Plaintiffs allege that their video history was private, that Craftsy intentionally intruded

upon their seclusion by sharing that history with Meta, and that Craftsy's disclosure

would be highly offensive to a reasonable person.  Compl. ¶ 78 (alleging "intrusions

upon their affairs and concerns that would be highly offensive to a reasonable person,

as a result of Defendant's uniform and wrongful conduct in intentionally disclosing

their Private Purchase Information to Meta").  Plaintiffs' alleged injuries are therefore

similar to the injuries that form the basis of intrusion-upon-seclusion claims.

As for the tort of public disclosure of private information:  A defendant can be

held liable for publicizing a private matter if the matter "(a) would be highly offensive

to a reasonable person, and (b) is not of legitimate concern to the public."  Restatement

(Second) of Torts § 652D.  To "publicize" a private matter is to "communicat[e] it to the

public at large, or to so many persons that the matter must be regarded as substantially

certain to become one of public knowledge."  *Id.* cmt. a.  Plaintiffs plausibly allege that

the disclosure of their viewing history would be highly offensive to a reasonable

person.  Compl. ¶ 78.  Moreover, plaintiffs' viewing history is not of legitimate public

concern.

Craftsy argues that public disclosure of private information is not an apt

comparison because Craftsy gave plaintiffs' information to a single company (Meta)

rather than communicating it to the public at large. Def.'s Reply at 3–5. Again, though, as explained above, the relevant comparison is harm to harm, not elements to elements. *TransUnion*, 594 U.S. at 433; *Pileggi*, 146 F.4th at 1227; *Golan*, 930 F.3d at 959. And as also explained above, an intangible injury can be sufficiently concrete to give a plaintiff standing to seek recovery in a statutory action, even if the plaintiff would not be successful in seeking recovery in a tort action. *See Spokeo*, 587 U.S. at 341–42; *Golan*, 930 F.3d at 958–59; *Potocnik*, 2016 WL 3919950, at *2–3.

Putting that aside, plaintiffs allege that their private information (i.e., the videos that they chose to watch) was given by Craftsy to the largest social media company in the world (Meta), so that Meta could used that information to feed targeted advertisements to plaintiffs, and so that Meta could sell that information to an unlimited number of other advertisers for use in targeting plaintiffs. This is a long way from storing plaintiffs' private information in a "desk drawer." *TransUnion*, 594 U.S. at 434.

In sum, plaintiffs allege that Craftsy's disclosure of their video-watching histories—and Meta's subsequent use and sale of that information—harmed plaintiffs by widely disseminating private information that was of no legitimate concern to the public. Compl. ¶¶ 13–14, 21–22, 29–30. These intangible injuries are quite similar to the harms that form the basis of the torts of intrusion upon seclusion and public

-10-

disclosure of private information, and thus plaintiffs' alleged injuries are sufficiently

concrete to give them standing to pursue VPPA claims against Craftsy. *See Pileggi*, 146

F.4th at 1229–30 (noting that a VPPA claim "parallels the longstanding tort of publicity

given to private life" and that "the form in which an injury may manifest does not

change the fact of the common law injury itself—namely, the unconsented prying into

private details").[3]  Craftsy's motion to dismiss for lack of standing is denied.

### B. Motion to Compel Arbitration

### 1. Standard of Review

Alternatively, Craftsy moves to compel arbitration under the Federal Arbitration

Act ("FAA"), 9 U.S.C. § 1 et seq.  Under the FAA, "[a] court must grant a motion to

compel arbitration if a valid arbitration clause exists which encompasses the dispute

between the parties." *3M Co. v. Amtex Sec., Inc.*, 542 F.3d 1193, 1198 (8th Cir. 2008) (first

citing 9 U.S.C. § 4, and then citing *MedCam, Inc. v. MCNC*, 414 F.3d 972, 974 (8th Cir.

2005)).  Motions to compel arbitration may be asserted under either Fed. R. Civ. P.

12(b)(6) or Fed. R. Civ. P. 56.  *City of Benkelman v. Baseline Eng'g Corp.*, 867 F.3d 875,

881–82 (8th Cir. 2017).  Where, as here, the parties have introduced matters outside of

---

[3]Notably, every circuit court to have addressed this issue has reached the same conclusion. *See id.* at 1227–31; *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 540–44 (2d Cir. 2024); *Salazar v. Paramount Global*, 133 F.4th 642, 647 (6th Cir. 2025), *cert. granted*, No. 25-0459 (U.S. Jan. 26, 2026); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 982–84 (9th Cir. 2017); *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1339–41 (11th Cir. 2017).

the pleadings, *see, e.g.*, McNaughton Decl.; Croteau, Thomas, DaoJensen, and Young

Decls., application of the summary-judgment standard is appropriate.  *See Neb. Mach.*

*Co. v. Cargotec Sols., LLC*, 762 F.3d 737, 742 (8th Cir. 2014).

Summary judgment is warranted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution

might affect the outcome of the suit under the governing substantive law.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if

"the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in his favor."  *Id.* at 255 (citation omitted)*.*

## 2.  Compelling Arbitration

"The Federal Arbitration Act (FAA) 'establishes a liberal federal policy favoring

arbitration agreements.'"  *Duncan v. Int'l Mkts. Live, Inc.*, 20 F.4th 400, 402 (8th Cir. 2021)

(quoting *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 505 (2018)).  "But despite arbitration's

'favored status,' a party cannot be compelled to arbitrate unless [she] has contractually

agreed to be bound by arbitration."  *Id.*  (quoting *Shockley v. PrimeLending*, 929 F.3d 1012,

1017 (8th Cir. 2019)).  Thus, on a motion to compel arbitration, the "primary inquiry is

'whether the parties formed a valid contract that binds them to arbitrate their dispute.'"

*Id.* (quoting *Shockley*, 929 F.3d at 1017). "As the party seeking to compel arbitration," Craftsy "carries the burden to prove a valid and enforceable agreement." *Burnett v. Nat'l Ass'n of Realtors*, 75 F.4th 975, 981 (8th Cir. 2024) (quoting *Shockley*, 929 F.3d at 1017). "State contract law governs whether a valid agreement to arbitrate exists." *Triplet v. Menard, Inc.*, 42 F.4th 868, 870 (8th Cir. 2022) (citation omitted).

Under Minnesota law,[4] a valid contract requires offer, acceptance, and consideration. *See Ballou v. Asset Mktg. Servs., LLC*, 46 F.4th 844, 851 (8th Cir. 2022) (applying Minnesota law to determine the enforceability of an arbitration agreement). Courts determine mutual assent under an objective standard. *Id.* "[T]he existence of mutual assent is generally a factual question that is resolvable at [the motion to compel stage] only if the material facts are not in dispute." *Foster v. Walmart*, 15 F.4th 860, 864 (8th Cir. 2021) (citation modified).

Craftsy allows an individual to subscribe to its website online and to pay for her subscription with a credit card or PayPal. McNaughton Decl. ¶ 8. After entering her payment information, the individual clicks a button labeled "Complete Order" and

---

[4]Minnesota law applies to this inquiry. Def.'s Mem. at 23; McNaughton Decl. Ex. 1 at 9 (relying on the arbitration agreement's choice-of-law clause); *see also Barker v. Golf U.S.A., Inc.*, 154 F.3d 788, 791 (8th Cir. 1998) (noting that a choice-of-law provision in the contract at issue in a case generally controls absent "persuasive reason" to adopt the laws of a different state), *abrogated on other grounds by*, *Breadeaux's Pisa, LLC v. Beckman Bros. Ltd.*, 83 F.4th 1113 (8th Cir. 2023); *Barclay v. Icon Health & Fitness, Inc.*, 550 F. Supp. 3d 710, 717 (D. Minn. 2021) (noting that even if no choice-of-law provision existed in a contract, the forum state's law would otherwise apply).

thereby becomes a subscriber. *Id.* Under the "Complete Order" button appears the following text: "By completing my order, I agree to Membership with automatic renewal, the terms of service and privacy policy." *Id.* The text appears in black, except the phrases "terms of service" and "privacy policy" appear in orange to connote that they are hyperlinks. *Id.* When the "terms of service" hyperlink is clicked, Crafty's terms of service are displayed. *Id.* Those terms include an arbitration agreement found in a section labeled "Arbitration Notice and Class Action Waiver." *Id.* ¶ 10, Ex. 1.

Craftsy thus uses what the Eighth Circuit has called a "browsewrap" arrangement in attempting to create arbitration agreements with new subscribers.[5] As a general matter, a new subscriber may assent to such an arbitration agreement after receiving either actual notice or inquiry notice. *Foster*, 15 F.4th at 863–64. Actual notice occurs when a "user is actually aware of the terms of use, most commonly after clicking on a hyperlink and reviewing [those terms]." *Id.* at 863 (citation omitted). Inquiry notice occurs when the terms of use are "reasonably conspicuous"; if they are, "then the user is deemed to have notice of all facts that reasonable inquiry would disclose, including the terms themselves." *Id. at* 864 (quotations omitted).

---

[5]"A 'browsewrap' arrangement . . . imputes assent through the user's performance of some specific act—here, using or accessing Walmart's website. In this scenario, no other affirmative action is required, meaning that users are never asked if they agree to the terms and conditions. The terms themselves are also usually provided through a hyperlink rather than directly to the user." *Foster*, 15 F.4th at 863 (quotations omitted, cleaned up).

When there is no dispute that a user was actually aware of the terms of the arbitration agreement when she did something (such as complete an order) that was defined as acceptance of the agreement, a court will usually compel arbitration. *Id.* at 863–64 (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014)). But "[w]here a user does not click on the hyperlink [to the relevant terms of service] and is not required to click a button showing assent, the question becomes whether the user had inquiry notice sufficient to form a contract." *Ballou*, 46 F.4th at 861 (citing *Foster*, 15 F.4th at 863). Courts engage in a fact-intensive analysis to determine if a user was on inquiry notice, taking into account the "website's overall design and content" and "whether the existence of the relevant terms are reasonably conspicuous to the user." *Id.* (quoting *Foster*, 15 F.4th at 864).

Here, there are genuine issues of material fact about what was actually displayed to plaintiffs on the Craftsy website and what each plaintiff actually saw (i.e, which hyperlinks, if any, each plaintiff clicked). It is undisputed that Craftsy's subscription page included a "terms of service" hyperlink below a "complete order" button. *See generally* Young Decl.; McNaughton Decl. It is also undisputed that clicking on this hyperlink opened a list of terms including an "Arbitration Notice and Class Action Waiver." *Id.* But that is where the agreement ends.

Both parties submit contradictory declarations about what each plaintiff would have seen on her screen when subscribing. *E.g.*, Young Decl.; McNaughton Decl. Jay McNaughton, Craftsy's Chief Marketing Officer, submits a screenshot of what he alleges every plaintiff would have seen when subscribing to Craftsy:



McNaughton Decl. ¶ 8. Craftsy contends that McNaughton's evidence is sufficient to establish that plaintiffs had inquiry notice of the arbitration agreement. Def.'s Mem. at 5–8, 25; Def.'s Reply at 11–15. In Craftsy's view, because plaintiffs "do not deny seeing the language relating to the terms of service, nor do they deny that they clicked the hyperlink to the terms of service," the Court must compel arbitration. Def.'s Reply at 13.

Plaintiffs disagree. Pl.'s Opp. at 27–32. Plaintiffs argue that by "consciously limiting its presentation to a zoomed in payment interface" (rather than providing

evidence of the entire webpage), Craftsy fails to meet its burden of showing that plaintiffs were on inquiry notice. *Id.* at 30–31. Thus, plaintiffs argue, the Court should deny Craftsy's motion "on that basis alone." *Id.* at 31. Moreover, instead of presenting a single screenshot as Craftsy does, plaintiffs submit several screenshots purporting to show various screens that various plaintiffs would have seen on various devices (e.g., iPhone, Android, or PC laptop). *Id.* at 34, 41, 43, 44, 46, 49, 51. Plaintiffs contend that their screens would not have displayed the hyperlink until plaintiffs had entered their financial information and were ready to click on "complete order," undermining the opportunity to view and engage with the terms. *E.g.*, *id.* at 38–40, 45–47, 50–51.

Critically, all allegations are supported by expert descriptions of what plaintiffs *would have seen*. But the record contains no testimony from any plaintiff about what she *actually saw*. Given the material facts missing from the record, and given the conflicting nature of the material facts included in the record, the Court cannot now determine as a matter of law that mutual assent did or did not exist. *Cf. Foster*, 15 F.4th at 865 (remanding for trial on validity of an arbitration agreement when "without more information [in the record], [the court was] left to guess" whether plaintiffs actually used or accessed a website).

Accordingly, the Court will give the parties 90 days to conduct discovery on the issue of whether plaintiffs are bound by a valid arbitration agreement. In so doing, the

Court follows the lead of other courts that have allowed limited discovery regarding the existence and validity of an arbitration agreement before either ruling on a motion to compel arbitration or proceeding to trial on the issue.[6] Following this discovery period, Craftsy may renew its motion to compel arbitration and motion to dismiss for failure to state a claim.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.   Defendant's motion to dismiss [ECF No. 17] is DENIED as follows:

a.   Defendant's motion to dismiss for lack of standing under Fed. R. Civ. P. 12(b)(1) is DENIED.

b.   Defendant's motion to compel arbitration is DENIED WITHOUT PREJUDICE.

---

[6]*See, e.g., Air-Con, Inc. v. Daikin Applied Latin Am., LLC,* 21 F.4th 168, 175–76 (1st Cir. 2021); *Boykin v. Family Dollar Stores of Mich., LLC,* 3 F.4th 832, 841 (6th Cir. 2021); *Guidotti v. Legal Helpers Debt Resol., LLC,* 716 F.3d 764, 774–76 (3d. Cir. 2013); *Traylor v. I.C. Sys., Inc.,* No. 11-CV-2968 (DWF/SER), 2012 WL 1883814, at *2, *4 (D. Minn. May 22, 2012) (allowing "very limited discovery" into "whether [p]laintiff agreed to the arbitration provision via the online application process"); *Barclay v. ICON Health & Fitness, Inc.,* No. 19-CV-2970 (ECT/DTS), 2020 WL 6083704, at *12 (D. Minn. Oct. 15, 2020) ("[C]ourts may order limited discovery relevant to determining whether the parties agreed to arbitrate." (citing *Traylor,* 2012 WL 1883814, at *4)).

c.  Defendant's motion to dismiss for failure to state a claim under

Fed. R. Civ. P. 12(b)(6) is DENIED WITHOUT PREJUDICE.

2.  The parties may, for a period of 90 days, engage in discovery limited to

the issue of whether plaintiffs are bound by a valid arbitration agreement.

Dated: March 24, 2026

/s/ Patrick J. Schiltz
Patrick J. Schiltz, Chief Judge
United States District Court